ACCEPTED
03-15-00285-CV
6511633
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/14/2015 4:55:21 PM
JEFFREY D. KYLE
CLERK

# NO. 03-15-00285-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/14/2015 4:55:21 PM
JEFFREY D. KYLE
Clerk

## IN THE THIRD COURT OF APPEALS
## AUSTIN, TEXAS

### VOLKSWAGEN GROUP OF AMERICA, INC. AND AUDI OF AMERICA, INC.,

*Appellants*,

*v.*

### JOHN WALKER III, *ET AL.*

*Appellees*.

On Appeal from the 201st Judicial District Court, Travis County, Texas
Honorable Amy Clark Meachum, Presiding Judge

### INTERVENORS' BRIEF ON APPEAL

Wm. R. Crocker
State Bar No. 05091000
807 Brazos, Suite 1014
Austin, Texas 78767
Telephone: (512) 478-5611
Facsimile: (512) 474-2540
Email: crockerlaw@earthlink.net

ATTORNEY FOR
INTERVENOR/APPELLEE
BUDGET LEASING, INC. D/B/A
AUDI NORTH AUSTIN AND AUDI
SOUTH AUSTIN

J. Bruce Bennett
State Bar No. 0214550
CARDWELL, HART & BENNETT, LLP
807 Brazos, Suite 1001
Austin, Texas 78701
Telephone: (512) 322-0011
Facsimile: (512) 322-0808
Email: jbb.chblaw@sbcglobal.net

ATTORNEY FOR
INTERVENORS/APPELLEES
RICARDO M. WEITZ, HI TECH
IMPORTS NORTH, LLC, HI TECH
IMPORTS SOUTH, LLC, AND HI
TECH IMPORTS, LLC

## IDENTITY OF PARTIES AND COUNSEL

Appellants                    *Volkswagen Group of America, Inc. and Audi of America, Inc. (hereinafter "Audi" Or "Appellants")*

                            Represented By:

                            S. Shawn Stephens
                            Texas Bar No. 19160060
                            James P. Sullivan
                            Texas Bar No. 24070702
                            KING & SPALDING
                            1100 Louisiana, Suite 4000
                            Houston, Texas 77002
                            Tel: (713) 751-3200
                            Fax: (713) 751-3290

                                  Lead Appellate Counsel

                            Billy M. Donley
                            Texas Bar No. 05977085
                            Mark E. Smith
                            Texas Bar No. 24070639
                            BAKER & HOSTETLER LLP
                            811 Main Street, Suite 1100
                            Houston, Texas 77002
                            Tel: (713) 751-1600
                            Fax: (713) 751-1717
                            bdonley@bakerlaw.com
                            mesmith@bakerlaw.com

                                Trial and Appellate Counsel

Appellees/Defendants     *The Honorable Michael J. O'Malley and Penny A. Wilkov (the "ALJs")*

                            Represented By:

                            Kimberly Fuchs

Texas Bar No. 24044140
Chief, Open Records Litigation
Administrative Law Division
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel: (512) 475-4195
Fax: (512) 320-0167
kimberly.fuchs@texasattorneygeneral.gov

Trial and Appellate Counsel

**Chairman John H. Walker, III (the "Chairman" or "Walker")**

Represented By:

Dennis McKinney
Texas Bar No. 13719300
Assistant Attorney General
Office of the Attorney General of Texas
Administrative Law Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel: (512) 475-4020
Fax: (512) 320-0167
dennis.mckinney@texasattorneygeneral.gov

Trial and Appellate Counsel

Appellees/Intervenors    **Budget Leasing, Inc. d/b/a Audi North Austin and Audi South Austin ("Budget")**

Represented By:

Wm. R. Crocker
Texas Bar No. 05091000
807 Brazos, Suite 1014
Austin, Texas 78767
Tel: (512) 478-5611

Fax: (512) 474-2540

crockerlaw@earthlink.net

Trial and Appellate Counsel

***Ricardo M. Weitz ("Weitz"), Hi Tech Imports, LLC ("Imports"), Hi Tech Imports North, LLC ("North"), and Hi Tech Imports South, LLC ("South" and, together with Weitz, North, and South, the "Weitz Group")***

Represented By:

J. Bruce Bennett
Texas Bar No. 0214550
Leon V. Komkov
Texas Bar No. 11670500
CARDWELL, HART & BENNETT, LLP
807 Brazos, Suite 1001
Austin, Texas 78701
Tel: (512) 322-0011
Fax: (512) 322-0808
jbb.chblaw@sbcglobal.net
lvk@longroadllc.com

Trial and Appellate Counsel

Joseph W. Letzer
Texas Bar No. 24030763
Dent M. Morton
Texas Bar No. 24056645
BURR & FORMAN, LLP
420 20th Street N, Suite 3400
Birmingham, AL 35203-5210
Tel: (205) 251-3000
Fax: (205) 458-5100
jletzer@burr.com
dmorton@burr.com

Trial and Appellate Counsel

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................ i

TABLE OF CONTENTS.............................................................................. iv

INDEX OF AUTHORITIES......................................................................... vi

STATEMENT OF THE CASE...................................................................... xi

STATEMENT REGARDING ORAL ARGUMENT ....................................... xiii

ISSUES PRESENTED............................................................................... xiv

STATEMENT OF FACTS ...........................................................................1

    I.     Preliminary Matter. ......................................................................1

    II.    Parties. ........................................................................................1

    III.   The Protest....................................................................................3

    IV.   Post-PFD Board Proceedings.........................................................5

SUMMARY OF THE ARGUMENT ...............................................................11

ARGUMENT ............................................................................................16

    I.     This Court Should Affirm The District Court's Dismissal
         Because Of Audi's Failure To Exhaust Administrative
         Remedies. ...................................................................................16

         A.    The Board Has Exclusive Jurisdiction Over The
             Protest...............................................................................18

         B.    The "Without Jurisdiction" Exception To The
             Exhaustion Requirement Is Inapplicable. ...........................20

    II.    This Court Should Affirm The District Court's Dismissal
         Because Defendants Did Not "Exceed Their Powers." ...................25

         A.    The Legal Framework Applicable To The Protest. ..............25

         B.    Chairman Walker. ..............................................................27

i.     The Board had authority to remand the Protest to SOAH. ....................................................................28

ii.    The Board had the power and authority to order the ALJs to reopen the record.....................................32

iii.   The Board did not authorize the consideration of "untimely" evidence......................................................34

iv.   Nothing about the Remand Order violates the rules against "influencing" the ALJs. .........................36

    a.    The alleged "ex parte" communications issue has been waived by Audi and had no effect on the outcome of the remand vote........36

    b.    The Remand Order does not differ from Member Slovacek's motion. .............................38

    c.    The ALJs have remained fair and impartial.....40

C.    The ALJs Have Not Acted *Ultra Vires*..................................41

III.   This Court Should Affirm The District Court's Dismissal On The Basis Of Sovereign Immunity.......................................................43

IV.   This Court Should Affirm The District Court's Dismissal Because Audi Failed To Join The Board And/Or The Other Board Members. ..........................................................................................44

CONCLUSION ...............................................................................................47

# INDEX OF AUTHORITIES

## Cases

*Appraisal Review Bd. of Harris Cty. Appraisal Dist.*
*v. O'Connor & Assocs*, 267 S.W.3d 413
(Tex. App. – Houston [14th Dist.] 2008, no pet.) ........................ 17, 21, 46

*Black v. City of Kileen*,
78 S.W.3d 686 (Tex. App. – Austin 2002, pet. denied) ............................36

*Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd. of the Tex. Dept. of Transp.*,
179 S.W.3d 589 (Tex. App. – Austin 2005, pet. denied) ..........................19

*City of El Paso v. Heinrich*,
284 S.W.3d 366 (Tex. 2009) ...................................................... 23, 43, 46

*City of Houston v. Rhule*,
417 S.W.3d 440 (Tex. 2014) ...................................................... 16, 17, 46

*City of Houston v. Williams*,
99 S.W.3d 709
(Tex. App. – Houston [14th Dist.] 2003, no pet.) ........................ 17, 20, 46

*City of Sherman v. Pub. Util. Comm'n of Tex.*,
643 S.W.2d 681 (Tex. 1983) ...................................................... 22, 24, 46

*Coastal Habitat Alliance v. Pub. Util. Comm'n*,
294 S.W.3d 276 (Tex. App. – Austin, 2009, no pet.) ................................44

*Edwards v. City of Tomball*,
343 S.W.3d 213 (Tex. App. – Houston [14th Dist.] 2011, no pet.) ..........22

*Friends of Canyon Lake, Inc. v. Guadalupe-Blanco River Auth.*,
96 S.W.3d 519 (Tex. App. – Austin 2002, pet. denied) .................... 20, 22

*Gonzalez v. Tex. Educ. Ag.*,
882 S.W.2d 526 (Tex. App. – Austin 1994, no pet.).................... 20, 22, 24

*Layton v. City of Fort Worth*,
    No. 02-14-00084-CV, 2014 WL 6997350, at *6
    (Tex. App. – Fort Worth Dec. 11, 2014, no pet.) ......................................44

*Liberty Mut. Ins. Co. v. Griesing*,
    150 S.W.3d 640, 648 (Tex. App. – Austin 2004, pet. dism'd w.o.j.) .......31

*Lim v. Hall, D.C.*,
    No. 03-96-00530-CV, 1997 WL 366803, at *1
    (Tex. App. – Austin July 3, 1997, writ denied)..........................................34

*Lone Starr Multi Theatres, Inc. v. State*,
    922 S.W.2d 295 (Tex. App. – Austin 1996, no writ) ...............................45

*Mag-T, L.P. v. Travis Cent. Appraisal Dist.*,
    161 S.W.3d 617 (Tex. App. – Austin 2005, pet. denied)............. 17, 46, 47

*Montgomery Indep. Sch. Dist. v. Davis*,
    34 S.W.3d 559 (Tex. 2000) ......................................................................29

*Moreno v. State*,
    409 S.W.3d 723 (Tex. App. – Houston [1st Dist.] 2013, pet. refused).....36

*N. Alamo Water Supply Corp. v. Tex. Dept. of Health*,
    839 S.W.2d 455 (Tex. App. – Austin 1992, writ denied) .........................20

*Park v. Tex. Dept. of Health*,
    No. 04-97-00338-CV, 1998 WL 412436, at *1
    (Tex. App. – San Antonio July 22, 1998, no pet.)........................ 16, 17, 20

*Pearce v. City of Round Rock,* 992 S.W.2d 668
    (Tex. App. – Austin 1999, pet. denied) ....................................................45

*Reynolds v. Haws*,
    741 S.W.2d 582 (Tex. App. – Fort Worth 1987, writ denied) ..................45

*Scott v. Graham,*
    292 S.W.2d 324 (Tex. 1956) ....................................................................45

*Sw. Bell Tel., L.P. v. Emmett,*

459 S.W.3d 578 (Tex. 2015) ....................................................... 43, 46

*State v. Mid-South Pavers, Inc.*,
    246 S.W.3d 711 (Tex. App. – Austin 2008, pet. denied) .........................40

*Subaru of Am., Inc. v. David McDavid Nissan, Inc.*,
    84 S.W.3d 212 (Tex. 2002) ........................................................................19

*Tarrant Appraisal Dist. v. Moore*,
    845 S.W.2d 820 (Tex. 1993) ......................................................................27

*Tex. Nat. Res. Conservation Comm'n v. Sierra Club*,
    70 S.W.3d 809 (Tex. 2002) ........................................................................47

*Tex. State Bd. of Pub. Accountancy v. Bass*,
    366 S.W.3d 751 (Tex. App. – Austin 2012, no pet.)..................................30

*Westheimer Independent School District v. Brockette*,
    567 S.W.2d 780 (Tex. 1978) ......................................................................24

## Administrative Decisions

*All Points Inspection Servs., Inc. v. Navistar, Inc.*,
    MVD No. 08-0432 CAF/WI 362638, 2011 WL 1341523, at *1
    (Tex. St. Off. Admin. Hgs. Mar. 28, 2011) ...............................................30

*Appeal of Paris A. Mims, Jr.*,
    2004 WL 4172108, at *1
    (Tex. St. Off. Admin. Hgs. Sept. 2004).............................................. 30, 31

*In re Belinda Quintero Molina*,
    SOAH Docket No. 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
    (Tex. St. Off. Admin. Hgs. Feb. 28, 2012).................................................42

*In re Taxpayer No.: *** (CPA Hearing No. 107,108)*,
    SOAH Docket No. 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.26, 2014 WL 4694592, at *1
    (Tex. St. Off. Admin. Hgs. June 9, 2014) ..................................................42

*In re Taxpayer No.: *** (CPA Hearing No. 108,005)*,
    SOAH Docket No. 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.26, 2014 WL 4694594, at *1

(Tex. St. Off. Admin. Hgs. June 16, 2014) ................................................42

*In re Taxpayer No.: \*\*\* (Type: Motor Vehicle Gross Rental Receipts Tax/RDT)*,
Hearing Nos. 30,505, 32,656, 1997 WL 617908, at \*1
(Tex. Cptr. Pub. Acct. Sept. 23, 1997) .............................................. 34, 35

*In re Taxpayer No.: \*\*\* (Type: Sales and Use Tax)*,
Hearing No. 39,563, 2004 WL 3673564, at \*1
(Tex. Cptr. Pub. Acct. 2004) .......................................................35

*Petitioner v. Tax Division, Texas Comptroller of Public Accounts*,
SOAH Dkt. 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.26
(Tex. St. Off. Admin. Hgs. June 16, 2014) ................................................33

*Texas Comm'n on Law Enforcement v. Bush*,
SOAH Dkt. No. 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
(Tex. St. Off. Admin. Hgs. Feb. 27, 2013) ......................................... 32, 43

*Texas Dept. of Ins. v. Mondragon*,
SOAH Docket No. 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.C
(Tex. St. Off. Admin. Hgs. Oct. 23, 2014) ................................................42

*Tex. Dept. of Licensing and Regulation v. Drobot*,
SOAH Dkt. No. 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
(Tex. St. Off. Admin. Hgs. Apr. 11, 2014) ................................................33

*Texas Dept. of Licensing and Regulation v. Guerra*,
SOAH Dkt. No. 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.ACR
(Tex. St. Off. Admin. Hgs. June 5, 2013) ................................................33

## <u>Statutes</u>

Tex. Civ. Prac. & Rem. Code § 37.006(a) ...........................................45

Tex. Gov't Code § 2001.058 ................................................. 28, 29

Tex. Gov't Code § 2001.174 .............................................................21

Tex. Occ. Code § 2301.001 ................................................. 19, 25

Tex. Occ. Code § 2301.004 .............................................................. 18, 25

Tex. Occ. Code § 2301.151 ........................................................... 18, 19, 28

Tex. Occ. Code § 2301.153 ......................................................... 19, 26, 28, 29

Tex. Occ. Code § 2301.359 .......................................................... 5, 7, 18, 35

Tex. Occ. Code § 2301.360 ............................................................... *passim*

Tex. Occ. Code § 2301.458 ...................................................................18

Tex. Occ. Code § 2301.571 ...................................................................27

Tex. Occ. Code § 2301.702 ............................................................... 26, 29

Tex. Occ. Code § 2301.703 ...................................................................26

Tex. Occ. Code § 2301.704 ............................................................... 26, 41

Tex. Occ. Code § 2301.709 ............................................................... *passim*

Tex. Transp. Code § 1001.021(a) ..........................................................45

**Administrative Rules**

1 Tex. Admin. Code § 155.153(a)(4) ................................................... 32, 42

43 Tex. Admin. Code § 215.22(b) ..........................................................37

43 Tex. Admin. Code § 215.23(d) ...........................................................4

**Rules of Appellate Procedure**

Tex. R. App. P. 38.1(g) .......................................................................1

## STATEMENT OF THE CASE

Audi filed a lawsuit in the Travis County district court on March 25, 2015, seeking temporary, preliminary, and permanent injunctive relief against the Chairman of the Texas Department of Motor Vehicles Board (the "Board"), John H. Walker, III ("Chairman Walker"), and two administrative law judges employed by the State Office of Administrative Hearings ("SOAH"), Judges Michael J. O'Malley and Penny A. Wilkov (the "ALJs"). (Clerk's Record ("CR") at 117-148.) Audi's petition alleged that Chairman Walker acted *ultra vires* in authorizing, on behalf of the Board, the remand of a contested case proceeding to SOAH and that the ALJs were engaging in *ultra vires* acts by conducting the remand. (*Id.* at 136-147.)

Audi's Application for Temporary Restraining Order was denied on March 26, 2015.  (CR 713-714, 729-730.) On March 27, 2015, the parties adverse to Audi in the underlying contested case proceeding (the "Intervenors" in the district court) intervened in the lawsuit in support of Chairman Walker and the ALJs.  (CR 665-703.) In April 2015, Intervenors, Chairman Walker, and the ALJs each filed a plea to the jurisdiction, seeking dismissal of Audi's claims against Chairman Walker and the ALJs for lack of subject matter jurisdiction. (CR 731-774, CR 821-829, CR 836-843.)

On April 30, 2015, District Judge Meachum sustained Chairman Walker and the ALJs' pleas to the jurisdiction and dismissed Audi's case. (CR 2030-2031.) On May 8, 2015, Audi appealed to this Court. (CR 2030.) On June 15, 2015, Audi filed a Motion for Temporary Relief, which this Court denied on July 8, 2015.

## STATEMENT REGARDING ORAL ARGUMENT

Intervenors do not request oral argument. If, however, the Court decides to hear oral argument, then Intervenors request the opportunity to participate.

# ISSUES PRESENTED

I.    Whether Chairman Walker and/or the ALJs acted (or are acting) "without jurisdiction" or "wholly outside their jurisdiction" in authorizing and conducting, respectively, a limited remand of the contested case proceeding over which the Board has exclusive original jurisdiction such that Audi was excused from exhausting its administrative remedies.

II.    Whether Chairman Walker and/or the ALJs exceeded (or are exceeding) the powers or statutory authority provided to them by Chapter 2301 of the Transportation Code, Chapter 2001 of the Texas Government Code, and the administrative rules applicable to the Board and SOAH in authorizing and conducting, respectively, the limited remand of the contested case proceeding over which the Board has exclusive original jurisdiction.

III.    Whether Chairman Walker and/or the ALJs acted (or are acting) within their jurisdiction and within the scope of discretion afforded to them under the laws such that they are entitled to immunity from suit under well-recognized principles of governmental immunity.

IV.    Whether either the Board or the other Board members are indispensable parties to Audi's lawsuit because Audi is challenging an order entered by the Board, not just Chairman Walker, and the order being challenged was agreed upon by seven of the Board's members.

# STATEMENT OF FACTS

## I.  PRELIMINARY MATTER.

Audi's Statement of Facts, (Appellants' Brief (hereinafter "Audi's Br.") at pp. 1-7), is incomplete, argumentative, mischaracterizes events, and is otherwise not in compliance with the standards set forth in Tex. R. App. P. 38.1(g).[1] Intervenors do not accept (and urge the Court not to accept) any statement in Audi's factual statement as being true and correct unless corroborated by an accurate citation to admitted evidence.

## II.  PARTIES.

Audi of America, Inc. is a division of Volkswagen Group of America, Inc. (CR 119 at ¶ 6.) The plaintiff in the underlying lawsuit is Appellant Volkswagen Group of America, Inc. d/b/a Audi of America, Inc. ("Audi"). (*Id.*)

Appellee/Intervenor Budget Leasing, Inc. d/b/a Audi North Austin and Audi South Austin ("Budget") is the owner of, *inter alia*, two Audi dealerships, a Porsche dealership, and a Maserati dealership in Austin, Texas. (CR 1276 at Finding of Fact ("FOF") No. 11.)

In December 2012, Appellee/Intervenor Ricardo M. Weitz ("Weitz"), on behalf of himself and his assigns, entered into a Dealership Purchase Contract to

---

[1]  (*See, e.g.*, Audi's Br. at p. 4 n.4 (arguing that Intervenors are not proper parties to the contested case); 5 (arguing that the Board granted rehearing due to an *ex parte* communication); 7 (arguing that "[t]he court below erroneously dismissed the lawsuit….").)

1

buy Budget's Audi, Porsche, and Maserati dealerships. (CR 1276 at FOF Nos. 12, 13.)

Weitz formed Appellees/Intervenors Hi Tech Imports, LLC ("Imports"), Hi Tech Imports North, LLC ("North"), and Hi Tech Imports South, LLC ("South") to own the Porsche, Audi North, and Audi South dealerships, respectively. (CR 1276 at FOF Nos. 26, 27.) (Weitz, Imports, North, and South are hereinafter referred to as the "Weitz Group.")

After Audi rejected the Weitz Group's initial applications to buy Budget's Audi dealerships, Budget and the Weitz Group filed a statutorily authorized protest (the "Protest") with the Board.[2] (Reporter's Record ("RR") at Pl.'s Ex. 3.) The Board docketed the Protest as a contested case and referred the case to SOAH and the ALJs conducted the contested case proceeding. (*See generally* CR 1275 at FOF Nos. 3-10.)

Audi filed the lawsuit underlying this appeal on March 25, 2015, in response to a decision the Board made at its February 13, 2015 meeting. (CR 136-142.) Audi named Chairman Walker and the ALJs as defendants to the lawsuit. (CR 120 at ¶¶ 7-9.) Audi did not include as defendants any of the other Board members,

---

[2] The Protest was filed pursuant to Section 2301.360(a) of the Texas Occupations Code (sometimes referred to hereinafter as the "Code").

Budget, or any members of the Weitz Group. (*Id.*) Budget and the Weitz Group subsequently intervened in the lawsuit. (CR 665-703.)

## III. THE PROTEST.

On December 20, 2012, Budget notified Audi that it had entered into a Dealership Purchase Contract with Mr. Weitz. (CR 487 at FOF No. 17.) Thereafter, Weitz and his business partners, either personally or through their representatives, submitted a host of information to Audi required by Audi as part of the transfer application process. (CR 487-489 at FOF Nos. 18-19, 22-23, 38.)

On April 16, 2013, after stating that a "complete" application package had been received as of April 4, 2013, Audi rejected the Weitz Group's applications to approve transfer of the Audi dealer agreements for Audi North Austin and Audi South Austin. (*See generally* CR 489 at FOF Nos. 39-40; CR 1886 at ¶ 2.) Audi included a list of its alleged "material reasons for rejection" of the proposed transfer. (*Id.*)

Weitz sent a letter to Audi, dated April 30, 2013, stating that the proposed buyer agreed to be bound by the terms of the Audi franchise (hereinafter the "April 30th Letter"). (CR at 655.) On May 1, 2013, Weitz submitted two more packages of information to Audi (one from North and one from South). (CR 490 at FOF Nos. 41.)

On May 14, 2013, Budget and the Weitz Group filed a Protest of Rejection of Applications for Franchises, protesting the rejection of Budget's transfer of its Audi and Porsche dealerships to Weitz. (RR at Pl.'s Ex. 3; CR 1884-1887.) The Board referred the matter to SOAH for a contested case hearing. (CR 1879-1883.)

After Audi objected to the Weitz Group's participation in the Protest as "protestants," the members of the Weitz Group were permitted to realign themselves as "Intervenors." (RR at Pl.'s Ex. 4; CR 371-385.)[3]

In late February and early March, 2014, Audi, Budget, and the Weitz Group participated in a nine day hearing before the ALJs. (CR 486 at FOF No. 9.)

On July 16, 2014, the ALJs issued a proposal for decision (the "July 2014 PFD"). (RR at Pl.'s Ex. 8; CR 396-502.) In the July 2014 PFD, the ALJs found that Weitz, the buyer and intended manager of the dealerships, is "overly-qualified" to own Budget's Audi and Porsche dealerships, but that Weitz's primary business partner (anticipated to be the second largest owner of the dealerships' holding company) is "under-qualified." (CR 499.) Pursuant to Section 2301.360(d)

---

[3] In one of the many legal arguments in its Statement of Facts, Audi contends that the members of the Weitz Group were not "proper parties" to the Protest. (Audi's Br. at p. 4 n.4.) Judge O'Malley expressly found otherwise. (RR at Pl.'s Ex. 4.) In Order No. 3, noting that Weitz's interest in the Protest, which involves the denial or approval of his multi-million dollar transaction, is "great," Judge O'Malley held that the Weitz Group was entitled to intervene under Board Rule 215.23(d), which permits "any person" having an "interest in a proceeding" to "intervene and present any relevant and proper evidence, data, or argument bearing upon the issues involved in the particular proceeding." (*Id.* at p. 12.)

4

of the Code, the ALJs recommended conditions that would render the prospective transferees qualified under Section 2301.359 of the Code. (*Id.*)

The ALJs also found: 1) "[t]he DMV has jurisdiction...over the parties and the subject matter of this case"; and, 2) the Weitz Group had substantially complied with § 2301.359(c)(3) of the Code. (CR 413-415; CR 490 at FOF Nos. 43-46; CR 499 at Conclusion of Law ("COL") No. 1; CR 501 at COL Nos. 22-23.)

## IV. POST-PFD BOARD PROCEEDINGS.

After the July 2014 PFD was provided to the Board, the Weitz Group filed a Motion to Find the Prospective Transferees Qualified, asking the Board to determine that the Weitz Group had met the recommended conditions. (*See generally* RR at Pl.'s Ex. 16 (directing ALJs to consider said motion).)

The Protest came before the Board on September 12, 2014. At that time, the Board, in a 3 to 2 vote, voted to dismiss the Protest for "want of jurisdiction." (RR at Pl.'s Ex. 9; CR 972-973.) The Board found that the Code's notice provision, Tex. Occ. Code § 2301.359(c)(3), was "jurisdictional" and recommended dismissal because it could not find "the prospective transferee's written agreement to comply with the franchise" in the SOAH record. (*Id.*)

On October 2, 2014, Budget and the Weitz Group filed a Motion for Rehearing. (RR at Pl.'s Ex. 10.) The Texas Automobile Dealers' Association filed

5

an amicus brief in support of the Motion for Rehearing. (RR at Pl.'s Ex. 15 (noting that TADA filed an amicus brief).)

On October 13, 2014, Audi filed its opposition to the Motion for Rehearing. (RR at Pl.'s Ex. 11.)

On October 15, 2014, Budget and the Weitz Group filed a response in support of their Motion for Rehearing. (RR at Pl.'s Ex. 12.) Budget and the Weitz Group attached to the response the April 30th Letter from Weitz to Audi wherein Weitz, on behalf of himself and in his capacity as manager of North and South, agreed in writing to be bound by the terms of the Audi franchise. (CR at 655.)

While the rehearing briefing was ongoing, on October 10, 2014, Corbin Robertson III, a principal of one of Mr. Weitz's silent partners,[4] contacted a Board member, Laura Ryan, regarding the motion for rehearing. (RR at Pl.'s Ex. 13; CR 874.) On October 21, 2014, the Board's General Counsel, David Duncan, sent a letter to counsel for all parties disclosing (and providing a copy of) the exchange between Mr. Robertson and Ms. Ryan. (*Id.*)

On December 10, 2014, the Board voted to grant the Motion for Rehearing and entered an order stating: "[S]ubstantial controversies continue to exist and

---

[4] (CR 497 at FOF 30-31, 33, 128.)

[those] controversies require further adjudication within the contested case process." (RR at Pl.'s Ex. 15; CR 1120-1121.)[5]

The Board considered the Protest again on February 13, 2015. (*See generally* CR 910-926.) The Board's staff recommended that the Board remand the case to SOAH so that SOAH could make findings of fact and conclusions of law concerning Weitz's April 30th Letter and its effect on the issue of compliance with Tex. Occ. Code § 2301.359(c)(3). (*Id.*)

At the Board's hearing, the Board's general counsel, David Duncan, explained to the Board that, after it had dismissed the Protest, "the staff…received a copy of a document, [the April 30th Letter], that may satisfy the statutory requirement that was discussed in the September board meeting. Because that item is clearly missing from the SOAH record, it's the staff's position that the most appropriate outcome is to remand the matter to SOAH so that the document can be considered by the SOAH judges." (CR 914.)[6]

After Mr. Duncan finished speaking, the following exchange occurred:

**Mr. Slovacek:** What is the staff's recommendation?

**Mr. Duncan:** To remand to SOAH to consider the document that we received in the period between the board's last action and today.

---

[5] Laura Ryan, the Board member contacted by Mr. Robertson, abstained from voting on the Motion for Rehearing.

[6] The Board acknowledged at the February 13th meeting that the Board has "always had jurisdiction over this matter." (RR at Pl.'s Ex. 18, p. 12; CR 913.)

7

**Mr. Slovacek:** Mr. Chairman, I make a motion that we remand to SOAH, for the reasons outlined by Mr. Duncan, this entire case, for all the reasons set forth, to determine whether the intervenors have, in fact, satisfied the conditions of the proposal for decision.

**Mr. Palacios:** I second the motion.

(CR 915.)

Before the Board voted on the motion, the Board allowed counsel for the parties to the Protest to speak on the subject. (CR 915-923.) Audi's counsel argued, *inter alia*, that it would be improper to remand the case to SOAH because SOAH could not reopen the record to consider the April 30th Letter and that the Board lacked the authority to consider the April 30th Letter because it was not "timely" submitted. (*Id.*) Audi's counsel did not argue that the alleged ex parte communication had affected the vote on the Motion for Rehearing or was a reason not to remand the matter to SOAH. (*Id.*)

The seven Board members present then voted,[7] unanimously, to remand the Protest to SOAH. (RR at Pl.'s Ex. 16; CR 7-38.) The Board's "Interim Remand Order" stated:

The Board remands this matter to [SOAH] for supplemental proceedings, limited to the following:

Did Audi receive the letter dated April 30, 2013, from Ricardo M. Weitz to Sally Grimes, and should this letter be added to the record? If so, what effect, if any, does the letter have on the issue of compliance

---

[7] Laura Ryan was not present at the February 13th meeting and did not participate in the vote recommending the Remand.

8

with Texas Occupations Code § 2301.359 in light of the prior decision in *Gordon Rountree Motors, Ltd. v. Mazda Motors of America*, MVD Docket No. 07-0038 (May 4, 2010)?

While adjudicating this case on remand, SOAH is also directed to review the qualifying conditions set forth in Findings of Fact Nos. 154-158, Intervenors' Motion to Find the Prospective Transferees Qualified, and Volkswagen Group of America, Inc. & Audi of America, Inc.'s Response to Intervenors' Motion to Find the Prospective Transferees Qualified. At the conclusion of this review, SOAH is directed to provide a specific finding that the prospective transferees either are qualified or are not qualified.

(RR at Pl.'s Ex. 16.)

On February 20, 2015, Audi filed a motion with the ALJs asking them to send the Protest back to the Board. (CR 172-182.) Audi challenged the Board's authority to remand the Protest to SOAH, the ALJs' authority to reopen the record, and the ALJs' authority to issue a proposal for decision on remand. (*Id. See also* RR at Pl.'s Ex. 19.) The ALJs denied that motion on March 4, 2015. (RR at Pl.'s Ex. 29.)

On March 16, 2015, Audi filed an Emergency Motion to Vacate or Modify Statutory Stay and to Stay Further Proceedings (the "Emergency Motion to Stay") with the ALJs. (RR at Pl.'s Ex. 2; CR 1868-1878.) Audi reasserted its belief that the Board's remand and the reopening of the record were acts outside the Board's and the ALJs' statutory authority. (*Id.*) Audi sought a stay of the remand proceedings so that it could "expeditiously file a petition in the Travis County district court" to address the purported *ultra vires* acts of the Board and SOAH.

9

(*Id.*) Audi attached a draft of its district court petition as an exhibit to its Emergency Motion to Stay. (CR 1909-1939.) On March 19, 2015, the ALJs denied the Emergency Motion to Stay. (RR at Pl.'s Ex. 25; CR 1943-1945.)

On March 25, 2015, Audi filed the lawsuit underlying this appeal. (CR 117-151.) Chairman Walker, the ALJs, and Budget and the Weitz Group filed pleas to the jurisdiction, seeking dismissal of Audi's claims for lack of subject matter jurisdiction. (CR 731-774.) On April 30, 2013, District Judge Meachum sustained Chairman Walker and the ALJs' pleas to the jurisdiction and dismissed Audi's case. (CR 2030-2031.) This appeal arises from that dismissal. (CR 2030.)

In the meantime, beginning April 16, 2015, the ALJs held a two-day hearing on the remanded issues. (CR 1980.) Audi participated in the hearing, cross-examining the witnesses called by Budget and the Weitz Group, calling three witnesses of its own, introducing exhibits into evidence, and presenting argument on evidentiary and other legal issues. Audi subsequently filed both a post-hearing brief and a reply to the Weitz Group's post-hearing brief. The ALJs closed the record on Remand on June 16, 2015 and, on August 13, 2015, issued their second proposal for decision.[8]

---

[8] Pursuant to Tex. R. Evid. 201(b)(2), Intervenors request the Court to take judicial notice of the ALJs' second proposal for decision, which is attached to Intervenors' Appendix at Tab 1 and can be found on SOAH's public website: https://cis.soah.state.tx.us/dmwebbasic?WCI=API&J3G0nF1LfcOS0QXdMTy6vhVx1B8nLm2+FlDSScMeKoN0rZ3HrCVdArVTCR2G/AN8lX8Dn0GqhYoInSRd1k32Kg== (last accessed

10

## SUMMARY OF THE ARGUMENT

The essence of Audi's lawsuit is that the Board did not have the authority to order a limited purpose remand of a contested case proceeding to SOAH and that the ALJs do not have the authority to conduct a limited purpose remand ordered by the Board. The Travis County District Court properly dismissed Audi's lawsuit and its judgment is due to be affirmed for at least four reasons.

**First**, the district court's dismissal should be affirmed because Audi failed to exhaust its administrative remedies before the Board and, therefore, the district court lacked subject matter jurisdiction. The Board has exclusive original jurisdiction over protests filed pursuant to Tex. Occ. Code § 2301.360, which means that Audi was required to exhaust its administrative remedies before the Board prior to seeking relief from the state court. Because of the Board's undisputed exclusive original jurisdiction over the underlying contested case proceeding and the undisputed fact that Audi has not exhausted its remedies before the Board, this case falls squarely within those cases that are dismissed due to lack of subject matter jurisdiction.

---

Aug. 13, 2015). Judicial notice of another court's records may properly be taken for the first time on appeal as long as the appellate court is provided with proof of the record. *Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex.*, 878 S.W.2d 598 (Tex. 1994) (holding appellate court erred in failing to take judicial notice of agency order relevant to appeal); *Healthtronics, Inc. v. Lisa Laser USA, Inc.*, 382 S.W.3d 567, 576 n.2 (Tex. App. Austin 2012) (taking judicial notice of verdict form, final judgment, and post-trial order in related California case); *In re Anthony Sheridan*, 2014 WL 6140078, at *2 n.2 (Tex. App. – Austin Nov. 14, 2014) (taking judicial notice of record in prior, related appeal and drawing facts from that record where record in current proceeding "provide[d] a less-than-complete procedural background").

Relying on a fundamental misconception of one of the exceptions to the exhaustion requirement, Audi tries to salvage its lawsuit by arguing that Chairman Walker and the ALJs are acting *ultra vires* and, therefore, Audi is excused from exhausting its administrative remedies before the Board. The exception that Audi seeks to take advantage of applies when an administrative agency acts "without jurisdiction," not when a party to an administrative proceeding contends that the agency made a wrong decision about the law or failed to comply with the administrative process. If Audi's interpretation of the narrow exception were correct, then every frustrated party to an administrative proceeding would be excused from exhausting its administrative remedies and the exception would swallow the rule.

Because Audi has never disputed (and cannot dispute) that the Board has exclusive original jurisdiction over the underlying protest and the "without jurisdiction" exception is inapplicable, Audi is required to exhaust its administrative remedies before seeking judicial review and relief from the state courts. Audi's lawsuit was properly dismissed.

**Second**, although the first argument is dispositive of this appeal and the Court need go no further in analyzing the issues on appeal, the dismissal is also due to be affirmed because neither Chairman Walker nor either of the ALJs has exceeded his or her powers or authority. There are few, if any, administrative

12

agencies within the State of Texas that are given the broad powers, authority, and jurisdiction given to the Board. "Notwithstanding any other provision of the law," the Board has "all powers necessary, incidental, or convenient to" the discharge of the duties given to it in Chapter 2301 of the Texas Occupations Code, including its duty to decide disputes between franchised dealers and manufacturers. Further, when reviewing cases arising under Chapter 2301, the Board is authorized to take "any further action" conducive to the issuance of a final order. Chapter 2301 bestows upon the ALJs all of the Board's powers with the exception of the authority to issue a final order.

Despite the Board's extensive powers, Audi contends that the Board does not have authority to remand a case to SOAH for further fact finding and that the ALJs do not have the authority to issue an amended proposal for decision (even if ordered to do so by the referring agency). Significantly, Audi cites no case, statute or authoritative source for the general proposition that a remand is unauthorized in the absence of express "remand" language in an agency's enabling statute or for the specific proposition that the Board cannot remand a case to SOAH for further fact finding. Audi also does not cite any cases, statutes, or authoritative sources for the contention that an ALJ cannot reopen evidence and issue a new proposal for decision if ordered to do so by a referring agency. In fact, ALJs frequently entertain remands from referring agencies.

13

Audi is incorrect that the Administrative Procedure Act is the "sole source" of the Board's authority when reviewing a proposal for decision. The Texas Occupations Code plainly grants the Board the power to take "any further action" conducive to the issuance of a final order; that power, which does not appear in any other agency's enabling statute, allows the Board to remand a contested case proceeding to SOAH for the consideration of new evidence and additional fact finding. The Texas Occupations Code also states that, in the event of a conflict between the APA and Chapter 2301 of the Code, Chapter 2301 controls.

Audi's "hail Mary" argument that Chairman Walker interfered with the neutral decision-making process in authorizing a limited remand is a scurrilous argument unsupported by any evidence. The argument is premised on an alleged *ex parte* communication (not made to Chairman Walker) that occurred four months before the Board voted on the rehearing. That communication was fully disclosed to all counsel of record which, under the applicable Board rule, cured any purported effect of the communication, and the Board member who received the communication was not even at the meeting where the Board authorized the remand. More importantly, there is no evidence that any Board member was influenced by the communication in any way.

The argument is also based on the insupportable contention that the Board has tried to influence the ALJs. That contention is completely unsupported by the

record. There is no evidence that any of the Board members, including Chairman Walker, has communicated with either of the ALJs and the Board's remand order contains no suggestive language or recommendations for how the Board thinks the ALJs should find. It merely asks the ALJs to consider and decide certain issues.

Audi perceives the Board's authorization of a remand to be unfavorable and, in an effort to halt it, Audi has concocted any argument it can conceive of to defeat actions taken in the proper exercise of the Board's discretion. None of those arguments is persuasive or factually supported and this Court should affirm the district court's dismissal.

**Third**, the district court properly dismissed Audi's lawsuit because Chairman Walker and the ALJs are protected by the doctrine of governmental immunity. Agency officials performing discretionary acts within the scope of their statutory or constitutional authority are immune from suit for those actions. Audi's argument that Chairman Walker and the ALJs are acting *ultra vires* and are not immune from suit is unavailing. The Board has broad and extensive powers and the ALJs have all of the Board's powers except the power to issue a final order. Nothing that the Board has done or is doing was *ultra vires* and, therefore, nothing that the ALJs have done or are doing is *ultra vires*.

**Fourth**, the district court's dismissal should be affirmed because of Audi's failure to join the Board and/or the seven other Board members who voted in favor

15

of the remand. Chairman Walker is not the Board; he is one of nine members of the Board. Audi is seeking premature judicial review of an action of the Board and, therefore, the Board is a necessary and indispensable party to Audi's lawsuit. Assuming, *arguendo*, that the Board is not an indispensable party because Audi has alleged that certain actions were taken *ultra vires*, then the other Board members who voted for the remand are indispensable parties. Either way, Audi's lawsuit properly was dismissed.

## ARGUMENT

**I.     THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S DISMISSAL BECAUSE OF AUDI'S FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES.**

"When the Legislature grants an administrative agency sole authority to make an initial determination in a dispute, agency jurisdiction is exclusive. A party then must exhaust its administrative remedies before seeking recourse through judicial review." *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2014). "[T]h[e exhaustion] doctrine prevents parties from seeking redress from courts before an administrative process runs its statutorily-created course." *Park v. Tex. Dept. of Health*, 1998 WL 412436, at *1 (Tex. App. – San Antonio 1998, no pet.). "Absent exhaustion of administrative remedies, a trial court **must** dismiss the case." *Rhule*, 417 S.W.3d at 443 (emphasis added) (dismissing case due to plaintiff's failure to first exhaust administrative remedies).

16

This Court routinely affirms or orders the dismissal of cases in which it is apparent from the face of the pleadings that a plaintiff has not exhausted his or her administrative remedies. *See*, *e.g.*, *Mag-T, L.P. v. Travis Cent. Appraisal Dist.*, 161 S.W.3d 617 (Tex. App. – Austin 2005, pet. denied) (affirming dismissal for lack of jurisdiction). *See also Rhule*, 417 S.W.3d 440 (reversing judgment for claimant and rendering dismissal for city where claimant failed to exhaust administrative remedies); *Appraisal Review Bd. of Harris Cty. Appraisal Dist. v. O'Connor & Assocs.*, 267 S.W.3d 413 (Tex. App. – Houston [14th Dist.] 2008, no pet.) (reversing denial of plea to the jurisdiction where taxpayers failed to exhaust administrative remedies); *City of Houston v. Williams*, 99 S.W.3d 709 (Tex. App. – Houston [14th Dist.] 2003, no pet.) (reversing denial of City of Houston's plea to the jurisdiction and holding that firefighter was required to exhaust administrative remedies prior to judicial review); *Park*, 1998 WL 412436, at *1 (affirming trial court's dismissal).

The Board's jurisdiction over the underlying Protest is "exclusive." None of the narrow exceptions to the exhaustion requirement applies in this case. Audi's failure to exhaust its administrative remedies before seeking judicial review of an interlocutory order with the district court required the district court to dismiss Audi's case.

**A.** **The Board Has Exclusive Jurisdiction Over The Protest.**

Tex. Occ. Code § 2301.151 sets forth the jurisdiction and the authority of the Board:

> (a) The board has the **exclusive original jurisdiction** to regulate those aspects of the distribution, sale, or lease of motor vehicles that are governed by this chapter, including the original jurisdiction to determine its own jurisdiction.
>
> (b) The board may take any action that is specifically designated or implied under this chapter or that is necessary or convenient to the exercise of the power and jurisdiction granted under Subsection (a).

(emphasis added).

One matter falling squarely within that grant of exclusive original jurisdiction is the regulation of a franchised dealer's right and ability to sell its dealerships to a person or persons of its own choosing. *See* Tex. Occ. Code §§ 2301.004, 2301.359, 2301.360, 2301.458. If a manufacturer or distributor rejects a selling dealer's proposed buyer, the dealer may "protest" the rejection with the Board. *Id.* at § 2301.360. In the event of a protest, Tex. Occ. Code § 2301.360(b) charges the Board with determining "whether the rejection was reasonable" under criteria described in Tex. Occ. Code § 2301.359.

Not only does the Board have "exclusive original jurisdiction" over such matters, but the legislature also provided the Board with the power to determine its own jurisdiction in the first instance and the power to take **any action** – specifically designated, implied, necessary, or convenient – to the Board's exercise

18

of its jurisdiction. Tex. Occ. Code § 2301.151(b). Where, as here, the Board is discharging a duty expressly set forth in Chapter 2301, the legislature went further, giving the Board "all powers necessary, incidental, or convenient to" the discharge of that duty, "**[n]otwithstanding any other provision of law**." *Id.* at § 2301.153(a). The clear language of Chapter 2301, especially when coupled with the legislative mandate that the Chapter "shall be liberally construed," *id.* at § 2301.001, shows the legislature's intent for the Board's jurisdiction over motor vehicle issues to be plenary and broad.

This Court has so held, stating that "the Board has broad and exclusive jurisdiction to regulate the distribution, sale, or lease of motor vehicles." *Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd. of the Tex. Dept. of Transp.*, 179 S.W.3d 589 (Tex. App. – Austin 2005, pet. denied). The Supreme Court agrees. *See Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 223 (Tex. 2002) (holding that the Board has "exclusive jurisdiction over claims and issues the [Texas Occupations] Code governs.").

Audi does not (and cannot) contend that the Board lacks exclusive original jurisdiction over the Protest. Nor does Audi argue it has exhausted its administrative remedies with the Board. Instead, Audi argues, incorrectly, that it should be exempted from exhausting its remedies because of the "without jurisdiction" or *ultra vires* exception to the exhaustion doctrine.

**B.** **The "Without Jurisdiction" Exception To The Exhaustion Requirement Is Inapplicable.**

One recognized exception to the exhaustion requirement is when an administrative agency acts "without jurisdiction." *Park*, 1998 WL 412436, at *2. However, "the mere claim that an administrative agency acted 'ultra vires' does not authorize litigation before administrative remedies are exhausted…." *Park* at *2. *See also Williams*, 99 S.W.3d at 717. Instead, a litigant seeking to avoid the exhaustion requirement must allege that the administrative agency "**acted wholly outside its jurisdiction.**" *Friends of Canyon Lake, Inc. v. Guadalupe-Blanco River Auth.*, 96 S.W.3d 519, 528 (Tex. App. – Austin 2002, pet. denied) (emphasis added) (litigant's contention that the administrative agency "exercised authority beyond that conferred by the legislature" was insufficient to avoid exhaustion doctrine).

A litigant is not excused from exhausting administrative remedies merely because an agency "may have made an incorrect decision about the law" or "exceeded its statutory authority by acting wrongfully in some fashion." *Gonzalez v. Tex. Educ. Ag.*, 882 S.W.2d 526 (Tex. App. – Austin 1994, no pet.). *See N. Alamo Water Supply Corp. v. Tex. Dept. of Health*, 839 S.W.2d 455, 459 (Tex. App. – Austin 1992, writ denied) ("The fact that the [agency] may decide 'wrongly' in the eyes of an opposing party does not vitiate the agency's decision to make an initial decision."). Further, a claim that an administrative agency or actor

"fail[ed] to perfectly comply with all of the intricacies of the administrative process [does not] necessarily constitute extra-judicial action by an agency." *O'Connor & Assocs.*, 267 S.W.3d at 419.

The Administrative Procedure Act ("APA") specifically provides that, on judicial review, a court "shall reverse or remand a case" if the appellant's rights are prejudiced by "findings, inferences, conclusions, or decisions" of an administrative agency that are "in violation of a constitutional or statutory provision; (B) in excess of the agency's statutory authority; (C) made through unlawful procedure; (D) affected by other error of law;…or (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Tex. Gov't Code § 2001.174. That language demonstrates that claims that an agency exceeded its authority or discretion or did not follow proper procedures are to be heard during the statutorily authorized judicial review process - not during the pendency of an ongoing contested case proceeding.

Here, Audi is **not** complaining that Chairman Walker and the ALJs acted "without" or "wholly outside" their jurisdiction. Audi never has disputed the Board's subject matter jurisdiction over the Protest. Instead, Audi contends only that Chairman Walker and the ALJs "exceeded their authority," (Audi's Br. at p. 15), and acted "beyond [their] statutorily conferred powers." (*Id.* at p. 16.) Those allegations are insufficient, as a matter of law, to permit Audi to avoid exhausting

21

its administrative remedies with the Board before seeking judicial review. *Compare City of Sherman v. Pub. Util. Comm'n of Tex.*, 643 S.W.2d 681, 685 (Tex. 1983) (municipally-owned utility not required to exhaust remedies before the Public Utilities Commission because agency "ha[d] no statutory authority to regulate the operations or services of 'municipally-owned utilities'") *with Friends of Canyon Lake, Inc.*, 96 S.W.3d at 528 (contention that the administrative agency "exercised authority beyond that conferred by the legislature" was insufficient to avoid exhaustion doctrine). *See also Edwards v. City of Tomball*, 343 S.W.3d 213 (Tex. App. – Houston [14th Dist.] 2011, no pet.) (agency's actions allegedly taken in violation of statute did not excuse plaintiff from exhausting administrative remedies).

If a litigant could avoid the exhaustion doctrine to seek immediate judicial review of an interlocutory agency ruling, order, or decision every time the litigant contended that the agency exceeded its authority, acted wrongfully, or violated a statutory provision, "the exception would swallow the rule because the legislature has never statutorily authorized state agencies to act inconsistent[ly] with the law." *Gonzalez*, 882 S.W.2d at 528. Every error (or alleged error) committed by an agency in interpreting the scope of its statutory authority – even those errors committed in dealing with a matter clearly within its jurisdiction – would result in a void act. Agency members and administrative law judges would be exposed to

individual and official liability and agency orders would be subject to immediate judicial review without awaiting the issuance of a final order and exhaustion of administrative remedies. Texas courts and Travis County district courts would be swamped with declaratory judgment and injunction actions against state agency officials and SOAH judges.

Audi relies upon *City of El Paso v. Heinrich*, 284 S.W.3d 366 (Tex. 2009). Audi cites *Heinrich* for the proposition that the exhaustion of remedies doctrine does not apply when government officials' actions are "ultra vires," (Audi's Br. at p. 9), and for the proposition that, in *Heinrich*, the Texas Supreme Court authorized the use of lawsuits such as this one "to prevent harm when individual actors exceed their statutorily authorized powers in an underlying administrative proceeding." (*Id.* at p. 15.)[9] *Heinrich* does not support either of those propositions.

In *Heinrich*, a policeman's widow filed a state court lawsuit against the City of El Paso and other state agencies and officials. The case did not involve an underlying administrative proceeding, the doctrine of exhaustion of remedies, or

---

[9] Audi also cites *Heinrich* for the principle that, "[w]here the evidence raises a fact issue, the court must send the dispute to the fact finder." (Audi's Br. at p. 9.) In *Heinrich*, however, there was a factual dispute – created by affidavits and documentary evidence – regarding whether or not the plaintiff was entitled to 100% of her husband's pension or a lesser amount. 284 S.W.3d at 379-380. The plaintiff contended that the pension board had voted to award her 100% of the pension notwithstanding the board's bylaws (as the board was allowed to do in certain circumstances). In support of that contention, the plaintiff submitted affidavit and documentary evidence. The court could not resolve the plaintiff's *ultra vires* claims as a matter of law because the resolution of those claims depended on which version of the facts was true. In this case, there are no disputed factual issues (and Audi has not pointed the Court to any).

23

any exceptions to the exhaustion doctrine. The entire case centered on sovereign immunity and the "*ultra vires*" exception to the **immunity** doctrine. Case law regarding the "*ultra vires*" exception to the doctrine of sovereign immunity does not support Audi's plea to be excused from exhausting its administrative remedies in this case.

None of the courts in the myriad of cases Audi cites held that a litigant was excused from exhausting its administrative remedies because an agency or agency official "exceeded its authority" or "acted beyond its statutory powers."[10] The undersigned has not found a single Texas case so holding.

Audi's lawsuit properly was dismissed because, as in *Gonzalez*, "[t]his . . . is not a case in which the agency is acting wholly outside its jurisdiction, but rather a case in which [Audi] seeks to prove the [agency] may have made an incorrect decision about the law." 882 S.W.2d 526. Audi's only recourse is judicial review

---

[10] Audi cites only two cases in which the plaintiff was not required to exhaust its administrative remedies before filing a state court lawsuit; both cases turned on the fact that the administrative agency at issue was "without jurisdiction" to preside over the dispute in question. In *City of Sherman*, 643 S.W.2d at 685, the Texas Supreme Court held that the Public Utilities Commission had "no statutory authority" over a municipally-owned public utility and, as such, the utility was not required to exhaust its remedies before the PUC. In *Westheimer Independent School District v. Brockette*, 567 S.W.2d 780, 786-787 (Tex. 1978), the Supreme Court held that the Commissioner of Education had "no jurisdiction to review a valid and final order" of the State Board of Education and "no jurisdiction to rescind, countermand or change" a final order of the Board of Education even if the order was void *ab initio*. Accordingly, the independent school district was not required to await the Commissioner's review of the order before seeking judicial relief. Obviously, those cases are distinguishable from this case because the Protest is indisputably within the Board's exclusive original jurisdiction.

following completion of the administrative process, and the district court properly dismissed Audi's premature lawsuit seeking to interrupt that process.

## II. THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S DISMISSAL BECAUSE DEFENDANTS DID NOT "EXCEED THEIR POWERS."

Because the Board and the ALJs acted (and are acting) within their "jurisdiction," the inquiry into the propriety of this appeal should end, and the district court's dismissal should be affirmed.

Nonetheless, Intervenors respond to the various ways in which Audi contends that Chairman Walker and the ALJs allegedly "exceeded their powers." First, however, the challenged actions must be considered in light of the law applicable to the Protest.

### A. The Legal Framework Applicable To The Protest.

Chapter 2301 of the Texas Occupations Code concerns the distribution, sale, and lease of motor vehicles. *See generally* Tex. Occ. Code §§ 2301.001-2301.853. The provisions of Chapter 2301 are "liberally construed" and they exclusively govern "all aspects of the distribution and sale of motor vehicles" (unless otherwise specifically provided by law not in conflict with Chapter 2301). *Id.* at § 2301.004.

As discussed above, (*see supra* § I.A.), the Board's powers to regulate the distribution, sale, and lease of motor vehicles are extensive. "**Notwithstanding any other provision of law**, the board has all powers necessary, incidental, or

25

convenient to perform a power or duty expressly granted under [Chapter 2301]." *Id.* at § 2301.153(a) (emphasis added). Those powers include, but are by no means limited to, the power to "initiate and conduct proceedings, investigations, or hearings; . . . (3) receive evidence and pleadings; . . . (6) make findings of fact on all factual issues arising out of a proceeding initiated under [Chapter 2301]; [and] (7) specify and govern appearance, practice, and procedures before the board . . . " *Id.*

A franchised dealer whose sale to a proposed transferee is rejected by the manufacturer may file a protest with the board. Tex. Occ. Code § 2301.360(a). "A protest filed under [Section 2301.360] is a contested case." *Id.*

Subchapter O of Chapter 2301 governs "**HEARING PROCEDURES.**" Hearings arising under Chapter 2301 "must be conducted in accordance with [Chapter 2301], any order, decision, or rule of the board, and Chapter 2001, Government Code." Tex. Occ. Code § 2301.703. However, "[t]o the extent of a conflict between [Chapter 2301] and Chapter 2001, Government Code, **[Chapter 2301] controls**." *Id.* at § 2301.702 (emphasis added).

Chapter 2301 provides that an administrative law judge of SOAH must hold contested case hearings. *Id.* at § 2301.704(a). SOAH's administrative law judges have "**all**" of the Board's power and authority provided under Chapter 2301, *id.* at (b) (emphasis added), except the power to issue a final order.

26

Review of a proposal for decision by the Board is governed by Section 2301.709. In reviewing a contested case, "the board…shall take **any further action** conducive to the issuance of a final order and shall issue a written final decision or order." *Id.* at (c) (emphasis added). A party to a contested case proceeding affected by a Board's final order may seek judicial review in the district court of Travis County or this Court. *Id.* at § 2301.571(a). Judicial review is governed by Chapter 2001 of the APA.

Chapter 2301's plain language makes it clear that the legislature intends for the Board to have extensive power and jurisdiction over contested cases arising under Chapter 2301. Those powers are applicable to the Protest currently pending before SOAH on remand from the Board. Furthermore, the Board's construction of its powers under Chapter 2301 "is entitled to serious consideration, as long as the construction is reasonable and does not contradict the plain language of the statute itself." *Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex. 1993). Any doubts concerning the extent of the Board's power are to be resolved in the Board's favor if its construction is reasonable and consistent with the language of Chapter 2301.

### B.   Chairman Walker.

Audi contends that Chairman Walker exceeded his powers or authority in the following ways: 1) signing the Remand Order which remanded the case back to

27

SOAH after the ALJs issued the first proposal for decision (Audi's Br. at pp. 20-24); 2) "commanding" the ALJs to commit an act that exceeded their statutory power by ordering them to reopen the record after issuance of a proposal for decision (*id.* at p. 24-25); 3) ordering the ALJs to consider alleged "untimely" evidence (*id.* at pp. 25-28); and 4) "attempting to influence the neutral ALJs through the use of improper evidence." (*Id.* at pp. 28-39.)

### i. The Board had authority to remand the Protest to SOAH.

Section 2301.709 of Subchapter O of Chapter 2301 gives the Board the power to take "**any** further action conducive to the issuance of a final order." *Id.* at (c) (emphasis added). Nothing in Chapter 2301 or Subchapter O limits what the Board may or may not do when reviewing a proposal for decision and "any further action" certainly includes the authority to enter an interim order remanding a case to SOAH to consider matters that the Board believes will assist it in rendering a final decision. That is especially true in light of the enormously broad powers granted the Board in Tex. Occ. Code §§ 2301.151 & 2301.153.

Audi argues that Section 2001.058 of the APA is "the **sole source** of the Board's power when considering a PFD." (Audi's Br. at p. 20-21 (emphasis added).)[11] Audi is wrong. The legislature has the power to modify the applicability of the APA to certain agency cases (or to exempt contested cases from the

---

[11] Audi cites no law in support of that statement other than Tex. Gov't Code § 2001.058. Nothing about that Code section supports Audi's broad statement.

provisions of the APA altogether). *See, e.g.*, *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 565 (Tex. 2000) (noting that the administrative scheme in the Tex. Educ. Code is "different from" and "not subject" to the APA).

Here, the Legislature has specifically supplemented the Board's power to consider a proposal for decision under § 2001.058 of the APA with § 2301.709(c) of the Code.[12]  Moreover, in remanding the Protest to SOAH, the Board exercised its power under Section 2301.709(c) of the Code without violating Section 2001.058 of the APA.  The Board did not reject any of the ALJs' proposed findings of fact or conclusions of law, but remanded for further analysis and findings.  Finally, if one assumes for purposes of argument that a conflict exists between Section 2301.709(c) of the Code and Section 2001.058 of the APA, Section 2301.709(c) controls. Tex. Occ. Code § 2301.702.

Audi then argues that an agency can remand a contested case to an administrative law judge only if the agency has been given "statutory authority" to do so and, Audi contends, the Board has not been given such authority. (Audi's Br. at p. 22.)  That argument is incorrect and ignores Tex. Occ. Code § 2301.709(c), which authorizes the Board, in reviewing a contested case, to take "any further action conducive to the issuance of a final order," and Tex. Occ. Code § 2301.153,

---

[12] That is in addition to the powers the legislature granted to the Board under Tex. Occ. Code § 2301.153(a), which apply "[n]otwithstanding any other provision of law."

which grants the Board "all powers necessary, incidental, or convenient to" performing its duty to decide protests, "[n]otwithstanding any other provision of law…." Those sections plainly provide the Board with the power and ability to remand a contested case to SOAH for clarification or further findings before taking final action on a proposal for decision.

Audi cites no case, statute, or other authoritative source in support of its argument.[13] In fact, state agencies – including the Texas Department of Motor Vehicles, the Employees Retirement System of Texas, and the Texas State Board of Public Accountancy – all have remanded contested cases to SOAH despite the word "remand" not appearing in their enabling statutes. *See Tex. State Bd. of Pub. Accountancy v. Bass*, 366 S.W.3d 751, 763 n.11 (Tex. App. – Austin 2012, no pet.) (referencing that the agency remanded the case to SOAH for consideration of new evidence after issuance of the PFD); *All Points Inspection Servs., Inc. v. Navistar, Inc.*, 2011 WL 1341523, at *1 (Tex. St. Off. Admin. Hgs. Mar. 28, 2011) ("On February 8, 2011, the Texas Department of Motor Vehicles (TxDMV) issued an order rejecting the PFD [issued by the ALJ the prior year] and remanding the case back to the ALJ for further consideration."); *Appeal of Paris A. Mims, Jr.*, 2004

---

[13] Audi cites as authority eight pages of a Texas Tech Administrative Law Journal article entitled "From Proposal For Decision To Final Decision: What Happens In Between?" (*Id.*) The word "remand" does not appear in those eight pages and they offer no support for the proposition that a remand can "only" occur if an agency has been given specific statutory authority to do so.

WL 4172108, at *1 (Tex. St. Off. Admin. Hgs. Sept. 2004) (noting that ERS Board "remanded the matter back [to] SOAH" for consideration of additional records).

Audi's citations to specific rules governing the Texas Commission on Environmental Quality and the Texas Public Utility Commission's ability to remand cases to SOAH are inapposite. The Board's review power – to take "any further action conducive to issuance of a final order" (derived from a statute and not an administrative rule) – is broader than those entities' review power and certainly broad enough to encompass the remand such as the one ordered here.[14]

Audi's effort to "explain away" § 2301.709 by arguing that it is a "general provision" that must give way to the more "specific provisions" contained in the APA, (Audi's Br. at pp. 33-36), fails.[15]

First, Section 2301.709's title – **"Review by Board"** – and its placement in Subchapter O, **"HEARING PROCEDURES"** – after **"Conduct of Hearing"** and before **"Rehearing"** – belies any contention that this section was not meant to specifically apply to the Board's review of proposals for decision issued by SOAH

---

[14] A Westlaw search of the Texas statutes shows that the Legislature has not given any other administrative agency the power to take "any further action" conducive to issuance of a final order.

[15] Audi suggests that SOAH's procedural rules trump Section 2301.709. (Audi's Br. at p. 36.) That suggestion is frivolous, since it is well-settled that rules of administrative agencies are void if they conflict with statutes. *Liberty Mut. Ins. Co. v. Griesing*, 150 S.W.3d 640, 648 (Tex. App. – Austin 2004, pet. dism'd w.o.j.) (citing *Employees Ret. Sys. of Tex. v. Jones*, 58 S.W.3d 148, 154 (Tex. App. – Austin 2001, no pet.)).

judges. Further, Chapter 2301 specifically provides that, if there is a conflict with the APA, Chapter 2301 controls. The legislature has crafted for the Board a specific provision applicable to the review of contested cases that supplements the Board's powers under Section 2001.058 of the APA. Here, without acting on the PFD or on any proposed findings of fact and conclusions of law, the Board properly used its power under Tex. Occ. Code § 2301.709(c) to seek further findings from the SOAH ALJs.

### ii. The Board had the power and authority to order the ALJs to reopen the record.

Audi argues that SOAH Rule 155.153(a)(4) prohibits an ALJ from reopening a record after issuance of a proposal for decision, even if ordered to do so by the referring agency. (Audi's Br. at pp. 24-25.) Audi cites no cases for that proposition (and the undersigned has found none).

However, numerous decisions exist in which ALJs expressly recognize that they can reopen the record in a contested case if directed to do so in a remand order from the agency in question. For example, in *Texas Commission on Law Enforcement v. Bush,* SOAH Dkt. No. 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 (Feb. 27, 2013),[16] Appellee Judge Wilkov, presented with the Respondent's attempt to submit additional evidence after she had issued a PFD and submitted it to the Commission, stated

---

[16] For the Court's convenience, the SOAH decisions cited by Intervenors are attached to Intervenors' Appendix at Tab 2.

32

that "**[t]he Commission may remand the case for consideration of new evidence**, but without such order, the record established at the hearing is the sole basis for the recommendations found in the PFD." (emphasis added). *See also Tex. Dept. of Licensing and Regulation v. Drobot,* SOAH Dkt. No. 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 (April 11, 2014) (emphasis added) ("SOAH's rules do not contemplate that a judge re-open the evidentiary record of a case after the PFD has issued, **in the absence of an order by the governing body of the referring agency remanding the case to SOAH for further fact finding**."). The ALJ in *Petitioner v. Tax Division, Texas Comptroller of Public Accounts,* SOAH Dkt. 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.26 (June 16, 2014), recognized that "[i]f Petitioner has additional evidence that can fill in the evidentiary gaps, then it can consider including the additional evidence with a Motion for Remand or a Motion for Rehearing filed with the Comptroller's office.").[17]

Read properly and in context, the rule is intended to clarify that, **in the absence of further orders from the referring agency**, an ALJ's authority over a contested case ends with the ALJ's issuance of a dismissal, a proposal for decision, or a final decision. Its purpose is obvious: to avoid having an agency working

---

[17] ALJs sometimes urge referring agencies to remand cases for further proceedings when a perceived need to reopen the record exists. *See, e.g., Texas Dept. of Licensing and Regulation v. Guerra,* SOAH Dkt. No. 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.ACR (June 5, 2013), ("[T]he Department has the discretion to remand this case for additional evidence consistent with Respondent's exceptions . . . I urge the Department to adopt this course.").

with one version of a proposal for decision while, unbeknownst to the agency, the ALJ is generating another proposal for decision. That purpose is not served by preventing the agency from remanding the case for further proceedings, and nothing in the rule prevents an agency from doing so. Neither SOAH nor any court has ever given the rule a contrary interpretation.

### iii. The Board did not authorize the consideration of "untimely" evidence.

Audi argues that Chairman Walker lacked the authority to order the ALJs to consider the April 30th Letter because it was not submitted in a timely manner, citing § 2301.709(a) of Chapter 2301. (Audi's Br. at pp. 25-27.) That statute states that the Board "may consider only materials that are submitted timely." Without citing to any legislative history, case law, canon of statutory construction, or other authority concerning the meaning of the word "timely," Audi summarily concludes that the April 30th Letter was not "timely."

Audi's argues that the April 30th Letter was untimely because it was submitted with an "improperly filed" response brief. Nothing in Chapter 2301, the APA, SOAH's rules, or the Board's rules makes the filing of a response to a reply to a motion for rehearing improper. *See*, *e.g.*, *Lim v. Hall, D.C.*, 1997 WL 366803, at *1 (Tex. App. – Austin 1997, writ denied) (ruling on motion for rehearing, noting the filing of the motion, a reply, and a response to the reply); *In re Taxpayer No.: *** (Type: Motor Vehicle Gross Rental Receipts Tax/RDT)*, Hearing Nos.

34

30,505, 32,656, 1997 WL 617908, at *1 (Tex. Cptr. Pub. Acct. Sept. 23, 1997) (setting deadline for petitioners to file response to reply to supplemental motion for rehearing); *In re Taxpayer No.: \*\*\* (Type: Sales and Use Tax)*, Hearing No. 39,563, 2004 WL 3673564, at *1 (Tex. Cptr. Pub. Acct. 2004) (noting petitioner's filing of a reply to the Comptroller's response to petitioner's motion for rehearing).

While the undersigned has not located any cases or materials discussing or construing the meaning of "timely," as used in § 2301.709(a), the logical meaning of "timely" in the context of the statute is that material is "timely" when it becomes relevant[18] and as long as the Board receives the material with sufficient opportunity for the Board and the parties to the contested case to study the material and to consider how it may affect the Board's final order or decision. Moreover, the Board did not consider the April 30th Letter in deciding whether or not to adopt the PFD. Rather, it remanded the case to the ALJs to determine **whether the document should be considered** and, if so, what effect it would have, in an evidentiary hearing in which Audi participated. Surely a document admitted in such a proceeding is "timely."

---

[18] The April 30th Letter did not become relevant until **after** the July 2014 PFD issued and the Board decided that strict compliance with Tex. Occ. Code § 2301.359(c) would be required (rather than substantial compliance, which is what the ALJs decided).

### iv. Nothing about the Remand Order violates the rules against "influencing" the ALJs.

#### a. The alleged "ex parte" communications issue has been waived by Audi and had no effect on the outcome of the remand vote.

Audi suggests that an alleged *ex parte* communication from Mr. Robertson (a principal of one of the entities involved in the buy/sell) in early October 2014 somehow tainted the Board's February 13, 2015 vote on the Remand Order, rendering the entire remand "unauthorized."

The Court should disregard that contention. First, Audi did not allege in its petition in the district court and never argued to the district court that the Remand was unauthorized because it was "influenced by" an *ex parte* communication.[19] Arguments not asserted below are waived on appeal. *Black v. City of Kileen*, 78 S.W.3d 686, 691 n.4 (Tex. App. – Austin 2002, pet. denied). *See also Moreno v. State*, 409 S.W.3d 723, 728-29 (Tex. App. – Houston [1st Dist.] 2013, pet. refused) (arguments not asserted before the trial court are not preserved for review). Second, Audi acknowledged to the Board that neither the Board nor its staff acted "improperly" or "w[ould] be influenced by" the alleged communication.[20] In its

---

[19] In its brief in support of its motion for a preliminary injunction, Audi argued that Mr. Robertson "very clear[ly] attempt[ed] to improperly influence" a Board member prior to the **Motion for Rehearing** vote. However, Audi never argued that the **Remand Order** was influenced or that Mr. Robertson "attempted to" influence the Board regarding the remand.

[20] Before the Board's vote on the Motion for Rehearing, Audi filed a written opposition to the staff's recommendation that the Motion be granted. In that pleading, Audi argued that,

desperation to keep alive this action, Audi now contends the communication corrupted state officials. Audi's efforts are transparent and completely unsupported by any evidence.

Audi's attempt to "poison the well" also leaves out critical points. The alleged *ex parte* communication occurred two months before the Board voted on the Motion for Rehearing and four months before the Board voted to remand the case to SOAH.[21] Further, pursuant to Board Rule 215.22(b), which provides that, in the event of an alleged *ex parte* communication, "a copy or summary thereof shall be filed with the record of such proceeding and a copy forwarded to all parties of record….", the Board's general counsel disclosed the existence and substance of the alleged *ex parte* communication to all parties shortly after it occurred. That disclosure – which "cured" any effect of the communication[22] – occurred a month and a half before the Board voted on the Motion for Rehearing and almost four months before the Board voted for the Remand. Finally, the Board

---

"[a]lthough Audi is not suggesting that the Board or its Staff acted improperly or will be influenced by these inappropriate actions, the efforts by Robertson to impermissibly taint the Board proceedings are grounds to deny the motion for rehearing." (Audi's Response to Staff's Executive Summary and Proposed Order at p. 2.) Intervenors request the Court to take judicial notice of that pleading, which is attached to Intervenors' Appendix at Tab 3. (*See supra* n.8.)

[21] Audi also improperly suggests that the alleged *ex parte* communication related to the remand. It did not; the communication occurred during the Motion for Rehearing briefing.

[22] The legislative history of Board Rule 215.22 states that it "allows the Board to cure an *ex parte* communication by reporting it and providing the communication or a summary to all parties to a proceeding." 35 Tex. Reg. 884.

member who received alleged the *ex parte* communication, Laura Ryan, abstained from voting on the Motion for Rehearing and did not participate in the meeting during which the Board voted to remand the case to SOAH.

The alleged *ex parte* communication was disclosed and cured per the Board's own rules, and had no effect on the Board's vote. Audi's overt suggestion that the communication caused the Board's general counsel to "retreat[] from his prior recommendation" (Audi's Br. at p. 30), and that the remand occurred "at the improper *ex parte* urging of a witness" (*id.* at p. 36), is unsupported and absurd.

### b. The Remand Order does not differ from Member Slovacek's motion.

Audi's argument that the remand was unauthorized because the language of the Remand Order did not match exactly the language of Member Slovacek's motion to remand the Protest is specious.

To begin with, Audi cites to no statute, rule, or other authority providing that an agency's oral motion to take an action must match, *verbatim*, the agency's later written order.

Second, Audi is wrong that Member Slovacek's motion did not encompass the April 30th Letter. Before the meeting, the Board received the agency staff's written recommendation of a remand so that SOAH could consider the admissibility and effect of the April 30th Letter. During the hearing, the Board's general counsel reiterated that recommendation.

38

After the Board's general counsel finished speaking, the following exchange occurred:

> **Mr. Slovacek:** What is the staff's recommendation?
>
> **Mr. Duncan:** To remand to SOAH to consider the document, [the April 30th Letter], that we received in the period between the board's last action and today.
>
> **Mr. Slovacek:** Mr. Chairman, I make a motion that we remand to SOAH, *for the reasons outlined by Mr. Duncan, this entire case, for all the reasons set forth*, to determine whether the intervenors have, in fact, satisfied the conditions of the proposal for decision.
>
> **Mr. Palacios:** I second the motion.

Before the Board voted on the motion, it allowed counsel to speak on the subject. Audi's counsel, aware that the staff was recommending a remand to consider the admissibility and effect of the April 30th Letter, argued, *inter alia*, that it would be improper to remand the case because SOAH could not reopen the record to consider the April 30th Letter and that the Board lacked the authority to consider the April 30th Letter because it was not "timely" submitted.

Audi itself interpreted the motion to include consideration of the April 30th letter and vociferously argued against such consideration.[23] Audi's *post-hoc* effort

---

[23] Audi did not, however, argue that a remand to consider whether the Weitz Group met the conditions in the July 2014 PFD was improper, or even mention the conditions. Consequently, Audi is now arguing for a construction of Member Slovacek's motion that is diametrically opposed to what its counsel understood the motion to mean when it was made at the Board meeting.

to argue that the Board did not know that it was voting to remand the case for consideration of the April 30th Letter is meritless.

### c.      The ALJs have remained fair and impartial.

Audi argues that Chairman Walker has subverted the neutral fact finding process and rendered the contested case proceeding unfair. (Audi's Br. at pp. 36-42.) That argument is frivolous.

First, it is based on the faulty legal assumptions that the Board has "disregarded the rules" and does not have the right to remand cases to SOAH for further fact finding. As shown above, Audi is wrong. The Board has remanded cases to SOAH in the past and has the clear power to do so. *See, e.g., All Points Inspection Servs., Inc.*, 2011 WL 1341523, at *1 (noting that the TxDMV rejected the ALJ's PFD and remanded the case back to the ALJ for further consideration).

Audi's "neutrality" argument is also based on assumptions that are unsupported by evidence. No evidence exists of any inappropriate interaction between Chairman Walker and/or the Board and the ALJs. No evidence exists that Chairman Walker tried to usurp the ALJs' fact finding duties or tried to influence the ALJs' neutrality.[24] Nothing about the Remand Order directs the ALJs to find

---

[24] *State v. Mid-South Pavers, Inc.*, 246 S.W.3d 711, 722-23 (Tex. App. – Austin 2008, pet. denied), cited by Audi, is distinguishable. There, the court found that the executive director's changes to findings and conclusions suggested that he was "acting as TxDOT's own factfinder"; the changes were not supported by substantial evidence and not explained with a written statement.

40

one way or another (or implies or suggests that they should). Rather, it directs them to determine **if** Audi received the April 30th Letter, **if** the letter should be received into evidence, and, if so, "what affect, **if any**," it had on compliance with the Code, and to determine whether or not the Weitz Group had met the conditions in the July 2014 PFD. Audi's assertion that the Remand rendered the Protest "unfair" is another unfounded, specious argument.

### C.     The ALJs Have Not Acted *Ultra Vires*.

For the reasons discussed above, (*see supra* §§ II.A. and II.B.), Audi's arguments that the ALJs acted "ultra vires" in reopening the record and receiving additional evidence after being ordered to do so by the Board are meritless.[25]

Section 2301.704(b) of the Code gives the ALJs "all of the board's power and authority as provided in [Chapter 2301] to conduct hearings…." The ALJs powers are coextensive with the Board's powers. Because the Board has not exceeded its authority in ordering the remand, the ALJs are not exceeding their authority in executing that order.

---

[25] Audi's contention that Judge O'Malley "encouraged" Audi to seek relief from the district court, (Audi's Br. at p. 41), is silly. Judge O'Malley merely stated to Audi that, as a matter of procedure, the ALJs would halt the Remand if ordered to do so by a district court. He also clearly stated that the ALJs **did** have the authority to entertain the Remand. (*Id.*) And, in the proposal for decision on remand, (*see* Intervenors' Appx. at Tab 1, p. 48), the ALJs included conclusions of law stating that "[t]he Department properly referred this case to SOAH, (*id.* at COL 3), and "SOAH has jurisdiction over all matters relating to the conduct of the hearing in this matter." (*Id.* at COL 4.)

Audi cites several cases for the proposition that SOAH ALJs are aware of the limitations imposed by Rule 155.153(a)(4). Those cases are distinguishable from this case because in none of those cases did the referring agency remand the contested case to SOAH or ask it to reopen the agency record. In *Texas Department of Insurance v. Mondragon*, SOAH Docket No. 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.C (Tex. St. Off. Admin. Hgs. Oct. 23, 2014), the Department of Insurance's staff – not the Commissioner of Insurance – sought to have the ALJ reopen the record after issuance of the proposal for decision and in the absence of a remand order from the Department of Insurance. *See also In re Taxpayer No.: \*\*\* (CPA Hearing No. 108,005)*, SOAH Docket No. 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.26, 2014 WL 4694594, (Tex. St. Off. Admin. Hgs. June 16, 2014) (recognizing, on consideration of the parties' exceptions to the PFD, that ALJ could not reopen the record to receive new evidence to modify the PFD; not speaking to reopening of record if ordered to do so); *In re Taxpayer No.: \*\*\* (CPA Hearing No. 107,108)*, SOAH Docket No. 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.26, 2014 WL 4694592, at \*1 (Tex. St. Off. Admin. Hgs. June 9, 2014) (same); *In re Belinda Quintero Molina*, SOAH Docket No. 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 (Tex. St. Off. Admin. Hgs. Feb. 28, 2012) (recognizing that ALJ could not rule on motion filed after issuance of the proposal for decision; not speaking to ability to rule on motion if ordered to do so by referring agency).

These cases stand in stark contrast to the cases discussed above in which the referring agencies remanded contested cases to SOAH for further proceedings, including the taking of new or additional evidence. *See e.g., Bush*, 2013 WL 1087536, at \*1 (in which Judge Wilkov stated: "Respondent's communications indicate that he may have new evidence that was not offered or admitted at the hearing. New evidence cannot be offered through any exception, and the consideration of new evidence is relief that I cannot grant. **The Commission may remand the case for consideration of new evidence**…." (emphasis added).

## III.  THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S DISMISSAL ON THE BASIS OF SOVEREIGN IMMUNITY.

"Governmental immunity implicates a court's jurisdiction and serves to protect political subdivisions of the state from both suit and liability." *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 587 (Tex. 2015). "To fall within th[e] *ultra vires* exception [to the immunity doctrine], a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Heinrich*, 284 S.W.3d at 372. "Ministerial acts are those where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Emmett*, 459 S.W.3d at 587 (citation omitted). "Discretionary acts on the other hand require the exercise of judgment and personal deliberation." *Id.*

43

"[A] suit that seeks to control a state official's exercise of discretion within his legal authority is a suit to control state action" and is barred by sovereign immunity. *Coastal Habitat Alliance v. Pub. Util. Comm'n*, 294 S.W.3d 276, 285 (Tex. App. – Austin, 2009, no pet.). An official is not acting *ultra vires* if that official is performing a discretionary act that is within his statutory or constitutional authority. *See, e.g.*, *Layton v. City of Fort Worth*, 2014 WL 6997350, at *6 (Tex. App. – Fort Worth 2014, no pet.) (affirming dismissal of claim against government officials based on lack of subject matter jurisdiction, stating: "[C]laims that seek to control the State or its officials in the exercise of discretionary statutory or constitutional authority are barred by sovereign immunity.").

As shown above, (*see supra* §§ II.B & II.C.), all of the actions taken by Chairman Walker and the ALJs were within their jurisdiction and did not exceed their powers or authority. The fact that Audi disagrees with the Board and the ALJs' decisions or with the way the Board interprets statutes it is charged with enforcing does not mean that any of the Board or ALJs' actions were *ultra vires* acts.

## IV. **THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S DISMISSAL BECAUSE AUDI FAILED TO JOIN THE BOARD AND/OR THE OTHER BOARD MEMBERS.**

Audi's lawsuit asked the district court to declare the Board's remand order void and sought injunctive relief barring enforcement of that order. The Board was

a necessary and indispensable party to that lawsuit. *See* Tex. Civ. Prac. & Rem. Code § 37.006(a) ("When declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties."); *Reynolds v. Haws,* 741 S.W.2d 582, 587-588 (Tex. App. – Fort Worth 1987, writ denied) (affirming dismissal of case for failure to join board of adjustment when the validity of the board's action was the suit's focus).[26] *See also Scott v. Graham,* 292 S.W.2d 324, 327 (Tex. 1956) (those whose rights will be directly affected by the writ of injunction are indispensable parties to the injunction proceeding); *Lone Starr Multi Theatres, Inc. v. State,* 922 S.W.2d 295, 298 (Tex. App. – Austin 1996, no writ) ("[A]ll parties against whom an injunction must run in order to be effective should be named in a suit for injunctive relief.").

Audi sued only Chairman Walker and did not include the Board or any of the other six Board members who voted in favor of the Remand Order.[27] Chairman Walker alone is **not** the Board. *See Pearce v. City of Round Rock,* 992 S.W.2d 668, 671 (Tex. App. – Austin 1999, pet. denied) ("A county is more than its commissioners; a city is more than its mayor."). Audi's failure to join the Board as a party is fatal to its claims.

---

[26] "[I]t is not proper for a court to render a decision affecting the action of the Board, without the Board as a party to the lawsuit." *Id.* at 588.

[27] The Board is comprised of 9 members. *See* Tex. Transp. Code § 1001.021(a).

In the district court, Audi contended that it was not required to name the Board as a party to the suit because it was asserting claims for *ultra vires* acts and, therefore, needed to name only the agency officials who allegedly were acting without authority. Audi cited, among other cases, *Emmett*, 459 S.W.3d 578, and *Heinrich*, 284 S.W.3d 366. The problem with that argument is two-fold.

First, the case law cited by Audi is inapplicable to this case. *Emmett* and *Heinrich* involved lawsuits filed directly against officials who were allegedly acting unlawfully.[28] They did not involve underlying administrative proceedings or efforts to enjoin ongoing administrative proceedings.

By contrast, in every case that Audi cites concerning an underlying and ongoing administrative action, the state agencies in question were named parties to the lawsuit. *See Davis*, 34 S.W.3d 559 (naming school district as defendant); *O'Connor & Assocs.*, 267 S.W.3d 413 (naming county appraisal district, chief appraiser, appraisal review board, and board's former chairman); *Rhule*, 417 S.W.3d 440 (naming City of Houston as defendant); *Williams*, 99 S.W.3d 709 (naming City of Houston as defendant); *City of Sherman*, 643 S.W.2d 681 (naming Public Utility Commission of Texas as defendant); *Mag-T, L.P.*, 161 S.W.3d 617 (naming appraisal district, appraisal review board, and tax assessor-collector as

---

[28] Again, Audi confuses the "ultra vires" exception to the exhaustion of administrative remedies doctrine with the "ultra vires" exception to the governmental immunity doctrine.

defendants). That is because, when seeking judicial review of an administrative agency's ruling, decision, or order, the agency itself (and not any of its members), is the proper defendant. *See, e.g., Tex. Nat. Res. Conservation Comm'n v. Sierra Club*, 70 S.W.3d 809, 813 (Tex. 2002) (holding that Texas Natural Resource Conservation Commission was the "proper defendant" when plaintiff sought judicial review of agency's order).

Second, even if Audi was correct that it did not need to name the Board, Audi's claims still must be dismissed because Audi failed to join any of the other six Board members who allegedly committed the *ultra vires* acts. Chairman Walker did not act alone; nor is he the Board. Moreover, Audi sought to enjoin "all persons acting in concert" with Chairman Walker, which would include the other Board members. Enjoining Walker alone would not prevent the other Board members from considering the supplemental proposal for decision that the ALJs have issued.

## CONCLUSION

WHEREFORE, Budget and the Weitz Group pray that the Court affirm the Travis County District Court's dismissal of Audi's lawsuit for lack of subject matter jurisdiction. They also pray for such other, further, and different relief that may be just and proper.

47

Respectfully submitted,

/s/ Wm. R. Crocker
Wm. R. Crocker
State Bar No. 05091000
807 Brazos, Suite 1014
Austin, Texas 78767
Telephone: (512) 478-5611
Facsimile: (512) 474-2540
Email: crockerlaw@earthlink.net

Attorney for Intervenor/Appellee
Budget Leasing, Inc. d/b/a Audi
North Austin and Audi South Austin

/s/ J. Bruce Bennett
J. Bruce Bennett
State Bar No. 0214550
Leon V. Komkov
State Bar No.11670500
CARDWELL, HART & BENNETT,
LLP
807 Brazos, Suite 1001
Austin, Texas 78701
Telephone: (512) 322-0011
Facsimile: (512) 322-0808
Email: jbb.chblaw@sbcglobal.net
Email: lvk@longroadllc.com

/s/ Joseph W. Letzer
Joseph W. Letzer
Tx. State Bar No. 24030763
Dent M. Morton
Tx. State Bar No. 24056645
BURR & FORMAN, LLP
420 20th Street N, Suite 3400
Birmingham, AL 35203-5210
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
Email: jletzer@burr.com

Email: dmorton@burr.com

Attorneys for Intervenors/Appellees
Ricardo M. Weitz, Hi Tech Imports,
LLC, Hi Tech Imports North, LLC,
and Hi Tech Imports South, LLC

## CERTIFICATE OF COMPLIANCE WITH RULE 9.4

Pursuant to Tex. R. App. P. 9.4(i)(2)(B), the undersigned certifies this response complies with the type-volume limitations of Tex. R. App. P. 9.4. The brief was prepared using Microsoft Word 2011. According to that program's word count, the brief contains 11,810 words, exclusive of the exempted portions in Tex. R. App. P. 9.4(i)(1).

*s/ Joseph W. Letzer*
Joseph W. Letzer

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2015, I used the Court's electronic case filing system to file the foregoing document and to serve this document on the following persons:

Billy M. Donley
Mark E. Smith
BAKER & HOSTETLER, LLP
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel: (713) 646-1382
Fax: (713) 751-1717
bdonley@bakerlaw.com
mesmith@bakerlaw.com

S.  Shawn Stephens
James P. Sullivan
KING & SPALDING, LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002
Tel: (713) 751-3200
Fax: (713) 751-3290

      Attorneys for Volkswagen Group of America, Inc. and
      Audi of America, Inc.

Kimberly Fuchs
Texas Attorney General's Office
P.O.  Box 12548
Austin, Texas 78711
Tel: (512) 475-4195
Fax: (512) 320-0167
kimberly.fuchs@texasattorneygeneral.gov

      Attorney for the Honorable Michael J. O'Malley
      and Penny A. Wilkov

Dennis McKinney
Texas Attorney General's Office
P.O.  Box 12548
Austin, Texas 78711
Tel: (512) 475-4020
Fax: (512) 320-0167
dennis.mckinney@texasattorneygenreal.gov

      Attorney for Chairman John H. Walker

This the 14th day of August, 2015.

*s/ Joseph W. Letzer*
Joseph W. Letzer

# NO. 03-15-00285-CV

IN THE THIRD COURT OF APPEALS
AUSTIN, TEXAS

**VOLKSWAGEN GROUP OF AMERICA, INC.
AND AUDI OF AMERICA, INC.,**

*Appellants,*

*v.*

**JOHN WALKER III,** *ET AL.*

*Appellees.*

On Appeal from the 201st Judicial District Court, Travis County, Texas
Honorable Amy Clark Meachum, Presiding Judge

## INTERVENORS' APPENDIX

Wm. R. Crocker
State Bar No. 05091000
807 Brazos, Suite 1014
Austin, Texas 78767
Telephone: (512) 478-5611
Facsimile: (512) 474-2540
Email: crockerlaw@earthlink.net

J. Bruce Bennett
State Bar No. 0214550
CARDWELL, HART & BENNETT, LLP
807 Brazos, Suite 1001
Austin, Texas 78701
Telephone: (512) 322-0011
Facsimile: (512) 322-0808
Email: jbb.chblaw@sbcglobal.net

ATTORNEY FOR
INTERVENOR/APPELLEE
BUDGET LEASING, INC. D/B/A
AUDI NORTH AUSTIN AND AUDI
SOUTH AUSTIN

ATTORNEY FOR
INTERVENORS/APPELLEES
RICARDO M. WEITZ, HI TECH
IMPORTS NORTH, LLC, HI TECH
IMPORTS SOUTH, LLC, AND HI
TECH IMPORTS, LLC

**INTERVENORS' APPENDIX**

**TAB 1**

# State Office of Administrative Hearings



Cathleen Parsley
Chief Administrative Law Judge

August 13, 2015

Daniel Avitia, Director                                  **VIA INTERAGENCY MAIL**
Motor Vehicle Division
Texas Department of Motor Vehicles
4000 Jackson Avenue
Austin, TX 78731

RE:    **Docket No. 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.LIC; Budget Leasing Inc., d/b/a Audi North Austin and Audi South Austin and Ricardo M. Weitz, Hi Tech Imports North, LLC, Hi Tech Imports South, LLC, Hi Tech Imports, LLC v. Volkswagen Group of America, Inc. and Porsche Cars North America, Inc.**

Dear Mr. Avitia:

Please find enclosed a Remand Proposal for Decision in this case. It contains our recommendation and underlying rationale.

Exceptions and replies may be filed by any party in accordance with 1 Tex. Admin. Code § 155.507(c), a SOAH rule which may be found at www.soah.state.tx.us.

Sincerely,

Michael J. O'Malley
Administrative Law Judge

Penny A. Wilkov
Administrative Law Judge

MJO/PAW/ap
Enclosure
cc:    Per attached service list - **VIA REGULAR MAIL**
       Alice Carmona, Docket Clerk, Texas Department of Motor Vehicles, 4000 Jackson Avenue, Austin, Texas 78731 - **VIA INTERAGENCY MAIL**

Upload Date: 20150813132847    Account Number: 13    Upload Description: 13-4599REMANDPFD

# STATE OFFICE OF ADMINISTRATIVE HEARINGS
### AUSTIN OFFICE
300 West 15th Street Suite 502
Austin, Texas 78701
Phone: (512) 475-4993
Fax: (512) 322-2061

## SERVICE LIST

**AGENCY:**               Motor Vehicles, Texas Department of (TDMV)

**STYLE/CASE:**           Hi TECH IMPORTS NORTH, LLC

**SOAH DOCKET NUMBER:**   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.LIC

**REFERRING AGENCY CASE:** 13-0008 LIC

| STATE OFFICE OF ADMINISTRATIVE HEARINGS | ADMINISTRATIVE LAW JUDGE ALJ MICHAEL J. OMALLEY |
|---|---|
| **REPRESENTATIVE / ADDRESS** | **PARTIES** |
| J. BRUCE BENNETT<br>CARDWELL, HART & BENNETT, L.L.P.<br>807 BRAZOS, STE 1001<br>AUSTIN, TX 78701<br>(512) 322-0011 (PH)<br>(512) 322-0808 (FAX)<br>jbb.chblaw@sbcglobal.net | |
| | WEITZ GROUP |
| | HI TECH IMPORTS, LLC |
| BILLY M. DONLEY<br>ATTORNEY<br>BAKER & HOSTETLER, LLP<br>811 MAIN STREET, SUITE 1100<br>HOUSTON, TX 77002-5009<br>(713) 751-1600 (PH)<br>(713) 751-1717 (FAX)<br>bdonley@bakerlaw.com | |
| | VOLKSWAGEN GROUP OF AMERICA, INC. |
| BUDDY FERGUSON<br>ATTORNEY AT LAW<br>STRASBURGER & PRICE LLP<br>720 BRAZOS ST., STE. 700<br>AUSTIN, TX 78701-3251<br>(512) 499-3641 (PH)<br>(512) 536-5705 (FAX)<br>buddy.ferguson@strasburger.com | |
| | PORSCHE CARS NORTH AMERICA, INC. |

ALICE S. CARMONA
LEGAL ASSISTANT
TEXAS DEPARTMENT OF MOTOR VEHICLES
MOTOR VEHICLE DIVISION
4000 JACKSON AVENUE
AUSTIN, TX 78731
(512) 465-7354 (PH)
(512) 465-3666 (FAX)
Alice.Carmona@txdmv.gov

MOTOR VEHICLE DIVISION

---

WILLIAM R. CROCKER
ATTORNEY AT LAW
807 BRAZOS, SUITE 1014 P.O. BOX 1418
AUSTIN, TX 78767
(512) 478-5611 (PH)
(512) 474-2540 (FAX)
crockerlaw@earthlink.net

BUDGET LEASING, INC.

---

JOSEPH LETZER
BURR & FORMAN, LLP
420 20TH ST. N.
BIRMINGHAM, AL 35203-5210
(205) 251-3000 (PH)
(205) 244-5671 (FAX)

HI TECH IMPORTS, LLC

---

ELIZABETH A. MCNELLIE
BAKER & HOSTETLER
65 EAST STATE STREET, STE. 2100
COLUMBUS, OH 43215
(614) 462-2651 (PH)
(614) 462-2616 (FAX)
emcnellie@bakerlaw.com

VOLKSWAGEN GROUP OF AMERICA, INC.

---

ELIZABETH B. SHIRLEY
BURR & FORMAN, LLP
420 20TH ST. N.
BIRMINGHAM, AL 35203-5210
(205) 251-3000 (PH)
(205) 244-5671 (FAX)

HI TECH IMPORTS, LLC

WEITZ GROUP

---

ELLEN T. MATHEWS
BURR & FORMAN, LLP
420 20TH ST. N.
BIRMINGHAM, AL 35203-5210
(205) 458-5410 (PH)
emathews@burr.com

HI TECH IMPORTS, LLC

WEITZ GROUP

xc: Docket Clerk, State Office of Administrative Hearings
Docket Clerk TDMV, Fax No. 512-465-3666

## SOAH DOCKET NO. 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.LIC

| | | |
|---|---|---|
| BUDGET LEASING INC. D/B/A AUDI NORTH AUSTIN AND AUDI SOUTH AUSTIN<br>Protestant | §<br>§<br>§<br>§<br>§ | BEFORE THE STATE OFFICE |
| RICARDO M. WEITZ, HI TECH IMPORTS NORTH, LLC, HI TECH IMPORTS SOUTH, LLC, HI TECH IMPORTS, LLC<br>Intervenors | §<br>§<br>§<br>§<br>§<br>§ | OF |
| v. | §<br>§ | |
| VOLKSWAGEN GROUP OF AMERICA, INC. AND PORSCHE CARS NORTH AMERICA, INC.<br>Respondents | §<br>§<br>§<br>§<br>§ | ADMINISTRATIVE HEARINGS |

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................................ 1

II. PROCEDURAL HISTORY .......................................................................................................... 3

III. REMAND NOTICE ISSUE ......................................................................................................... 4

    A.    Applicable Law ........................................................................................................... 4

    B.    Background During the Application Process ................................................................ 5

    C.    Background of the Notice Issue While the Case was at SOAH ................................... 7

IV. ANALYSIS OF REMAND NOTICE ISSUE .............................................................................. 8

    A.    Did Audi Receive the Letter Dated April 30, 2013? .................................................. 8

    B.    Should the April 30, 2013 Letter be Added to the Record? ....................................... 8

    C.    If the April 30, 2013 Letter is Admitted, What Effect, if Any, Does the Letter Have on the Issue of Compliance with Tex. Occ. Code § 2301.359 in Light of the Agency's Prior Decision in *Gordon Rountree, Ltd. v. Mazda Motors Cars of America*, MVD Docket No. 07-0038.LIC? ..................................................................... 10

**V.  REVIEW OF QUALIFYING CONDITIONS IN FINDINGS OF FACT** ........................ 15

    **A.**    The Remand Order ................................................................................. 15

    **B.**    Review of FOF Nos. 155 and 156:  Operational Acumen Requirements ........... 15

        1.    Background ................................................................................. 16
        2.    The Post-PFD Revised Company Agreement ............................ 18
        3.    ALJs Analysis of FOF Nos. 155 and 156 ................................ 21

    **C.**    Review of FOF No. 157:  Bridge Loan ................................................ 23

    **D.**    Review of FOF No. 158:  Cross-Collateralization Requirement .............. 25

        1.    Background ................................................................................. 25
        2.    The Post-PFD Loan Documents ............................................... 27
        3.    ALJs' Analysis ........................................................................... 32

**VI.  CONCLUSION** .................................................................................................. 36

**VII.  FINDINGS OF FACT** ...................................................................................... 37

**VIII.  CONCLUSIONS OF LAW** .............................................................................. 48

| | | |
|---|---|---|
| BUDGET LEASING INC. D/B/A AUDI | § | BEFORE THE STATE OFFICE |
| NORTH AUSTIN AND AUDI SOUTH | § | |
| AUSTIN | § | |
| Protestant | § | |
| | § | |
| RICARDO M. WEITZ, HI TECH | § | |
| IMPORTS NORTH, LLC, HI TECH | § | |
| IMPORTS SOUTH, LLC, HI TECH | § | |
| IMPORTS, LLC | § | OF |
| Intervenors | § | |
| | § | |
| v. | § | |
| | § | |
| VOLKSWAGEN GROUP OF | § | |
| AMERICA, INC. AND PORSCHE CARS | § | |
| NORTH AMERICA, INC. | § | |
| Respondents | § | ADMINISTRATIVE HEARINGS |

## REMAND PROPOSAL FOR DECISION

## I. INTRODUCTION

This is a turndown case in which Respondents Volkswagen Group of America, Inc. and Audi of America, Inc. (collectively, Audi[1] or Respondents) rejected the proposed transfer of the only two Audi dealerships in Austin, Texas, from Budget Leasing, Inc. d/b/a Audi North Austin and Audi South Austin (collectively, Budget or Protestant) to Ricardo M. Weitz.[2] Mr. Weitz was not the sole prospective transferee. Mr. Weitz partnered with a private equity fund to purchase and operate the dealerships.

After the Administrative Law Judges (ALJs) issued their proposal for decision (PFD) on July 16, 2014, and the Board (Board) of the Texas Department of Motor Vehicles (the Department or DMV) considered the PFD and motions for rehearing, the Board issued an

---

[1] Although Volkswagen Group of America and Porsche were named parties, Audi was the active participant at the hearing and the ALJs will refer to the collective parties as Audi.

[2] The transaction also involved the proposed sale of Budget's Porsche and Maserati dealerships.

Interim Order Remanding the Case (Remand Order) to the State Office of Administrative Hearings (SOAH) to consider three questions regarding Mr. Weitz's April 30, 2013 letter to Sally Grimes, Audi's network improvement manager for its southern region. First, did Audi receive the letter? Second, should the letter be added to the record? Finally, if the letter is admitted in evidence, what effect does the letter have on Intervenors'[3] compliance with Texas Occupations Code (Code) § 2301.359(c)(3)? Specifically, the Board directed the ALJs to consider Intervenors' compliance in light of the Executive Director's decision in *Gordon Rountree Motors, Ltd. v. Mazda Motors of America*, Docket No. 07-0038.LIC (May 4, 2010).[4]

The Board also directed the ALJs to review the conditions set forth in the July 16, 2014 PFD, specifically Findings of Fact (FOF) Nos. 154-158, and to determine whether Intervenors had met the conditions such that they are now qualified to become Audi dealers.

Audi received the letter dated April 30, 2013, and the ALJs admitted it into evidence. The ALJs also find that Intervenors substantially complied with the notice provision under Code § 2301.359(c)(3), and that the *Rountree* decision and other case law do not require strict compliance with Code § 2301.359(c)(3). In addition, Intervenors have met the conditions of FOF Nos. 154-157 and are qualified on these FOFs to become Audi dealers.[5] On FOF 158, however, the ALJs recommend that the Intervenors provide proof to the ALJs and the Board that the dealership guaranty of other dealerships provision has been removed to meet the requirement of FOF 158. Once the dealership guaranty of other dealerships provision has been removed, Intervenors have met the condition of FOF 158 and are qualified to become Audi dealers.

---

[3] Intervenors include Mr. Weitz, Hi Tech Imports North, LLC, Hi Tech Imports South, LLC, and Hi Tech Imports, LLC.

[4] When *Rountree* was decided, the Director of the Motor Vehicle Division, rather than the Board, issued final orders on protests filed under Tex. Occ. Code § 2301.360. The ALJ in the *Rountree* case issued a PFD on July 14, 2009. On February 1, 2010, the Director issued a Final Order, adopting the *Rountree* PFD except for certain parts rejected in an accompanying letter opinion. On May 3, 2010, the Director entered a Decision and Order of Division Director Denying Respondent's Motion for Rehearing and Denying Protestant's Motion for Rehearing. On May 4, 2010, the Director entered a Nunc Pro Tunc Decision and Order of Division Director Denying Respondent's Motion for Rehearing and Denying Protestant's Motion for Rehearing.

[5] The ALJs have reviewed all documents, evidence, and relevant testimony, as well as the closing arguments and briefs advanced by the parties, in reaching their decisions on notice and the financial structure issues as set forth in the Board's remand order.

## II. PROCEDURAL HISTORY[6]

On May 14, 2013, Mr. Weitz, Hi Tech Imports North, LLC (Hi Tech North), Hi Tech Imports South, LLC (Hi Tech South), Hi Tech Imports, LLC (Hi Tech Imports) (collectively, Intervenors), and Budget protested Audi's and Porsche's buy-sell turndown to Department. Audi filed its reply on June 14, 2013. In Audi's reply to the protest, Audi admitted that Budget and Mr. Weitz submitted notice and an application "in accordance with the provisions of Tex. Occ. Code, Title 14, 2301.359."[7] After the first hearing, the ALJs issued their PFD on July 16, 2014. After the ALJs issued their PFD, the Board assumed jurisdiction of the case and, on August 28, 2014, Audi filed a motion to dismiss with the Board. On August 29, 2014, Intervenors filed a Motion to Find the Prospective Transferees Qualified. On September 12, 2014, with 4 Board members absent, the Board voted 3 to 2 to dismiss the Protest for lack of subject matter jurisdiction. On October 2, 2014, Protestant and Intervenors filed a Motion for Rehearing. On October 13, 2014, Audi filed a response in opposition to the Motion for Rehearing and, on October 15, 2014, Protestant and Intervenors filed a reply in support of their Motion for Rehearing. The Board's staff recommended that the Motion for Rehearing be granted. On December 10, 2014, the Board voted to grant the Motion for Rehearing.

On February 13, 2015, the Board voted to remand the Protest to SOAH. On February 20, 2015, Audi filed a motion to send this case back to the Board, challenging the Board's authority to remand this contested case to SOAH. Protestant and Intervenors responded to that motion on February 27, 2015, and Audi filed a reply in support of that motion on March 2, 2015. The ALJs denied Audi's motion.[8]

---

[6] To avoid repetition and to focus on the remand issues, the ALJs incorporate the procedural history and background from the July 16, 2014 PFD into the Remand PFD, although certain facts are repeated as background for the remand issues.

[7] Audi's June 14, 2013 Reply to Protest ¶ 2.

[8] Although Audi challenged the Board's remand to SOAH, the ALJs denied any relief to dismiss the remand case at SOAH based on jurisdictional grounds. The ALJs proceeded as directed by the Board, and this PFD will not address the issue of whether the Board has the authority to remand cases to SOAH.

The hearing on the merits began on April 16, 2015, and concluded on April 17, 2015. The ALJs closed the record on June 16, 2015, after the parties filed post-hearing briefs.

## III.  REMAND NOTICE ISSUE

### A.  Applicable Law

Subsections (a), (b), and (c) of § 2301.359 of the Code relate to notice to the manufacturer of the proposed transfer and provide as follows:

(a) A dealer must notify the manufacturer or distributor of a vehicle the dealer is franchised to sell of the dealer's decision to assign, sell, or otherwise transfer a franchise or a controlling interest in the dealership to another person. The notice is the application by the dealer for approval by the manufacturer or distributor of the transfer.

(b) Notice under Subsection (a) must:

  (1) be in writing and include the prospective transferee's name, address, financial qualifications, and business experience; and

  (2) be sent by certified mail, return receipt requested.

(c) The notice must be accompanied by:

  (1) a copy of pertinent agreements regarding the proposed assignment, sale, or transfer;

  (2) completed application forms and related information generally used by the manufacturer or distributor in reviewing prospective dealers, if the forms are on file with the board; and

  (3) the prospective transferee's written agreement to comply with the franchise to the extent that the franchise is not in conflict with this chapter.

## B. Background During the Application Process

Budget and Mr. Weitz submitted the Dealership Purchase Contract (DPC) to Audi on December 20, 2012. Thereafter, Mr. Weitz, primarily through Candido Pagan, and Mr. Weitz's business partners Corbin Robertson, K. Rick Turner, C. Ross Bartley, either personally or through their representatives, submitted an array of documentation and information to Audi. The majority of that documentation and information was sent to Ms. Grimes, who was Mr. Weitz and Mr. Pagan's primary contact at Audi.

In early April 2013, Ms. Grimes informed Mr. Weitz that Audi had received all materials needed to evaluate the transfer proposal and that no additional information was being requested by Audi.[9] In a letter dated April 16, 2013, Audi rejected the applications to be granted Audi dealer agreements for Audi North Austin and Audi South Austin.[10] Audi stated that it was not approving Budget's proposed transfer and included a list of material reasons for rejection of the proposed transfer.[11] The rejection letter did not reference non-compliance with Code § 2301.359(c)(3) or any notice violations.

On April 18, 2013, Mr. Weitz sought to provide clarification of the ownership and capital structure involved in the proposed transaction because that appeared to be Audi's primary concern.[12] In a response letter to Mr. Weitz dated April 25, 2013, Audi stated that its "primary concern with the buy-sell was the ownership and capitalization structure of the purported buyer. While your letter provides some additional details, we are still of the opinion that the paperwork as submitted does not meet our requirements."[13] Audi's April 16th letter and its April 25th letter mentioned nothing about the prospective transferees' purported non-compliance with § 2301.359(c)(3) of the Code, nor did Audi indicate its concern that Mr. Weitz would not comply with the terms of the franchise agreement.

---

[9] Intervenors Ex. No. 35.

[10] Respondents Ex. No. 186.

[11] Respondents Ex. No. 186.

[12] Respondents Ex. No. 189.

[13] Respondents Ex. No. 197.

After April 25, 2013, Mr. Weitz, on behalf of Hi Tech Partners, LLC (Hi Tech Partners), and the other members of Hi Tech Motorcars, LLC (Motorcars) – Headwater, Turner, and Bartley – renegotiated the Motorcars' company agreement. The renegotiation culminated in the Hi Tech Motorcars, LLC, Amended & Restated Company Agreement (Revised Motorcars Agreement).[14] The Revised Motorcars Agreement was signed by every member of Motorcars.[15]

On May 1, 2013, Mr. Weitz submitted two more application packages, replacing the initial Motorcars company agreement with the Revised Motorcars Agreement.[16] The submissions were accompanied by two cover letters, one on Hi Tech North letterhead and one on Hi Tech South letterhead.[17]

In the May 1, 2013 packages from Hi Tech North and Hi Tech South, Mr. Weitz included two letters dated April 30, 2013 (April 30th Letters).[18] One letter was from David Stein (principal of Budget) to Ms. Grimes, notifying Audi of the proposed transfer. The other letter was from Mr. Weitz to Ms. Grimes.[19]

Audi received the April 30th Letters on approximately May 2, 2013.[20] There is no dispute that Audi received the April 30th Letters. On May 8, 2013, Brian Pellock sent a letter to Mr. Stein. In the letter, Audi took the position that the materials submitted by Mr. Weitz on May 1 (including the April 30th Letters) and received by Ms. Grimes on May 2nd were part of the DPC (submitted on December 14, 2012, and amended on February 9, 2013) that Audi had

---

[14] Intervenors Ex. No. 9.

[15] Intervenors Ex. No. 9 at 021 (executed signature page for Hi Tech Partners; Headwater; Charles Ross Bartley IRA; K. Rick Turner, as trustee; C. Ross Bartley, individually; and Turner Family Partnership).

[16] Intervenors Ex. Nos. 275, 276. Respondents Ex. Nos. 202, 203.

[17] Intervenors Ex. Nos. 275, 276. Respondents Ex. Nos. 202, 203.

[18] Intervenors Ex. No. 242. Tr. at 42-44.

[19] Intervenors Ex. No. 242.

[20] Intervenors Ex. No. 274 at 274-002, 003.

rejected on April 16, 2013. Therefore, Audi did not consider the DPC or the materials received by Audi on May 2nd.[21]

## C.     Background of the Notice Issue While the Case was at SOAH

Budget filed its protest on May 14, 2013. In the protest, Budget and Mr. Weitz indicated that they submitted the applications for the franchises in accordance with Code § 2301.359. Audi replied to the protest on June 14, 2013, and admitted that the applications had been submitted in accordance with Code § 2301.359. In its reply to the protest, Audi only raised the affirmative defense that Intervenors lacked standing to participate in the protest proceeding. Audi followed its reply with a motion to dismiss for lack of standing. The ALJs denied Audi's motion to dismiss. Audi, therefore, did not raise lack of notice issues in its reply to the protest, in its initial motion to dismiss, or in its initial responses to Intervenors' request for disclosures.

Audi raised the notice issue for the first time on January 3, 2014, in its response to Intervenors' motion for summary disposition. The ALJs denied the motions for summary disposition. Following the hearing on the merits, Audi addressed the notice issue in its post-hearing briefs.

In their PFD, the ALJs rejected Audi's arguments and found that Intervenors had substantially complied with the notice provisions of Code § 2301.359(c)(3). In summary, the ALJs found that Mr. Weitz signed and submitted an application for an Audi dealership, which strongly suggested an agreement to comply with the franchise. On April 18, 2013, Mr. Weitz notified Audi, in writing that he intended to comply with Audi's requirements.[22] Given Mr. Weitz's clear intent to purchase the Audi dealerships and his willingness to adhere to any of Audi's requirements necessary to obtain the dealerships, the ALJs found that Mr. Weitz satisfied the requirement of Code § 2301.359(c)(3). Audi did not file any exceptions to the ALJs'

---

[21] Intervenors Ex. No. 277.

[22] Respondents Ex. 189.

findings that Mr. Weitz had substantially complied with the notice provisions of Code § 2301.359(c)(3).[23]

## IV. ANALYSIS OF REMAND NOTICE ISSUE

### A.     Did Audi Receive the Letter Dated April 30, 2013?

The Board's first question asks whether Audi received the letter dated April 30, 2013, from Mr. Weitz to Ms. Grimes? The answer is yes. Audi admits that it received that letter.[24] This issue is not in dispute; therefore, no further discussion is necessary.

### B.     Should the April 30, 2013 Letter be Added to the Record?

The Board's second question asks whether the letter should be added to the record, which the ALJs assume means admitted into evidence? The answer is yes.

Intervenors contend that the April 30th letter should be admitted into evidence because the *Rountree* and other decisions require substantial compliance with Code § 2301.359(c)(3), and the letter is one other document that shows Intervenors substantially complied with Code § 2301.359(c)(3). Respondents argue that the *Rountree* decision requires strict compliance; therefore, the April 30th letter is irrelevant and cannot be admitted into evidence because the letter was sent two weeks after Audi rejected the dealership applications and not all prospective transferees signed the letter.

---

[23] The ALJs emphasize that Audi barely addressed the notice issue during the 14 months this case was pending at SOAH. If notice was a primary, preliminary reason for Audi's rejection of the dealership agreements or basis for objecting to the protest, it seems very likely that Audi would have raised this issue early on in the proceeding. It did not. Furthermore, once the ALJs fully analyzed the notice issue in their PFD and made findings on substantial compliance, Audi did not file exceptions. The notice issue appears to have become a concern for Audi only after the Board assumed jurisdiction of this case.

[24] Intervenors Ex. No. 274 at 274-002, 003.

The ALJs admitted the April 30th letter into evidence during the remand hearing on the merits.[25] Given that the ALJs find that the appropriate standard is substantial compliance (as further discussed below), the letter is one other document showing Intervenors substantially complied with the notice provisions of Code § 2301.359(c)(3). Moreover, the ALJs find there is no harm in admitting the letter and, since Audi received the letter, it is not unfairly prejudiced by its admission. Audi clearly is not harmed by admission of the letter because it never complained that Intervenors had failed to comply with Code § 2301.359(c)(3). In fact, Audi stated that Mr. Weitz's application was "complete." In Audi's reply to the protest, Audi confirmed that Budget and Mr. Weitz submitted notice and an application "in accordance with the provisions of Tex. Occ. Code, Title 14, 2301.359."[26] Next, Audi moved to dismiss the protest, but did not raise non-compliance with the Code or Intervenors' purported lack of agreement to be bound by the terms of the Audi dealer agreement as a ground for dismissal. Audi also did not raise those arguments in its initial responses to Intervenors' request for disclosures and, in fact, Audi did not raise the arguments until the summary disposition stage (at least eight months into this contested case). The ALJs denied the motions for summary disposition.

After the first evidentiary hearing, in post-hearing briefs, Audi argued that Intervenors had not complied with the Code's requirement to comply with the terms of Audi's dealer agreement. In their PFD, the ALJs found that Intervenors had substantially complied with Code § 2301.359(c)(3).[27] Audi did not file exceptions to these findings.

Now, as part of the remand proceeding, Respondents argue that Intervenors' (and the Headwater entities') failure to submit a statement of compliance before April 16, 2013, precludes its admission. The ALJs disagree. Before April 16, 2013, Mr. Weitz (and Intervenors) repeatedly submitted documentation as Audi requested certain documentation and updated information to complete the application. For example, Mr. Weitz notified Audi of his intent to purchase the Audi dealerships on December 20, 2012, when he introduced himself as a

---

[25] The ALJs overruled Respondents' relevance objection.

[26] *See* Protest at ¶ 1 and Audi's June 14, 2013 Reply to Protest ¶ 2.

[27] *See* PFD at 12-14.

"candidate to be an Audi dealer" and sought a dealer application from Audi.[28] Mr. Weitz also completed, signed, and submitted two copies of Audi's form document entitled "Application For an Audi Dealer Agreement," one for each Audi location. On both applications, Mr. Weitz indicated that the purpose of his application was "to be granted an Audi dealer agreement."[29] In addition, on April 18, 2013, Mr. Weitz notified Audi, in writing, that he "want[s] to comply 100% with Audi's requirements."[30] At the hearing, on March 10, 2014, Mr. Weitz testified that he is "absolutely" willing to sign a dealer agreement and is committed to doing anything requested by Audi with respect to a dealer agreement.[31] From January through April 2013, Mr. Weitz submitted vast amounts of documentation at Audi's request, and Audi never requested a "written agreement to comply with the franchise." The admission of the April 30th letter is one more document indicating that Intervenors intend to comply with Audi's franchise agreement.

C.   **If the April 30, 2013 Letter is Admitted, What Effect, if Any, Does the Letter Have on the Issue of Compliance with Tex. Occ. Code § 2301.359 in Light of the Agency's Prior Decision in *Gordon Rountree, Ltd. v. Mazda Motors Cars of America*, MVD Docket No. 07-0038.LIC?**

The Board's third question asks, if the April 30th letter is admitted, what effect does it have on compliance with Code § 2301.359 and the *Rountree* decision? Code § 2301.359 governs the transfer of an automobile dealership's ownership between the dealership's proprietor and a prospective buyer. Specifically, it governs the notice that a transferee/buyer must provide to the manufacturer regarding the sale of a franchise. As part of the notice requirements, a prospective transferee/buyer must provide a written statement of its intent to abide by the manufacturer's franchise agreement. As discussed below, the ALJs find the Code requires substantial compliance with notice provisions under Code § 2301.359(c)(3).

---

[28]   Intervenors Ex. 22.

[29]   Respondents Exs. 52, 312.

[30]   Respondents Ex. 189.

[31]   Tr. at 1907-09 (initial hearing on the merits, March 10, 2014).

Generally, case law supports substantial compliance with a statutory provision by requiring substantial compliance with the essential elements of the statute.[32] The concept of substantial compliance works to excuse deviations from a statutory requirement if such deviations do not hinder the legislative intent behind the requirement.[33] Thus, substantial compliance with Code § 2301.359 is the proper standard to apply in this case, particularly where the evidence shows that Audi had proper notice of Mr. Weitz's (and Intervenors') intent to comply with Audi's franchise agreement and did not reject the applications based on lack of notice.

The legislative history for Code § 2301.359 does not indicate whether substantial or strict compliance is the standard under Code § 2301.359. However, the courts have addressed Code § 2301.359, and the decisions illustrate substantial compliance as the appropriate standard for notice of application to a manufacturer. For instance, in *Ford Motor Co. v. Motor Vehicle Bd. of Texas Dept. of Transp.*,[34] numerous deficiencies existed in the seller's notice to Ford under Code § 2301.359, including an incomplete application from the proposed transferee and no final sales agreement. The Third Court of Appeals nevertheless rejected Ford's assertion that the Board had no jurisdiction to hear the seller's protest of Ford's rejection, stating that the Board had such jurisdiction. The Court held that "[i]nadequacies in a notice of a proposed sale and supporting materials sent to a manufacturer may make rejection of the sale more reasonable and, thus, may affect the assessment of the merits of the protest of the rejection, but we are not persuaded that such inadequacies deprive the Board of the power to consider the protest."[35]

The Court reached a similar result in *Ultimate Ford v. Motor Vehicle Div. of Texas Dept. of Transp.*[36] In this case, the dealerships claim that their rights were prejudiced because the

---

[32] *J.C. Evans Const. Co., Inc. v. Travis Cent. Appraisal Dist.*, 4 S.W.3d 447, 451 (Tex. Civ. App.—Austin 1999, no pet.)

[33] *Id.*

[34] *Ford Motor Co. v. Motor Vehicle Bd. of Texas Dept. of Transp.*, No. 03-05-00290-CV, 2008 WL 1912102, at * 3-4 (Tex. App.—Austin May 1, 2008, pet. denied) (mem. op.).

[35] *Id.* at 4.

[36] *Ultimate Ford v. Motor Vehicle Div. of Texas Dept. of Transp.*, No. 03-09-00548-CV, 2010 WL 3370683, at *4-5 (Tex. App.—Austin Aug. 27, 2010, pet. denied) (mem. op.).

termination notice provided by the manufacturer, Ultimate Ford, did not track the notice language under Code § 2301.453(c)(2). Although the Court recognized that Ultimate Ford's notice had not strictly followed the language of the statute, it, nonetheless, held that only substantial compliance was required when sending termination notice to dealership. The Court specifically stated that "[t]he evident purposes of this requirement is to ensure that a dealer facing termination is notified of its statutory rights to protest the termination and obtain a hearing, and how to do so."[37] And, although Ultimate Ford had not strictly followed the notice requirement under Code § 2301.453(c)(2), the Court found that its notice to the dealerships had satisfied the purpose of the statute.[38]

The ALJs find that the *Rountree* decision[39] also suggests substantial compliance as the appropriate standard.[40] Furthermore, the *Rountree* decision recognizes that a party can waive notice requirements.[41] Respondents argue that *Rountree* requires strict compliance. The ALJs do not interpret *Rountree* as requiring strict compliance with the notice provisions under Code § 2301.359(c)(3). In *Rountree*, the Board faced an issue dealing with waiver of the Code's certified mail notice requirement and an incomplete application. Specifically, the Board found that Mazda waived the certified mail requirement because Mazda treated certain communications as the notice of transfer, responded to the seller and buyer, requested other materials, and referenced the 60-day timeframe for evaluation. Although *Rountree* addressed waiver of the certified mail requirement, the decision suggests that other notice requirements can also be

---

[37] *Id.* at 5.

[38] *Id.* at 5. *See also, Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, Docket No. 01-0040.LIC (July 16, 2004) (ALJ finding that strict compliance with Code's notice provisions is not required); and *Houston Mack Sales & Service, Inc. v. Hayes Leasing Co., Inc.*, MVD Docket No. 10-0042.LIC (Jan. 13, 2011) (reversing ALJ's holding of dismissal based on strict compliance, stating: "[N]otice should not be deemed defective because it does not contain 'magic words;' rather, notice should be considered defective if it does not substantially comply with the notice requirements or does not function to provide the recipient with adequate information. A notice requirement. . . is not intended as a hurdle or stumbling block to participation.").

[39] *Gordon Rountree Motors, Ltd. v. Mazda Motors of America*, Docket No. 07-0038.LIC (May 4, 2010).

[40] The *Rountree* decision never discusses notice in terms of strict versus substantial compliance, so it is not entirely clear what standard was applied. Furthermore, the conclusions of law state that the notice and application did not comply with Code § 2301.359. Other than the certified mail notice requirement, no other notice provision was discussed, and *Rountree* was decided primarily because of the seller's deficient application.

[41] Waiver is established by a party's express renunciation of a known right, or by silence or inaction for so long a period as to show an intention to yield the known right. *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996).

waived. In other words, *Rountree* states that a manufacturer can *waive* specific objections to notice by moving forward with application process and essentially failing to object in a timely manner to notice deficiencies. It is also important to note that, although the *Rountree* decision discusses notice, the decision primarily discusses the piecemeal/incomplete application. In this case, Audi did not reject the application based on incomplete or deficient applications. In fact, Audi had sufficient information from the applications to deny them based on financing, lack of automobile experience, and ownership structure.

Here, Mr. Weitz submitted an application to Audi on December 20, 2012. During February and March 2013, Mr. Weitz provided additional information to Audi, primarily concerning finances and ownership structure. On April 16, 2013, Audi rejected the application on the following grounds: (1) financing concerns; (2) Headwater had limited experience in the automobile industry; and (3) Audi did not approve of the capitalization structure. Nothing in the April 16, 2013 rejection letter suggested notice was insufficient or that Audi was rejecting the application based on a failure to agree to the franchise. It was not until January 2014 (in a response to a summary disposition motion) that Audi asserted notice was insufficient under Code § 2301.359. Thus, Audi's actions fit within the definition of waiver, which states, ". . . silence or inaction for so long a period as to show an intention to yield the known right . . . ."[42] For eight months, Audi failed to assert any notice problem that would impact the applications. Not only did Audi fail to address a notice deficiency during the application process, it also failed to address the issue until eight months after the case had been referred to SOAH.[43] Although Audi revived the issue in post-hearing briefs, the ALJs rejected its argument and held that Mr. Weitz had substantially complied with the notice provisions of Code § 2301.359(c)(3). Audi did not file any exceptions to the ALJs' findings of fact or conclusions of law that Mr. Weitz had substantially complied with Code § 2301.359(c)(3), further indicating that Audi waived this issue.[44]

---

[42] *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996).

[43] By moving forward with the proceeding and not complaining about notice, Audi, as explained in the *Rountree* decision, waived its right to complain about notice.

[44] Although Audi relies on the *Rountree* decision to support its strict compliance argument, the ALJs point out that Audi never mentioned the *Rountree* decision during the original hearing or in any briefs or motions.

Even without the April 30, 2013 letter from Mr. Weitz to Ms. Grimes, the ALJs find that Intervenors substantially complied with Code § 2301.359 notice provisions. The April 30th letter is one more document and piece of information that supports substantial compliance with Code § 2301.359. The April 30th letter, however, does not show that Mr. Weitz (and Intervenors) strictly complied with Code § 2301.359(c)(3). Although the ALJs find the case law strongly supports substantial compliance as the standard, if the Board finds that the *Rountree* decision controls and requires strict compliance, the evidence does not necessarily show that Intervenors strictly complied with Code § 2301.359(c)(3) because they did not provide a written statement to comply with the franchise with their initial application.[45] Although the notice to comply with the franchise was not sent with the initial application or amended application, the evidence shows that Mr. Weitz intended for the April 30th letter (although sent later in the application process and after the April 16, 2013 rejection letter) to be part of the original application because Mr. Weitz references the December 14, 2012 DPC and the February 9, 2014 amended DPC.[46] Furthermore, Mr. Weitz sent the April 30th letter on behalf of himself, Hi Tech North, and Hi Tech South, the prospective transferees.[47]

Because Audi failed to raise the notice issue as a preliminary matter and, in fact, did not raise the issue until eight months after the case had been referred to SOAH, Audi waived the notice requirement under Code § 2301.359(c)(3), whether the Board finds the standard to be strict or substantial compliance. The case law, however, supports substantial compliance as the appropriate standard for the notice requirements under Code § 2301.359(c)(3). Furthermore, the evidence shows that Intervenors substantially complied with Code § 2301.359(c)(3). Finally, Audi admitted in its reply to the protest that Intervenors had complied with Code § 2301.359(c)(3).

---

[45] The ALJs find that the *Rountree* decision focuses more on waiver of notice requirements as opposed to a discussion of strict versus substantial compliance of notice requirements. The *Rountree* decision finds that a party can waive notice requirements, which strongly suggests substantial compliance as the appropriate standard.

[46] Intervenors Ex. No. 242. Attached to the April 30th letter were the original and amended applications for each dealership.

[47] Tr. at 56-60.

## V. REVIEW OF QUALIFYING CONDITIONS IN FINDINGS OF FACT

### A.     The Remand Order

In the Remand Order, the Board requested that the ALJs review the qualifying conditions set forth in FOF Nos. 154-158,[48] Intervenors' Motion to Find the Prospective Transferees Qualified (Motion), and Audi's Response (Response) to the Motion. The Remand Order also directed the ALJs to provide a specific finding that prospective transferees either are qualified or are not qualified. The following constitutes the FOFs under review and specific findings of the ALJs concerning the qualifications of the prospective transferees.

### B.     Review of FOF Nos. 155 and 156:   Operational Acumen Requirements

> **FOF 155:** The operational acumen requirement can be resolved between the overly-qualified majority owner (Mr. Weitz and Hi Tech Partners) and the under-qualified minority owner (Headwater Hi Tech) only if Headwater Hi Tech completely and fully relinquishes its contractual operational control to give written consent on any and all dealership management decisions whatsoever, including, but not limited to, indebtedness, expenditures, or employee pay, and instead, occupies the role of a "silent" investment partner.

> **FINDING:** The Prospective Transferees have complied with this requirement.

> **FOF 156:** The operational acumen requirement can be resolved if Headwater Hi Tech completely and fully relinquishes its contractual operational control to a Forced Sale, or any provision that resembles a Forced Sale section, and instead, proceeds as a "silent" investment partner.

> **FINDING:** The Prospective Transferees have complied with this requirement.

---

[48] The section where Findings of Fact (FOF) Nos. 154-158 are found is entitled "*Retention of Jurisdiction.*" The first FOF under that section, FOF 154, states "[t]he Intervenors, as the prospective transferees, are not qualified but would be qualified under the specific conditions set forth in the Findings of Fact below." Thus, FOF 154 will not be reviewed separately, except in the context of the other FOFs.

1.     **Background**

To better understand the issues, it is essential to examine the complex ownership structure of the four proposed dealerships at issue in this case.[49] At the dealership level, each of the four dealerships being purchased will be owned by a separate limited liability company "doing business as" Porsche of Austin, Maserati of Austin, Audi South Austin, and Audi North Austin (the Dealership Entities). The four Dealership Entities, respectively, are Hi Tech Italian Imports, LLC (Hi Tech Italian); Hi Tech Imports; Hi Tech South; and Hi Tech North. Each of the Dealership Entities is wholly owned by a holding company, Motorcars.

Hi Tech Partners, LLC owns 50.1% of Motorcars. Mr. Weitz is the manager of Hi Tech Partners. Through NICPA Austin Motorcars, LLC (NICPA)[50] and the Weitz 1998 Trust, Mr. Weitz is the sole owner of Hi Tech Partners.

The second largest owner of Motorcars, with a share of 46.36%, is Headwater Hi Tech Partners, LLC (Headwater Hi Tech). Headwater Hi Tech was created specifically for this transaction, and is an investment mechanism through which Headwater LP will provide its investment into Motorcars. At present, Headwater Hi Tech is wholly owned by Headwater GP. Once Headwater LP funds Headwater Hi Tech by infusing capital into Headwater Hi Tech, Headwater LP will become the 100% owner of Headwater Hi Tech, and Headwater GP will relinquish all of its ownership interest in that company.

The remainder of Motorcars, 3.54%, is owned by Charles Ross Bartley and K. Rick Turner, either individually or through entities controlled by them. Mr. Bartley, individually, owns 1.034% of Motorcars. Equity Trust Company FBO Charles Ross Bartley Individual Retirement Account (Bartley IRA) owns .295% of Motorcars. The K. Rick Turner Revocable Trust (Turner Trust) owns 1.625% of Motorcars and the Turner Family Partnership (Turner Partnership) owns .591% of Motorcars.

---

[49] *See* Proposal for Decision at 4-5.

[50] NICPA was created specifically for this transaction. It is named after Mr. Weitz's two children, Nicole and Paul. Mr. Weitz is the Manager of NICPA.

In sum, the four dealerships are 100% owned by Motorcars, which is composed of:

- 50.1% Hi Tech Partners (Mr. Weitz and his family trusts);
- 46.36% Headwater Hi Tech (Corbin Robertson III, co-managing partner); and
- 3.54% by Charles Ross Bartley and K. Rick Turner, either individually or through entities.

To put the operational acumen requirement controversy in context, Code § 2301.359 provides the factors that a manufacturer may consider in determining whether to approve or reject an application: (1) the transferee's financial and operational performance as a dealer, if the transferee is or has been a franchised dealer; (2) the transferee's moral character; or (3) the extent to which a transferee satisfies any criteria developed by the manufacturer and made available to the transferee, specifically to determine the business experience and financial qualifications of a transferee.[51] As to the criteria, the manufacturer may only consider criteria developed by the manufacturer if they are in writing, reasonable, and uniformly applied in similar situations.[52] A manufacturer may not reject a transferee who is of good moral character and who satisfies the criteria developed by the manufacturer.[53]

In the PFD, the ALJs categorized Audi's rejection reasons into three broad categories: (1) the control of the Audi dealerships would have been placed at risk (operational control); (2) the proposed owners lacked sufficient operational acumen (operational acumen); and (3) the transaction did not meet Audi's 1:1 debt-to-equity ratio requirement (debt-to-equity requirement).[54]

As relevant to the Remand Order and FOFs 155 and 156, in the Turndown Letter, Audi rejected the transaction because Headwater Hi Tech's ownership share, via its $15.7 million investment, was contingent upon excessive operational control conditions contained in a written

---

[51] Code § 2301.359(g)(1), (2), and (3).

[52] Code § 2301.359(h).

[53] Code § 2301.359(i).

[54] *See* PFD at 24.

agreement. In particular, as alleged by Audi in the original hearing in March 2014, Headwater Hi Tech had excessive operational control in the form of a contractual right in the First Amended Motorcars' Agreement to give written consent (Written Consent) on major dealership management decisions and the ability to have a "Forced Sale" (Forced Sale). The Forced Sale provision was triggered either by: (1) the seventh anniversary of the effective date of the First Amended Motorcars' Agreement; or (2) the occurrence of a material default. Audi estimated that a Forced Sale would be initiated on March 8, 2020, unless a material default was declared earlier, and that the Forced Sale section was a planned exit strategy for Headwater Hi Tech to receive its investment and a return. Thus, Audi argued that Headwater Hi Tech's investment "looked" and "felt" like a loan, and therefore the entire $15.7 million investment was debt and not equity for the debt-to-equity requirement.

The ALJs agreed with Audi, and found that the operational acumen requirement could only be resolved if Headwater Hi Tech completely and fully removed the Written Consent and Forced Sale provisions, and instead, proceeded as a silent investment partner. As explained below, the ALJs are persuaded that the conditions in FOF Nos. 155 and 156 are satisfied and the prospective transferees are qualified on these matters.

## 2.    The Post-PFD Revised Company Agreement

On July 1, 2014, Motorcars' members drafted Hi Tech Motorcars, LLC Second Amended and Restated Company Agreement (Revised Agreement)[55] and submitted the Revised Agreement to the DMV Board on August 28, 2014, in connection with the Motion and Response. The Revised Agreement was signed and approved by Mr. Bartley and Mr. Turner,[56] but will not be signed by Headwater Hi Tech until the DMV Board approves the transfer.

In support of the qualification finding, Intervenors presented the testimony of Mr. Robertson, co-managing partner of Headwater Investments, a well-funded private

---

[55] Intervenors Ex. No. 259.

[56] Intervenors Ex. Nos. 266 and 267.

investment partnership.[57] Mr. Robertson testified that the four-member investment committee of Headwater Investments met and voted to remove the Written Consent and Forced Sale in the Revised Agreement and to fund the entire Headwater Hi Tech investment in cash if the transfer is approved.[58] In return for the removal of the Written Consent and Forced Sale sections, Mr. Robertson testified that he asked Mr. Weitz if he would sign an "Unconditional Personal Guaranty,"[59] a written contract that ensures that the initial equity investment made by Headwater Hi Tech would be repaid in the event of a default.[60] If the Board approves the Revised Agreement, Headwater Hi Tech will sign this agreement, according to Mr. Robertson.[61]

As to Audi's concern that the Written Consent and Forced Sale provisions would be restored in a newly revised company agreement after the Remand proceedings, Mr. Robertson testified that no amendment would occur. He also pointed out that Mr. Weitz would not agree to any revision giving up control and Headwater Hi Tech would have no leverage over his decision.[62] Mr. Robertson stated, however, that if Mr. Weitz's personal guaranty is an impediment to transfer, then it will not be required.[63]

Mr. Weitz confirmed that he agreed to the personal guaranty of Headwater Hi Tech's investment.[64] But, he only agreed to guarantee Headwater Hi Tech's equity investment on the occurrence of an Event of Default, defined as: (1) bankruptcy of Motorcars; (2) liquidation of Motorcars; or (3) sale of all or substantially all of the assets of Motorcars or merger of Motorcars

---

[57] Mr. Robertson testified in the original hearing that Headwater Investments has $220 million in capital available for investments. *See* PFD at 54.

[58] Tr. at 250-51.

[59] Intervenors Ex. No. 245.

[60] Intervenors Ex. No. 245. Tr. at 251-52; 245.

[61] Tr. at 256.

[62] Tr. at 296.

[63] Tr. at 299, 300.

[64] Tr. at 332.

with or into another person or entity.[65] Moreover, even those events do not constitute events of default if they are "proximately caused by" Headwater Hi Tech.[66]

To show that the operational acumen requirement has not been satisfied by the removal of the Written Consent and Forced Sale sections, Audi presented the expert testimony of Robert A. Ragazzo, a law professor at the University of Houston Law School.[67] Mr. Ragazzo testified that for the removal of the controversial sections, Mr. Weitz had to agree to a personal guaranty that gives Headwater Hi Tech "substantial influence" over the operations of the dealership.[68] For instance, in the event of a possible default, Headwater Hi Tech may choose not to enforce the guaranty so that it may exercise substantial leverage over the dealership.[69] In this event, Mr. Weitz would want to cooperate to prevent the default to the detriment of Audi, according to Mr. Ragazzo.

Concerning Audi's concern that the Revised Agreement would be amended after the transfer is approved, Mr. Ragazzo pointed out that the agreement could be amended "by written consent of Members holding 60% of the LLC interests."[70] So, if Mr. Weitz and Headwater Hi Tech agreed to reinstate the Written Consent and Forced Sale sections, these obligations could be put back in at any time.[71] Mr. Ragazzo conceded, however, that the controversial provisions were removed from the Revised Agreement, and there are no provisions that require Mr. Weitz to give Headwater Hi Tech any greater control.[72]

---

[65] Intervenors Ex. No. 245.

[66] Intervenors Ex. No. 245 at 002.

[67] Tr. at 686.

[68] Tr. at 686-87.

[69] Tr. at 687.

[70] Intervenors Ex. No. 259.

[71] Tr. at 691.

[72] Tr. at 698-99.

### 3. ALJs Analysis of FOF Nos. 155 and 156

Audi has raised two key issues concerning whether the operational acumen requirement can be resolved between the overly-qualified majority owner, Mr. Weitz, and the under-qualified minority owner, Headwater Hi Tech, by the removal of its Written Consent and Forced Sale contractual operational control sections. First, Audi contends that the Revised Agreement is an unsigned and unexecuted "draft" that can be easily amended to revise the two sections; and second, Audi refutes that Headwater Hi Tech has relinquished its contractual operational control due to the personal guaranty.

Audi maintains that, because the Revised Agreement is unsigned by all Motorcar members, it remains a "draft" and the former agreement is the operative agreement. Further, Audi cannot ensure that the Revised Agreement is signed after approval. The ALJs reject this argument, however, based on the credible testimony of Mr. Robertson that the investment committee has approved and will sign the Revised Agreement, the testimony of Mr. Weitz that he intends to sign the Revised Agreement, and the signature pages of Mr. Turner and Mr. Bartley indicating that they have already signed it. There is simply no evidence in the record that the Revised Agreement will not be the operative document in this transaction, or that it will remain an unexecuted draft.

Audi further argues for disqualification of the prospective transferees because the Revised Agreement can easily be amended by 60% of the Motorcars' members. The ALJs are persuaded by the testimony that Headwater Hi Tech and Mr. Weitz have no intention, or nefarious motives, to amend the agreement to add the Written Consent and Forced Sale sections back into the agreement after approval by the Board. Further, Texas Occupations Code § 2301.478(b) imposes a requirement of good faith and fair dealing on every party to a franchise agreement. ("Each party to a franchise owes to the other party a duty of good faith and fair dealing that is actionable in tort."). Therefore, the ALJs do not find the unlikely possibility that the prospective transferees will put these two sections back into the Revised Agreement, after two contentious hearings regarding these sections and after Board approval, as grounds for a finding that FOF Nos. 155 and 156 have not been satisfied.

As to whether the Personal Guaranty by Mr. Weitz provides Headwater Hi Tech disqualifying contractual operational control, the ALJs conclude that it does not. First, the evidence shows that the guaranty was requested by Mr. Robertson but not required as a condition for investment, as confirmed by the two parties familiar with the circumstances. Instead, the personal guaranty indicates that Headwater Hi Tech is giving up contractual operational control of the dealership by seeking to protect its investment only in the event of default (Motorcars bankruptcy, liquidation, or sale or merger). Headwater Hi Tech has now assumed the role as silent investor with no contractual operational control.

Second, Mr. Ragazzo offered speculative testimony that if there was a possible default, Headwater Hi Tech could use forbearance (i.e. delayed right to collect on the debt) on the guaranty to "take over" the dealership. However, an examination of the Revised Agreement and Personal Guaranty does not show any contractual provision that would allow Headwater Hi Tech to assume control nor was there testimony that Headwater Hi Tech intended to use the Personal Guaranty as a leverage device. Instead, it is unlikely that a series of events--a possible default, an agreement for forbearance by Headwater Hi Tech, and an agreement by Mr. Weitz to give up control--would result in a takeover of the dealership. Mr. Robertson's repeatedly stated intention to give up all control to Mr. Weitz indicates Headwater Hi Tech's objectives in this business venture. If an expert has offered nothing to suggest that what he believes could happen has actually happened, the opinions are little more than subjective belief or unsupported speculation.[73] The ALJs, therefore, decline to find that the prospective transferees are disqualified based on the unlikely possibility that the Revised Agreement would be unsigned, or revised to include the two provocative sections, or that guaranty in the event of possible default could be used as leverage for control.

In sum, Intervenors have demonstrated full compliance with the conditions contained in FOF Nos. 155 & 156, and as such, are now qualified.

---

[73] *U.S. Renal Care, Inc. v. Jaafar*, 345 S.W. 3d 600, 607 (Tex. App.—San Antonio, 2011, pet. denied).

### C.    Review of FOF No. 157:  Bridge Loan

> **FOF 157**: The debt-to-equity requirement can only be satisfied under the following circumstances:  if a bridge loan will be used at closing, then this loan must be disclosed within 30 days of the closing to Audi, and the debt-to-equity ratio must be evaluated with the bridge loan included as debt.
>
> **FINDING**:  The Prospective Transferees have complied with this requirement.

In the original 2014 hearing, this controversy was rooted in Headwater Hi Tech's retention of the option to use a 90-day short-term loan, referred to as a "bridge loan" (bridge loan) to fund its $15.7 million investment.[74]  The bridge loan might have been necessary in the event that the limited partners' capital calls, or contractual monetary obligations, were not received in time for the closing, according to Mr. Robertson.

In the PFD, the ALJs agreed that use of the bridge loan for Headwater Hi Tech's $15.7 million investment must be included in the debt-to-equity ratio as debt rather than as equity, and must be disclosed to Audi within 30 days of the closing if a bridge loan would be used.  As explained below, the ALJs are persuaded that the condition in FOF No. 157 is satisfied, that Headwater Hi Tech will use cash and not debt to fund this transaction, and that the prospective transferees are qualified on this matter.

Mr. Robertson testified that Headwater Hi Tech will not use a bridge loan or any other debt to close this transaction but instead, will call equity capital from the partners before the closing to fund Headwater Hi Tech's portion of the transaction.[75]  In particular, according to Mr. Robertson, Headwater Hi Tech will fund the real estate down payment and its portion of the purchase of the dealerships with $18.5 million in cash that it will have in the Headwater I

---

[74] *See* PFD at 41.

[75] Tr. at 259-60, 270, 277, 282, 288, and 317.

account to close the transaction.[76] Mr. Robertson explained that once a capital call is made, the limited partners must fund the call within ten business days.[77]

Mr. Robertson also pointed out that he submitted a letter to the Director of the MVD with the following statement as evidence of Headwater Hi Tech's commitment not to use a bridge loan: [78]

> Further, Headwater [Hi Tech] . . . would be willing to issue capital calls to its limited partners such that the purchase price for the transactions involving the purchase of the dealerships and the related real estate will be funded at closing with limited partner equity capital contributions, and not a bridge loan or other borrowed funds.

Mr. Weitz also testified that a bridge loan would not be used for this transaction.[79]

Herbert E. Walter, Audi's expert on financial and management models and analysis, testified that, on this issue, not enough detail was given in the letter submitted by Mr. Robertson to judge the veracity of the claim. For instance, no information was provided about who the parties are to the capital call, what their percentages are, or their ability to fund the transaction, Mr. Walter pointed out.[80]

Based on the evidence and testimony, the ALJs conclude that a bridge loan will not be used to fund Headwater Hi Tech's contribution to the real estate down payment and the dealership purchase. No witness contradicted Mr. Robertson's oral and written commitment to fund the contribution with $18.5 million in the Headwater I account at the time of closing. Although Mr. Walter noted that the letter from Mr. Robertson lacked detail, the ALJs find that this presents insufficient reason to nullify Mr. Robertson's representations. Thus, the ALJs are

---

[76] Tr. at 277.

[77] Tr. at 277-78.

[78] Intervenor Ex. No. 243.

[79] Tr. at 64.

[80] Tr. at 471.

persuaded that the condition in FOF No. 157 is satisfied, that Headwater Hi Tech will use cash to fund this transaction, and that the prospective transferees are qualified on this matter.

## D. Review of FOF No. 158: Cross-Collateralization Requirement

> **FOF 158:** The debt-to-equity requirement can also only be satisfied under the following circumstances: no cross-collateralization provisions will be permitted such that a default on one aspect of any loan causes a default on all other loans.

> **FINDING:** With the removal of the provision that all four dealerships must guaranty the loans of the other dealerships, the Prospective Transferees have complied with this requirement.

## 1. Background

In the PFD, the ALJs made a recommendation that the debt-to-equity ratio should be adopted, explaining the financial structure of this transaction:[81]

| Debt | | Equity | |
|---|---|---|---|
| Ally Bank | $17,500,000 | Hi Tech Partners | $16,958,850 |
| Real Estate | $20,000,000 | Headwater Hi Tech | $15,691,150 |
| | | Turner Trust | $200,000 |
| | | Turner Partnership | $200,000 |
| | | Bartley IRA | $100,000 |
| | | Down-Payment | $5,000,000 |
| **Total Debt:** | **$37,500,000** | **Total Equity:** | **$38,150,000** |

The ALJs found that the debt-to-equity should be calculated as: $\frac{37,500,000}{38,150,000} = 0.98$.

To summarize the issue from the original hearing and PFD, on April 1, 2012, Candido Pagan, the controller for the various Weitz entities, provided Audi with a copy of loan commitment letter (commitment letter) from Ally Financial (Ally), a division of Ally Bank, to verify that Ally intended to make a $17.5 million loan as part of the total purchase price of $75,650,000 for the four dealerships.

---

[81] *See* PFD at 61.

The commitment letter revealed, however, that Ally would also hold a real estate purchase loan for $20,000,000 by Hi Tech Realty, a realty company owned 50.1% by Hi Tech Partners and 49.9% by Headwater Hi Tech. Hi Tech Realty intended to enter into lease agreements with each of the four Dealership Entities.

In particular, the commitment letter confirmed Ally's willingness to extend the loan subject to terms and conditions, but provided that additional security was needed. On April 2013, Ally provided a Cross-Collateral, Cross-Default, Cross-Guaranty Agreement (CCG Agreement) agreement between Ally and the "Dealers" (Hi Tech Realty, Motorcars, the four dealerships, and Mr. Weitz). The CCG Agreement contained a "cross-collateralization" provision that provided as follows: "To secure payment and performance of all Obligations, each Dealer grants to each of the Ally Parties a continuing security interest in all collateral in which one of the Ally Parties now has a security interest."[82] The CCG Agreement also contained a "cross-default" provision, in pertinent part: "It is agreed that any default or breach by any Dealer will, at the option of the Ally Parties, constitute a default under each Security Agreement and Obligation and any or all promissory notes arising therefrom."[83]

The CCG Agreement also contained a guaranty agreement. That provision stated, in relevant part: "All Dealers, jointly and severally, unconditionally guarantee[d] the performance and payment of all Obligations owing by any Dealer to any of the Ally Parties . . . ."[84]

Audi pointed out that all of the real estate loans were collateralized not only by the real estate, but by the physical assets of all of the dealerships. The letter committed funds only if all dealership entities, along with Mr. Weitz personally, guaranteed the Ally Bank loans. Thus, a default by one entity was a default by all entities of all loans.

---

[82] *See* Respondents Ex. 257 from first hearing.

[83] *Id.*

[84] *Id.*

In the PFD, the ALJs agreed with Audi that the $20 million real estate loan by Hi Tech Realty, although technically a separate entity, must be characterized as debt and included in the debt-to-equity ratio, along with the $17.5 million loan committed by Ally bank. The ALJs determined that Audi properly concluded that the related entities were "in a sense one company," and the common ownership and intertwined debt obligations made the real estate loan a debt of all of the entities. The ALJs concluded that the debt of Hi Tech Realty was tied to the collateral of all the dealerships and that each of these separate legal entities would be responsible for the debts of the others.

The ALJs, therefore, concluded that Intervenors would be qualified as prospective transferees under the following circumstances: "no cross-collateralization provisions will be permitted such that a default on one aspect of any loan causes a default on all other loans."

## 2.    The Post-PFD Loan Documents

After the PFD was issued, new loan documents were drawn up by Ally to remove the CCG Agreement. Now there are four separate sets of loan documents, one for each of the dealership locations, rather than one set of loan documents for all locations.[85] Specifically, there are four Commercial Loan and Security Agreements between Ally and Motorcars; four Commercial Real Estate Loan and Security Agreements between Ally and Hi Tech Realty; and four Inventory Financing and Security Agreements between Ally and each dealership. There is no dispute that there are no CCG Agreements contained in any of the documents.

To explain the documents, Intervenors presented the testimony of Anita Bhama, who drafted the documents and who serves as Ally's in-house counsel for commercial lending operations.[86] She testified that Ally has extensive experience in car dealership financing and a large dealership portfolio. She explained that she used a "standard set" of loan documents, used

---

[85] Intervenors Ex. Nos. 260-63.

[86] Tr. at 141-43.

nationwide, for the four dealerships.[87] The documents are labeled "draft," and are proposed as a method to remove the cross-collateralization provision, according to Ms. Bhama.[88] She explained that cross-collateralization occurs when the property of one borrower is collateral for another borrower's loans or different loans of that same borrower; here, however, none of the individual dealerships has placed its assets for the debts of another of the dealerships.[89]

Ms. Bhama pointed out that, for instance, the Commercial Real Estate Loan for Hi Tech North is secured by a Deed of Trust on the land occupied by Hi Tech North only.[90] Hi Tech Realty's failure to pay or perform would trigger the default provision on this loan only. Ally has also agreed to make an inventory loan, or "floor plan loan" to Hi Tech North, as well as to the other three dealerships.[91] Each dealership is the borrower on its own floor plan loan, with its assets as the sole security in the event of default, according to Ms. Bhama.[92]

Ms. Bhama testified that the automotive credit and automotive risk committees, composed of eight to twelve Ally employees, must approve the form and content of the loans. She testified that the meeting occurred and the documents were approved, but conceded that she did not personally participate in the meeting.[93] She testified that these documents will be signed by Ally, if the dealership transfer is approved.[94]

Ally continues to require, however, that certain entities execute a guaranty agreement guaranteeing the payment and performance by the borrower.[95] Specifically, the bank has required six guaranty agreements: (1) all four dealerships and Motorcars guaranty the loan

---

[87] Tr. at 143.

[88] Tr. at 212-13.

[89] Tr. at 160.

[90] Intervenors Ex. No. 260, Tr. at 163-65.

[91] Intervenors Ex. No. 260 at 6028.

[92] Tr. at 177-78.

[93] Tr. at 193, 211.

[94] Tr. at 215.

[95] Intervenors Ex. No. 264.

repayment of Hi Tech Realty; (2) all four dealerships and Hi Tech Realty guaranty Motorcars; (3) Hi Tech Realty guaranties the four dealerships; (4) all four dealerships guaranty the other dealerships; (5) Motorcars guaranties all four dealerships; (6) Mr. Weitz, personally, guaranties the loan repayment of the four dealerships, Motorcars, and Hi Tech Realty.[96]

Ms. Bhama testified that each Guaranty states that "[a]lthough executed as a single document by the guarantors, a breach of the guaranty by one guarantor is not a breach by any of the other guarantors, but the liability of all parties signing this guaranty is joint and several."[97] She explained that a breach by one co-guarantor is not a breach by any other co-guarantor, but that Ally can pursue any of the guarantors, all of the guarantors, or a combination under the guaranty agreement for repayment. As to the joint and several liability clause in the guaranty, Ms. Bhama testified that it means that Ally can pursue Hi Tech Imports, Hi Tech Italian, Hi Tech North, Hi Tech South, either individually or some combination or all of them under this guaranty.[98]

The financial expert witnesses, Robert C. Davis, III, (on behalf of Intervenors) and Charles L. Williams (on behalf of Audi) differed on their opinions on whether the financial structure proposed violated FOF 158. Mr. Davis focused on the requirement in FOF 158 that the loans not contain cross-collateralization (i.e. no cross-collateralization provisions will be permitted such that a default on one aspect of *any loan* causes a default on *all other loans*). Mr. Williams, however, focused on the guaranties and whether a default on a loan causes a cascade of defaults such that cross-collateralization occurs.

Mr. Davis, who is a C.P.A. with a master's degree in professional accountancy from UT Austin, testified that the proposed loan documents comply with FOF No. 158.[99] For example, he pointed out that if Hi Tech Realty defaulted on its commercial real estate loan involving the

---

[96] Intervenors Ex. Nos. 264-65, Tr. at 384.

[97] Tr. at 180.

[98] Tr. at 236.

[99] Tr. at 372.

property where Italian Imports dealership is located, then no other dealership location would be affected by the default because it is not cross-collateralized with any other loan to any other Hi Tech entity.[100]

Mr. Davis explained that under generally accepted accounting principles (GAAP), a guaranty is not a loan because loan proceeds go to the borrower, and not to the guarantor.[101] Therefore, under GAAP, the borrower is primarily responsible for the payment of the loan, and the guarantor has a contingent obligation only. That is why there are separate documents and separate obligations, he explained, and they are not considered part of the loan. He testified that if there is a default under any one of the guaranty agreement there is not a default under all the loan agreements.[102] For instance, if Motorcars is asked to pay under a guaranty and it defaults in payment of its guaranty, no other loans, other than the loan where Motorcars is a borrower, would be in default. With the dealerships guaranteeing other dealerships, Mr. Davis testified that if a dealership defaults on a floor plan, for instance, the bank could ask another dealership to pay off the floor plan loan of the other dealership.[103]

Audi pointed out, however, that Mr. Davis did not take into account what occurs in the event there is a breach on one of the guaranties, but rather was looking at defaults in the loans. However, Mr. Davis pointed out that there would need to be a default in the loan and then a separate default in the guaranty before a bank could begin looking at the assets of a dealership.[104]

Mr. Williams, who has a BBA in finance and who has worked extensively in the banking industry since 1966, testified that the proposed loan documents do not meet the requirement of FOF 158.[105] Mr. Williams based his conclusion on the provision that "each of the four dealership entities would jointly and severally guarantee the Commercial Loan." The guaranty

---

[100] Tr. at 383.

[101] Tr. at 378-79.

[102] Tr. at 384-85.

[103] Intervenors Ex. No 265, Tr. at 402-03.

[104] Tr. at 426, 438-39.

[105] Respondents Ex. No. 445 at 13.

contains boxes that specified that "[Ally] was going to take collateral assignments of all of the assets of the four dealerships to secure the Commercial Loan." [106] According to Mr. Williams, the guaranty operates to effectively cross-collateralize the obligations in the event of default.

Mr. Williams explained that the loan structure of loans and guaranties means that the assets of the two Audi dealerships were pledged to not only secure the Audi dealerships debt to Ally, but also pledged to secure the debt of the other two different automobile manufacturers.[107] Thus, the Audi dealerships' assets would be at risk for the potential unsuccessful operation of the other two non-Audi dealerships over which Audi has no control.

Another issue raised by Audi as an impediment to qualification of the prospective transferees on FOF No. 158 is whether the $17.5 million loan from Ally can be used to purchase the dealerships. In this regard, Audi's financial expert, Mr. Walter, stated that the $17.5 million working capital loan is typically not used to fund the purchase of other companies; rather, working capital is used to fund daily operations including paying expenses and carrying a cash "float."[108] Mr. Walter testified that use of the proceeds for the purpose of acquiring the dealership is a breach of the loan agreement because it can only be used for working capital.[109] Therefore, if the funds related to the working capital are constrained to the use of those funds for purposes of working capital, ultimately the transaction as structured does not have adequate funding to purchase the dealerships, according to Mr. Walter.[110]

Mr. Weitz disagreed, however, and testified that the capital loan could be used for the closing of the dealership because it was for purchase of the working capital of the dealerships.[111] Intervenors also pointed out that Ms. Bhama testified that the capital loan could be used for the

---

[106] Respondents Ex. No. 445 at 8-9.

[107] Respondents Ex. No. 445 at 13.

[108] Respondents Ex. No. 445, Tr. at 512-13.

[109] Tr. at 518.

[110] Tr. at 536.

[111] Tr. at 357.

purchase of the dealerships.[112] Further, Intervenors argue that Ally's commitment letter for the $17.5 million loan to Motorcars stated that one of the purposes of the loan was to partially fund the initial capitalization of Motorcars.[113]

Lastly, Audi objects to the numerous blank spaces on the Ally loan forms and maintains that it cannot evaluate the terms of the loans. Mr. Weitz, however, testified that the amounts on the loans must be calculated by Mr. Pagan, but would not be filled in until closing.[114] Intervenors argue that the blanks are not filled in until closing, as is typical with any loan.

### 3.    ALJs' Analysis

Several issues have been raised by Audi concerning the financing structure proposed by Intervenors and Ally: (1) does the structure as proposed, with the various loans and guaranties, satisfy the ALJs' cross-collateralization and cross-default prohibition; (2) does the use of the commercial loan, which by its terms is for the use of "working capital," impact the equity-to-debt ratio; and (3) does the submission of proposed "draft" documents make it impossible for Audi to assess the viability of the loans or guaranties?

As to FOF No. 158: "no cross-collateralization provisions will be permitted such that a default on one aspect of any loan causes a default on all other loans," the ALJs concur with Intervenors that the present proposed loan documents[115] comply with FOF No. 158. The ALJs also agree, however, with Audi that in requiring that all four dealerships (two Audi dealerships, one Porsche dealership, and one Maserati dealership) to guarantee each other's dealerships, Ally

---

[112] Tr. at 174.

[113] Respondents Ex. No 304 at VWG 00307.

[114] Tr. at 215.

[115] The loan documents consist of four Commercial Loan and Security Agreements between Ally and Motorcars; four Commercial Real Estate Loan and Security Agreements between Ally and Hi Tech Realty; and four Inventory Financing and Security Agreements between Ally and each dealership.

has overreached.[116]    By requiring that one manufacturer's dealership (i.e. Audi dealership) guaranty the financial performance of another's manufacturer's dealership (i.e. Porsche or Maserati dealership), Audi is correct in asserting that the assets of the two Audi dealerships are subject to the potential unsuccessful operation of the other two non-Audi dealerships over which Audi has no franchise control.    The requirement that all four dealerships, regardless of the particular manufacturer's product represented in the dealership, guaranty the performance of all other dealerships does not comply with FOF 158 and must be removed.    In their exceptions to the PFD, the Intervenors must provide proof to the ALJs and the Board that the dealership guaranty of other dealerships provision has been removed to meet the requirement of FOF 158.

Regarding the loan documents, the evidence shows that each type of loan–commercial loan, commercial real estate loan, and floor plan loan–is solely tied to a particular dealership and thus, does not demonstrate cross-collateralization.    Cross-collateralization is defined as, "an installment-contract provision allowing the seller, if the buyer defaults, to repossess not only the particular item sold but also every other item bought from the seller on which a balance remained due when the last purchase was made."[117]    Here the loans are structured so that cross-collateralization does not occur across dealerships or across particular types of loans.    For instance, if Hi Tech Italian, the Maserati dealership, fails to pay its floor plan loan then that would not cause a default of any other dealership's floor plan loan, such as the Audi dealership, nor does it result in a default on the real estate loan or commercial loan of any other dealership. No other dealership is affected by Hi Tech Italian's default on the floor plan loan.

Likewise, if Motorcars (a holding company composed of Headwater Hi Tech, Hi Tech Partners, and Mr. Turner and Mr. Bartley, individually or through entities) fails to pay its commercial loan to Ally, then no other loan of any other dealership would go into default. The evidence shows that the property of any other dealership does not serve as the collateral for

---

[116] The six guaranty agreements are:  (1) all four dealerships and Motorcars guaranty the loan repayment of Hi Tech Realty; (2) all four dealerships and Hi Tech Realty guaranty Motorcars; (3) Hi Tech Realty guaranties the four dealerships; (4) all four dealerships guaranty the other dealerships; (5) Motorcars guaranties all four dealerships; (6) Mr. Weitz, personally, guaranties the loan repayment of the four dealerships, Motorcars, and Hi Tech Realty.

[117] *Blanco Nat'l Bank v. Gonzalez*, 04-12-00079-CV, 2013 WL 1760604, at *5 (Tex. App.—San Antonio Apr. 24, 2013, no pet.) (mem. op.).

Motorcars' commercial loan. The only property pledged as security for the loans to Motorcars is its own property and not the property of the four dealerships. The evidence also shows that with the real estate loans, there are four deeds of trusts, one for each property. Thus, after considering all evidence and testimony, the ALJs conclude that the proposed loan documents comply with FOF No. 158.

A guaranty creates a secondary obligation whereby the guarantor promises to answer for the debt of another; and a creditor may call upon the guarantor to perform once the primary obligor has failed to perform.[118] The principal must default or be unable to perform the contract before the party can move against the guarantor.[119] Here, all the entities—Motorcars, Hi Tech Realty, and the dealerships—have agreed to a guaranty of the loans of each other. In this situation, if Motorcars defaults on one of the four loans, then the guaranties of all of the loans would be in default but it would not affect Hi Tech Realty's four loans, nor would it affect the four dealerships' floor plan loans. Similarly, Hi Tech Realty's loans, which are secured by the land where the dealerships are located, would not affect the commercial or floor plan loans of the dealerships if the Hi Tech Realty's loans were to go into default.

Where the guaranties become troubling to the ALJs is the requirement that dealerships must agree to the guaranty of the loans of the other dealerships. This presents a particularly unenviable situation where the Audi dealerships are required to directly guaranty the loans for their competitors, Maserati and Porsche. The dealership guaranties, which are secondary obligations to the loans, grant a collateral assignment of all vehicles, other inventory, equipment, etc. in all other dealerships. For instance, if Hi Tech Italian, the Maserati dealership, defaults on its loan, then under the guaranty, Ally has the right to move against the other three dealerships. These provisions put the Audi dealerships directly at risk for the performance of the other manufacturer's dealerships. The ALJs agree with Audi's banking expert, Mr. Williams, who pointed out that the Audi dealerships' assets would be at risk as to the potential unsuccessful operation of the other two non-Audi dealerships over which Audi has no franchise control.

---

[118] *Byrd v. Estate of Nelms*, 154 S.W. 3d 149, 157 (Tex. App.—Waco 2004, no pet.).

[119] *Ray v. Spencer*, 208 S.W. 2d 103, 104 (Tex. Civ. App.—Texarkana 1947, writ refused).

Thus, the requirement of all dealerships guaranteeing each other dealership's performance, regardless of the manufacturer, is overreaching by Ally and does not meet the requirement of FOF No. 158. In their exceptions to the PFD, the Intervenors must provide proof to the ALJs and the Board that the dealership guaranty of other dealerships provision has been removed to meet the requirement of FOF No. 158.

Therefore, the ALJs conclude that the following guaranty agreements meet the requirements of FOF No. 158: (1) all four dealerships and Motorcars guaranty the loan repayment of Hi Tech Realty, which has the real estate and Deed of Trust as separate security; (2) all four dealerships and Hi Tech Realty guaranty Motorcars, which has the property of Motorcars as separate security; (3) Hi Tech Realty guaranties the four dealerships; (4) Motorcars guaranties all four dealerships; and (5) Mr. Weitz, personally, guaranties the loan repayment of the four dealerships, Motorcars, and Hi Tech Realty. The ALJs conclude, however, that the guaranty agreement that all four dealerships guaranty the other dealerships, which is only secured by the inventory and assets of the other dealerships, does not meet the requirement of FOF No. 158 and must be removed. In their exceptions to the PFD, the Intervenors must provide proof to the ALJs and the Board that the dealership guaranty of other dealerships provision has been removed to meet the requirement of FOF 158.

Audi has challenged Intervenors' proposed use of the $17.5 million commercial loan, which provides by its terms that the funds are to be used for working capital, as a method to partially fund the initial capitalization of Motorcars. Audi argues that working capital is used solely to fund the daily operations of the company and provide a float between earning and collecting accounts receivable and should not be considered in the debt-to-equity ratio. Audi has suggested that the debt-to-equity ratio confirmed in the PFD should be revisited and revised to account for the source and use of funds, such that the $17.5 million commercial loan should be removed from the equity-side of the ratio. Intervenors, however, presented testimony from Ms. Bhama, the primary drafter of the loans, that it would be proper for Motorcars to use the commercial loan to close the purchase transaction.

The ALJs considered this issue at the remand hearing, and declined to expand and re-litigate the debt-to-equity issue because this argument was fully vetted and considered in the original hearing (which began on February 26, 2014, and concluded on March 11, 2014) and thoroughly discussed in the PFD. The ALJs find the testimony of Ms. Bhama, as the drafter of the loan documents, credible that the $17.5 million loan may be used for the purchase of the assets of the dealership, which confirms that this amount is included in the debt-to-equity calculation. Further, the ALJs determine this issue was only referred in the remand in the context of the cross-collateralization and thus, was not within the limited remand scope. Therefore, the ALJs decline to revise the debt-to-equity ratio determined in the PFD, and hereby confirm the debt-to-equity ratio as roughly $37,500,000 debt and $38,150,000 equity for a debt-to-equity ratio of 0.98, which is within Audi's policy requirement of debt-to-equity ratio of no higher that 1:1.

Lastly, Audi has also challenged the draft nature of the documents because there is no signed commitment letter from the bank. The ALJs agree with Intervenors that loan documents are not normally signed until closing and the documents provide the terms under which Ally will provide funds for this transaction. The ALJs, therefore, conclude that the draft documents provided by Ally provide sufficient information to Audi and to the ALJs to analyze the remand issues with regards to FOF No. 158.

## VI. CONCLUSION

The ALJs recommend approval of the Budget-Weitz buy-sell agreement, with the removal of the guaranty agreement that all four dealerships guaranty the other dealerships. Upon removal of this provision, the ALJs find that the prospective transferees are qualified in all regards.

## VII. FINDINGS OF FACT

### Procedural History

1. Respondents Volkswagen Group of America, Inc. and Audi of America, Inc. (collectively, Audi or Respondents) rejected the proposed transfer of the only two Audi dealerships in Austin, Texas from Budget Leasing, Inc. d/b/a Audi North Austin and Audi South Austin (collectively, Budget or Protestant) to Ricardo M. Weitz.

2. Budget and Mr. Weitz submitted the Dealership Purchase Contract (the DPC) to Audi on December 20, 2012, seeking approval of Mr. Weitz as transferee of two Audi dealerships owned by Budget in Austin, Texas.

3. Mr. Weitz proposed that the individual franchises would be held by Hi Tech Imports North (Hi Tech North or Audi North Austin), Hi Tech Imports South (Hi Tech South or Audi South Austin), Hi Tech Italian Imports LLC (Hi Tech Italian or Maserati), and Hi Tech Imports LLC (Hi Tech Imports or Porsche). Those entities, in turn, would be wholly owned by Hi Tech Motorcars, LLC (Motorcars). Motorcars would be owned:

   a. 50.1% by Hi Tech Partners, LLC (Hi Tech Partners), controlled by Mr. Weitz;

   b. 46.36% by Headwater Hi Tech Partners, LLC (Headwater Hi Tech), owned by LKCM Headwater Investments I, LP (Headwater LP or Headwater Investments), co-managed by partner Corbin Robertson III, and

   c. 3.54% by Charles Ross Bartley, Charles Ross Bartley IRA, K. Rick Turner Revocable Trust (Turner Trust), and Turner Family Partnership (Turner Partnership).

4. On May 14, 2013, Mr. Weitz, Audi North Austin, Audi South Austin, Porsche, and Budget protested Audi's and Porsche's buy-sell turndown to the Texas Department of Motor Vehicles, Motor Vehicle Division (the Department or DMV). Audi filed its reply on June 14, 2013.

5. Audi subsequently filed a Motion to Dismiss, in part, on the basis that Mr. Weitz, Hi Tech North, Hi Tech South, and Hi Tech Imports (collectively, Intervenors) lacked standing.

6. In response to Audi's Motion to Dismiss, Intervenors filed a Motion to Intervene.

7. The Administrative Law Judges (ALJs) denied Audi's Motion to Dismiss and granted the Motion to Intervene.

8. The ALJs conducted a nine-day hearing and issued their proposal for decision (PFD) on July 16, 2014.

9.   After the ALJs issued their PFD, the Department Board (Board) assumed jurisdiction of the case and, on August 28, 2014, Audi filed a motion to dismiss with the Board.

10.  On August 29, 2014, Intervenors filed a Motion to Find the Prospective Transferees Qualified.

11.  On September 12, 2014, with four Board members absent, the Board voted 3 to 2 to dismiss the Protest for lack of subject matter jurisdiction.

12.  On October 2, 2014, Protestant and Intervenors filed a Motion for Rehearing. On October 13, 2014, Audi filed a response in opposition to the Motion for Rehearing and, on October 15, 2014, Protestant and Intervenors filed a reply in support of their Motion for Rehearing. The Board's staff recommended that the Motion for Rehearing be granted. On December 10, 2014, the Board voted to grant the Motion for Rehearing.

13.  On February 13, 2015, the Board voted to remand the Protest to the State Office of Administrative Hearings (SOAH).

14.  On February 20, 2015, Audi filed a motion to dismiss the case at SOAH and send the case back to the Board, challenging the Board's authority to remand this contested case to SOAH. Protestant and Intervenors responded to that motion on February 27, 2015, and Audi filed a reply in support of that motion on March 2, 2015. The ALJs denied Audi's motion.

15.  The hearing on the merits began on April 16, 2015, and concluded on April 17, 2015. The ALJs closed the record on June 16, 2015, after the parties filed post-hearing briefs and responses.

16.  The Board remanded the case to SOAH to consider three questions regarding Mr. Weitz's April 30, 2013 letter to Sally Grimes. First, did Audi receive the letter? Second, should the letter be added to the record? Finally, if the letter is admitted in evidence, what effect does the letter have on Intervenors' compliance with Texas Occupations Code (Code) § 2301.359(c)(3)? Specifically, the Board directed the ALJs to consider Intervenors' compliance in light of the Executive Director's decision in *Gordon Rountree Motors, Ltd. v. Mazda Motors of America*, MVD Docket No. 07-0038 (May 4, 2010).

17.  The Board also directed the ALJs to review the conditions set forth in the July 16, 2014 PFD, specifically Findings of Fact (FOF) Nos. 154-158, Intervenors' Motion to Find the Prospective Transferees Qualified (Motion), and Audi's Response (Response) to the Motion.

18.  The Remand Order also directed the ALJs to provide specific findings that the prospective transferees either are qualified or are not qualified.

### Background Facts During the Application Process

19. Budget (through David Stein) and Mr. Weitz submitted the DPC to Audi on December 20, 2012.

20. Mr. Weitz, primarily through Candido Pagan, and Mr. Weitz's business investors (Mr. Robertson, Mr. Turner, and Mr. Bartley), either personally or through their representatives, submitted documentation and information to Audi.

21. Most of the documentation and information was sent to Sally Grimes, the Network Improvement Manager in Audi's Southern Region office, who was Mr. Weitz and Mr. Pagan's primary contact at Audi.

22. The DPC is the asset purchase agreement between Budget and Mr. Weitz, and/or his assigns, for Budget's Austin, Texas Audi, Porsche, and Maserati dealerships.

23. On December 21, 2012, Audi sent a standard email to Mr. Stein and Mr. Weitz. This email acknowledged receipt of the DPC and identified a list of documents required by Audi.

24. On January 12, 2013, Mr. Weitz submitted two Audi Dealer Applications, one for Audi North Austin and one for Audi South Austin.

25. In the applications, Mr. Weitz represented that Headwater LP, a private equity investment fund, would have an ownership interest in the dealerships.

26. The general partner of Headwater LP is Headwater GP.

27. On January 25, 2013, Audi received Headwater LP's dealer application.

28. In February 2013, Audi received several documents from Mr. Weitz in support of the buy-sell applications.

29. During February, March, and early April 2013, Mr. Weitz submitted to Audi several letters, certificates of legal entity, source of funds documents, and other information pertaining to the purchase of the two Audi dealerships in Austin, Texas.

30. In early April 2013, Ms. Grimes informed Mr. Weitz that Audi had received all materials needed to evaluate the transfer proposal and that no additional information was being requested by Audi.

31. In a letter dated April 16, 2013, Audi rejected the applications to be granted Audi dealer agreements for Audi North Austin and Audi South Austin.

32. Audi rejected the proposed transaction for three basic reasons. The first reason was financial. The highly leveraged capitalization structure caused concerns about the

dealerships' solvency and ability to remain adequately capitalized. The second reason was related to Headwater Hi Tech's lack of automotive experience. The last reason was that the proposed ownership and capitalization structure was inconsistent with Audi's interest in having a long-term relationship with its dealerships' owners.

33. The rejection letter did not reference non-compliance with Texas Occupations Code (Code) § 2301.359(c)(3) or any notice violations.

34. On April 18, 2013, Mr. Weitz sought to provide clarification of the ownership and capital structure involved in the proposed transaction.

35. In a response letter to Mr. Weitz dated April 25, 2013, Audi stated that its "primary concern with the buy-sell was the ownership and capitalization structure of the purported buyer. While your letter provides some additional details, we are still of the opinion that the paperwork as submitted does not meet our requirements."

36. Audi's April 25th letter said nothing about the prospective transferees' purported non-compliance with § 2301.359(c)(3) of the Code, nor did Audi indicate its concern that Mr. Weitz would not comply with the terms of the franchise agreement.

37. After April 25, 2013, Mr. Weitz, on behalf of Hi Tech Partners, and the other members of Motorcars – Headwater, Turner, and Bartley – renegotiated the Motorcars' company agreement. The renegotiation culminated in the Hi Tech Motorcars, LLC, Amended & Restated Company Agreement (First Amended Motorcars Agreement). The First Amended Motorcars Agreement was signed by every member of Motorcars.

38. On May 1, 2013, Mr. Weitz submitted two more application packages, replacing the initial Motorcars company agreement with the First Amended Motorcars Agreement. The submissions were accompanied by two cover letters, one on Hi Tech North letterhead and one on Hi Tech South letterhead.

39. In the May 1, 2013 packages from Audi North Austin and Audi South Austin, Mr. Weitz included two letters dated April 30, 2013 (April 30th Letters). One letter was from Mr. Stein to Ms. Grimes, notifying Audi of the proposed transfer. The other letter was from Mr. Weitz to Ms. Grimes.

40. Audi received the April 30th Letters on approximately May 2, 2013. There is no dispute that Audi received the April 30th Letters.

41. On May 8, 2013, Brian Pellock sent a letter to Mr. Stein. In the letter, Audi took the position that the materials submitted by Mr. Weitz on May 1 (including the April 30th Letters) and received by Ms. Grimes on May 2nd were part of the DPC that Audi had rejected on April 16, 2013. Therefore, Audi did not consider the DPC or the materials received by Audi on May 2.

## Background of Notice Issue While at SOAH

42. Budget filed its protest on May 14, 2013. In the protest, Budget and Mr. Weitz indicated that they submitted the applications for the franchises in accordance with Code § 2301.359.

43. Audi replied to the protest on June 14, 2013, and admitted that the applications had been submitted in accordance with Code § 2301.359.

44. In its reply to the protest, Audi only raised the affirmative defense that Intervenors lacked standing to participate in the protest proceeding. Audi followed its reply with a motion to dismiss for lack of standing. The ALJs denied Audi's motion to dismiss.

45. Audi never raised lack of notice issues, or Code § 2301.359 issues, in its reply to the protest, in its initial motion to dismiss, or in its initial responses to Intervenors' request for disclosures.

46. Audi raised the notice issue on January 3, 2014, in its response to Intervenors' motion for summary disposition. The ALJs denied the motions for summary disposition.

47. Following the hearing on the merits, Audi addressed the notice issue in its post-hearing briefs.

48. The ALJs rejected Audi's arguments and found that Intervenors had substantially complied with the notice provisions of Code § 2301.359(c).

49. The ALJs found that Mr. Weitz signed and submitted an application for an Audi dealership, which strongly suggested and intended to convey an agreement to comply with the franchise.

50. On April 18, 2013, Mr. Weitz notified Audi in writing that he intended to comply with Audi's requirements.

51. Given Mr. Weitz's clear intent to purchase the Audi dealerships and his willingness to adhere to any and all of Audi's requirements necessary to obtain the dealerships, the ALJs found that Mr. Weitz satisfied the requirement of Code § 2301.359(c)(3).

52. Audi did not file any exceptions to the ALJs' findings in the PFD that Mr. Weitz had substantially complied with the notice provisions of Code § 2301.359.

## Substantial Compliance with Code § 2301.359(c)(3)

53. Audi admits it received the April 30, 2013 letter from Mr. Weitz to Ms. Grimes.

54. The April 30, 2013 letter is another document showing Intervenors substantially complied with the notice provisions of Code § 2301.359(c)(3).

55. There is no harm in admitting the letter and, since Audi received the letter, Audi is not unfairly prejudiced by its admission.

56. During the application process in early 2013, Audi never complained that Intervenors had failed to comply with Code § 2301.359(c)(3).

57. Code § 2301.359 governs the transfer of an auto dealership's ownership between the dealership's proprietor and a prospective buyer. Specifically, it governs the notice that a transferee/buyer must provide to the manufacturer regarding the sale of a franchise.

58. As part of the notice requirements, a prospective transferee/buyer must provide a written statement of its intent to abide by the manufacturer's franchise.

59. Nothing in Audi's April 16, 2013 rejection letter suggested notice was insufficient or that Audi was rejecting the application based on a failure to agree to the franchise.

60. It was not until January 2014 (in a response to a summary disposition motion) that Audi asserted notice was insufficient under Code § 2301.359.

61. Audi's inaction on the notice issue indicates its belief that Intervenors had complied with Code § 2301.359(c)(3).

62. Once Audi more thoroughly raised the notice issue in its post-hearing briefs, the ALJs rejected Audi's arguments, and Audi did not file any exceptions to the ALJs' findings of fact or conclusions of law finding that Intervenors had complied with Code § 2301.359(c)(3).

63. Substantial compliance of Code § 2301.359(c)(3) is the proper standard to apply in this case, particularly where the evidence shows that Audi had notice of Intervenors intent to comply with Audi's franchise agreement.

### Facts Relating to FOF Nos. 154-156:  Operational Acumen Requirements

64. In the PFD, the ALJs categorized Audi's rejection reasons into three broad categories: (1) the control of the Audi dealerships would have been placed at risk (operational control); (2) the proposed owners lacked sufficient operational acumen (operational acumen); and (3) the transaction did not meet Audi's 1:1 debt-to-equity ratio requirement (debt-to-equity requirement).

65. Audi rejected the transaction because Headwater Hi Tech's ownership share, via its $15.7 million investment, was contingent upon excessive operational control conditions contained in in the First Amended Motorcars' Agreement.

66. Headwater Hi Tech had excessive operational control in the form of a contractual right in the First Amended Motorcars' Agreement to give written consent (Written Consent) on

major dealership management decisions and the ability to have a "Forced Sale" (Forced Sale).

67. The Forced Sale provision was triggered either by: (1) the seventh anniversary of the effective date of the First Amended Motorcars' Company Agreement; or (2) the occurrence of a material default.

68. Audi estimated that a Forced Sale would be initiated on March 8, 2020, unless a material default was declared earlier, and that the Forced Sale section was a planned exit strategy for Headwater Hi Tech to receive its investment and a return.

69. In FOF 154, the ALJs found that the prospective transferees were not qualified but would be qualified under the specific conditions set out FOFs 155-158.

70. In FOF 155, the ALJs found that the operational acumen requirement could only be resolved if Headwater Hi Tech completely and fully removed the Written Consent provision from the Motorcars' Company Agreement, and instead, proceeded as a silent investment partner.

71. In FOF 156, the ALJs found that the operational acumen requirement could only be resolved if Headwater Hi Tech completely and fully removed the Forced Sale provision from the Motorcars' Company Agreement, and instead, proceeded as a silent investment partner.

72. The conditions in FOF Nos. 155 and 156 are satisfied and the prospective transferees are qualified on these matters.

73. After the PFD, on July 1, 2014, Motorcars' members drafted Hi Tech Motorcars, LLC Second Amended and Restated Company Agreement (Revised Agreement) and submitted the Revised Agreement to the DMV Board on August 28, 2014, in connection with the Motion and Response.

74. The Revised Agreement was signed and approved by Mr. Bartley and Mr. Turner, but will not be signed by Headwater Hi Tech and Mr. Weitz until the DMV Board approves the transfer.

75. The Revised Agreement does not contain a Forced Sale or similar provision that gives Headwater Hi Tech any right or power to force a sale of any of the dealerships.

76. The Revised Agreement does not contain a Written Consent or similar provision that gives Headwater Hi Tech any right or power to have written consent on any management decisions.

77. Mr. Weitz agreed to sign an "Unconditional Personal Guaranty," a written contract that ensures that the initial equity investment made by Headwater Hi Tech would be repaid in the Event of Default, which is defined as: (1) bankruptcy of Motorcars; (2) liquidation of

Motorcars; or (3) sale of all or substantially all of the assets of Motorcars or merger of Motorcars with or into another person or entity.

78.   The Event of Default events in the Unconditional Personal Guaranty do not constitute a default if they are "proximately caused by" Headwater Hi Tech.

79.   The personal guaranty indicates that Headwater Hi Tech is giving up contractual operational control of the dealership by seeking to protect its investment only in the event of default (Motorcars bankruptcy, liquidation, or sale or merger).

80.   Headwater Hi Tech has now assumed the role as silent investor with no contractual operational control.

81.   The Revised Agreement will be signed by Motorcars' members and become the operative document in this transaction.

82.   Headwater Hi Tech and Mr. Weitz have not expressed an intention, nor should they attempt in the future, to amend the agreement to add the Written Consent and Forced Sale sections back into the agreement after approval by the Board.

**Facts Relating to FOF No. 157: Bridge Loan**

83.   In the 2014 hearing, Headwater Hi Tech retained the option to use a 90-day short-term loan, referred to as a "bridge loan" (bridge loan) to fund its $15.7 capital investment.

84.   The bridge loan would have been necessary in the event that the limited partners' capital calls, or contractual monetary obligations, were not received in time for the closing.

85.   In FOF No. 157, the ALJs found that use of the bridge loan for Headwater Hi Tech's $15.7 million investment must be included in the debt-to-equity ratio as debt rather than as equity, and must be disclosed to Audi within 30 days of the closing if a bridge loan would be used.

86.   The condition in FOF No. 157 is now satisfied because Headwater Hi Tech will use cash and not debt to fund this transaction, and therefore, the prospective transferee is qualified on this matter.

87.   Headwater Hi Tech will fund the real estate down payment and its portion of the purchase of the dealerships with $18.5 million in cash that it will have in the Headwater I account to close the transaction and not with borrowed funds.

88.   Headwater Hi Tech's $18.5 million capital contribution remains in the debt-to-equity ratio as equity.

**Facts Relating to FOF No. 158: Cross-Collateralization Requirement**

89. In FOF No. 158, the ALJs found that Intervenors would be qualified as prospective transferees under the following circumstances: no cross-collateralization provisions will be permitted such that a default on one aspect of any loan causes a default on all other loans.

90. The condition in FOF No. 158 is now satisfied, with the exception of the requirement that all four dealerships must guaranty the other dealerships. During the exceptions period, if the dealership guaranty of other dealerships is removed, then the prospective transferees are qualified on this matter unconditionally.

91. In the PFD, the ALJs made a recommendation that the debt-to-equity ratio should be adopted, explaining the financial structure of this transaction:

| Debt | | Equity | |
|---|---|---|---|
| Ally Bank | $17,500,000 | Hi Tech Partners | $16,958,850 |
| Real Estate | $20,000,000 | Headwater Hi Tech | $15,691,150 |
| | | Turner Trust | $200,000 |
| | | Turner Partnership | $200,000 |
| | | Bartley IRA | $100,000 |
| | | Down-Payment | $5,000,000 |
| **Total Debt:** | **$37,500,000** | **Total Equity:** | **$38,150,000** |

The ALJs found that the debt-to-equity should be calculated as: $\frac{37,500,000}{38,150,000} = 0.98$.

**The Pre-PFD Loan Documents**

92. On April 1, 2012, Candido Pagan, the controller for the various Weitz entities, provided Audi with a copy of loan commitment letter (commitment letter) from Ally Financial (Ally), a division of Ally Bank, to verify that Ally intended to make a $17.5 million loan as part of the total purchase price of $75,650,000 for the four dealerships.

93. The commitment letter confirmed Ally's willingness to extend the loan subject to terms and conditions, but provided that additional security was required.

94. In April 2013, Ally provided a Cross-Collateral, Cross-Default, Cross-Guaranty Agreement (CCG Agreement) agreement between Ally and the "Dealers" (Hi Tech Realty, Motorcars, the four dealerships, and Mr. Weitz). The CCG Agreement contained a "cross-collateralization" provision that provided as follows: To secure payment and performance of all Obligations, each Dealer grants to each of the Ally Parties a continuing security interest in all collateral in which one of the Ally Parties now has a security interest

95. The CCG Agreement also contained a "cross-default" provision, in pertinent part: It is agreed that any default or breach by any Dealer will, at the option of the Ally Parties, constitute a default under each Security Agreement and Obligation and any or all promissory notes arising therefrom.

96. The CCG Agreement also contained a guaranty agreement. That provision stated, in relevant part: All Dealers, jointly and severally, unconditionally guarantee the performance and payment of all Obligations owing by any Dealer to any of the Ally Parties.

97. The real estate loans were collateralized not only by the real estate, but by the physical assets of all of the dealerships and therefore, a default by one entity was a default by all entities of all loans.

98. In the PFD, the ALJs concluded that the debt of Hi Tech Realty was tied to the collateral of all the dealerships and that each of these separate legal entities would be responsible for the debts of the others.

### The Post-PFD Loan Documents

99. After the PFD was issued, new loan documents were drawn up by Ally to remove the CCG Agreement.

100. There are now four separate sets of loan documents, one for each of the dealership locations, rather than one set of loan documents for all locations.

101. There are four Commercial Loan and Security Agreements between Ally and Motorcars; four Commercial Real Estate Loan and Security Agreements between Ally and Hi Tech Realty; and four Inventory Financing and Security Agreements between Ally and each dealership.

102. There are no CCG Agreements contained in any of the documents.

103. Anita Bhama, who drafted the documents and who serves as Ally's in-house counsel for commercial lending operations, used a "standard set" of loan documents, used nationwide, for the four dealerships.

104. Cross-collateralization occurs when the property of one borrower is collateral for another borrower's loans or different loans of that same borrower; here, however, none of the individual dealerships has placed its assets for the debts of another of the dealerships.

105. The Commercial Real Estate Loan for Hi Tech North is secured by a Deed of Trust on the land occupied by Hi Tech North only. Hi Tech Realty's failure to pay or perform would trigger the default provision on this loan only. Ally has also agreed to make an inventory loan, or "floor plan loan" to Hi Tech North, as well as to the other three

dealerships. Each dealership is the borrower on its own floor plan loan, with its assets as the sole security in the event of default on the loan.

106. The Ally automotive credit and automotive risk committees, composed of eight to twelve Ally employees, approved the form and content of the loans and will be signed by Ally, if the dealership transfer is approved.

107. Ally continues to require that certain entities execute a guaranty agreement guaranteeing the payment and performance by the borrower.

108. Ally requires six guaranty agreements: (1) all four dealerships and Motorcars guaranty the loan repayment of Hi Tech Realty; (2) all four dealerships and Hi Tech Realty guaranty Motorcars; (3) Hi Tech Realty guaranties the four dealerships; (4) all four dealerships guaranty the other dealerships; (5) Motorcars guaranties all four dealerships; (6) Mr. Weitz, personally, guaranties the loan repayment of the four dealerships, Motorcars, and Hi Tech Realty.

109. Each Guaranty provides that although executed as a single document by the guarantors, a breach of the guaranty by one guarantor is not a breach by any of the guarantors, but the liability of all parties signing this guaranty is joint and several.

110. Under generally accepted accounting principles (GAAP), a guaranty is not a loan because loan proceeds go to the borrower, and not to the guarantor.

111. Under GAAP, the borrower is primarily responsible for the payment of the loan, and the guarantor has a contingent obligation only.

112. In requiring that all four dealerships (two Audi dealerships, one Porsche dealership, and one Maserati dealership) guarantee each other's dealerships, Ally has overreached.

113. By requiring that one manufacturer's dealership (i.e. Audi dealership) guaranty the financial performance of another's manufacturer's dealership (i.e. Porsche or Maserati dealership), the two Audi dealerships are subject to the potential unsuccessful operation of the other two non-Audi dealerships over which Audi has no franchise control.

114. The requirement that all four dealerships, regardless of the particular manufacturer's product represented in the dealership, guaranty the performance of all other dealerships does not comply with FOF 158 and must be removed.

115. The $17.5 million capital loan from Ally can be used for the purchase of the dealerships.

116. The loan document blanks will be filled in at closing, as is typical with any loan.

117. Relitigation of the debt-to-equity issue is not necessary because this issue was fully vetted and considered in the original hearing and thoroughly discussed in the PFD.

118. The debt-to-equity ratio is roughly $37,500,000 debt and $38,150,000 equity for a debt-to-equity ratio of 0.98, which is within Audi's policy requirement of debt-to-equity ratio of no higher that 1:1.

## VIII. CONCLUSIONS OF LAW

1. The Department has jurisdiction and authority over the parties and the subject matter of this case under Texas Occupations Code § 2301.151.

2. Notice of this protest and of the hearing on the merits was provided in accordance with Texas Government Code §§ 2001.051, 2001.052; Texas Occupations Code § 2301.705.

3. The Department properly referred this case to SOAH under Texas Occupations Code § 2301.704 to be conducted in accordance with Texas Administrative Code §§ 155.1 *et seq.*

4. SOAH has jurisdiction over all matters relating to the conduct of the hearing in this matter, including the preparation of a proposal for decision with findings of fact and conclusions of law. Texas Occupations Code § 2301.704.

5. In order to sell a dealership, a dealer must notify the manufacturer of the dealer's intent to sell by providing a completed application for transfer, which includes the transferee's name, address, financial qualifications, and business experience. Texas Occupations Code § 2301.359(a)(b) and (c)(2).

6. The application must also supply pertinent agreements regarding the sale; contain any forms or related information generally used by manufacturers; and provide a transferee's agreement to comply with the franchise agreement. Texas Occupations Code § 2301.359(c)(1), (c)(2), and (c)(3).

7. Not later than the 60th day after the date of receipt of a notice and application, a manufacturer must determine whether a prospective transferee is qualified and notify the dealer by letter of approval or rejection of the transferee. Texas Occupations Code § 2301.359(d).

8. If the transferee is rejected, the manufacturer must include a statement setting forth the material reasons for the rejection. Texas Occupations Code § 2301.359(d).

9. If a dealer's application is rejected, the dealer may file a protest and the Board shall refer the petition to SOAH. Texas Occupations Code § 2301.360(a).

10. At the hearing, the manufacturer has the burden of proof to prove that the transferee is not qualified. Texas Occupations Code § 2301.360(b), .704.

11.  A determination may be made as to whether the transferee is qualified, not qualified, or not qualified but with specific conditions given under which the prospective transferee would be qualified. Texas Occupations Code § 2301.360(c), (d)(1) and (2).

12.  If specific conditions are given under which the prospective transferee would be qualified, the Board retains jurisdiction of the dispute for a time certain to allow the dealer and prospective transferees to meet the conditions. Texas Occupations Code § 2301.360(e).

13.  The notice and application for approval of Budget's sale and transfer of its Audi dealerships to the prospective transferees complied with Texas Occupations Code § 2301.359.

14.  As part of the notice requirements, a prospective transferee/buyer must provide a written statement of its intent to abide by the manufacturer's franchise. Texas Occupations Code § 2301.359(c)(3).

15.  By completing application forms, the prospective transferees signaled their agreement to be bound by the terms of the Audi Dealer Agreement, as required by Texas Occupations Code § 2301.359.

16.  Case law supports substantial compliance with a statutory provision by requiring substantial compliance with the essential elements of the statute. *J.C. Evans Const. Co., Inc. v. Travis Cent. Appraisal Dist.*, 4 S.W.3d 447, 451 (Tex. Civ. App.—Austin 1999, no pet.).

17.  The concept of substantial compliance works to excuse deviations from a statutory requirement if such deviations do not hinder the legislative intent behind the requirement. *J.C. Evans Const. Co., Inc. v. Travis Cent. Appraisal Dist.*, 4 S.W.3d 447, 451 (Tex. Civ. App.—Austin 1999, no pet.).

18.  In *Ford Motor Co. v. Motor Vehicle Bd. of Texas Dept. of Transp.*, No. 03-05-00290-CV, 2008 WL 1912102, at * 3-4 (Tex. App.—Austin May 1, 2008, pet. denied) (mem. op.), numerous deficiencies existed in the seller's notice to Ford under Code § 2301.359, including an incomplete application from the proposed transferee and no final sales agreement, but the Board retained jurisdiction to hear the seller's protest.

19.  Inadequacies in a notice of a proposed sale and supporting materials sent to a manufacturer may make rejection of the sale more reasonable, but such inadequacies do not deprive the Board of the power to consider the protest. *Ford Motor Co. v. Motor Vehicle Bd. of Texas Dept. of Transp.*, No. 03-05-00290-CV, 2008 WL 1912102, at * 3-4 (Tex. App.—Austin May 1, 2008, pet. denied) (mem. op.).

20.  In *Ultimate Ford v. Motor Vehicle Div. of Texas Dept. of Transp.*, No. 03-09-00548-CV, 2010 WL 3370683, at *4-5 (Tex. App.—Austin Aug. 27, 2010, pet. denied) (mem. op.),

Ultimate Ford's notice had not strictly followed the language of the statute, nonetheless, only substantial compliance was required when sending termination notice to dealership.

21. The purpose of notice requirement is to ensure that a dealer facing termination is notified of its statutory rights to protest the termination and obtain a hearing, and how to do so. *Ultimate Ford v. Motor Vehicle Div.*, 2010 WL 3370683, at *5.

22. Ultimate Ford had not strictly followed the notice requirement under Code § 2301.453(c)(2), however, its notice to the dealerships had satisfied the purpose of the statute. *Ultimate Ford v. Motor Vehicle Div.*, 2010 WL 3370683, at *5.

23. Waiver is established by a party's express renunciation of a known right, or by silence or inaction for so long a period as to show an intention to yield the known right. *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996).

24. A party can waive a certain notice requirements, suggesting that substantial compliance is the appropriate standard. *Gordon Rountree Motors, Ltd. v. Mazda Motors of America*, MVD Docket No. 07-0038.LIC (May 3, 2010).

25. A manufacturer can waive specific objections to notice by moving forward with application process and essentially failing to object in a timely manner to notice deficiencies. *Gordon Rountree Motors, Ltd. v. Mazda Motors of America*, MVD Docket No. 07-0038.LIC (May 3, 2010).

26. Given Intervenor's substantial compliance with the notice provision under Texas Occupations Code § 2301.359(c)(3), their clear intent to purchase the Audi dealerships, and their willingness to adhere to any of Audi's requirements necessary to obtain the dealerships, Intervenors satisfied the requirement of Code § 2301.359(c)(3).

27. Cross-collateralization is defined as, "an installment-contract provision allowing the seller, if the buyer defaults, to repossess not only the particular item sold but also every other item bought from the seller on which a balance remained due when the last purchase was made." *Blanco Nat'l Bank v. Gonzalez*, 04-12-00079-CV, 2013 WL 1760604, at *5 (Tex. App.—San Antonio Apr. 24, 2013, no pet.) (mem. op.).

28. The principal must default or be unable to perform the contract before the party can move against the guarantor. *Byrd v. Estate of Nelms*, 154 S.W. 3d 149, 157 (Tex. App.—Waco 2004, no pet.).

29. The principal must default or be unable to perform the contract before the party can move against the guarantor. *Ray v. Spencer*, 208 S.W. 2d 103, 104 (Tex. Civ. App.—Texarkana 1947, writ refused).

30.   Pursuant to Texas Occupations Code § 2301.360(d), the proposed sale and transfer of Budget's Audi dealerships to the prospective transferees should be approved with the conditions set forth in this Remand Proposal for Decision.

**SIGNED August 13, 2015.**

MICHAEL J. O'MALLEY
ADMINISTRATIVE LAW JUDGE
STATE OFFICE OF ADMINISTRATIVE HEARING

PENNY A. WILKOV
ADMINISTRATIVE LAW JUDGE
STATE OFFICE OF ADMINISTRATIVE HEARINGS

**INTERVENORS' APPENDIX**

**TAB 2**

BEFORE THE TEXAS DEPARTMENT OF MOTOR VEHICLES
MOTOR VEHICLE DIVISION

| | | |
|---|---|---|
| BUDGET LEASING, INC. d/b/a AUDI NORTH AUSTIN and AUDI SOUTH AUSTIN, | § § § § | |
| Protestant, | § § § | |
| RICARDO M. WEITZ, HI TECH IMPORTS NORTH, LLC, HI TECH IMPORTS SOUTH, LLC, and HI TECH IMPORTS, LLC, | § § § § § | SOAH Docket No. 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.LIC MVD Docket No. 13-0008 LIC |
| Intervenors, | § § | |
| v. | § § | |
| VOLKSWAGEN GROUP OF AMERICA, INC. and PORSCHE CARS NORTH AMERICA, INC., | § § § § § | |
| Respondents. | § | |

## RESPONDENTS VOLKSWAGEN GROUP OF AMERICA, INC.'S AND AUDI OF AMERICA, INC.'S RESPONSE TO STAFF'S EXECUTIVE SUMMARY AND PROPOSED ORDER

Respondents Volkswagen Group of America, Inc. and Audi of America, Inc. (collectively "Audi") hereby file this Response To Staff's Executive Summary And Proposed Order. The Executive Summary refers to a document that was recently presented by Protestant and Intervenors as potentially satisfying the notice requirement and creating a controversy about which additional facts must be adjudicated. This document, however, is irrelevant to the issue of the Board's jurisdiction, and does not justify any further proceedings before SOAH.

In addition, on October 21, 2014, attorneys for the parties were informed by David Duncan, General Counsel for the Board, that a Board member was contacted in writing by a party with an interest in this protest regarding the member's vote on the pending motion. A third

party has also attempted to make contact with Board members regarding this protest. These contacts are blatantly improper, and should result in denial of the motion for rehearing.

## I.    IMPROPER CONTACTS WITH THE BOARD WARRANT DENIAL OF THE MOTION FOR REHEARING.

On October 10, 2014, a Board member was contacted in writing by Corbin Robertson in an attempt to discuss the merits of the case with this Board member. (copy of David Duncan letter to counsel enclosing Robertson message attached hereto as Exhibit A). Audi subsequently was informed that Stacy Gillman, a dealership owner and daughter of a former Board member, also made efforts to contact members of the Board about the merits of this case. (copy of October 24, 2014 letter from David Duncan to counsel attached hereto as Exhibit B). Although Audi is not suggesting that the Board or its Staff has acted improperly or will be influenced by these inappropriate actions, the efforts by Robertson to impermissibly taint the Board proceedings are grounds to deny the motion for rehearing.

In the written communication, Robertson (who identifies himself as "Corby" and Ricardo Weitz's partner) suggests that the fact that his family's name is on a football stadium, among others, are reasons that this Board member should vote in favor of the Protestant and Intervenors' pending motion for rehearing. (Exh. A). Robertson's communication, and potentially other contacts with Board members, violates the Administrative Code prohibition against discussions of the merits of the case with a hearing officer outside of the presence of all of parties.[1]  MVD Rule § 215.43 provides, in relevant part, as follows:

> Every party, witness, attorney, or other representative shall comport himself in all proceedings with proper dignity, courtesy, and respect for the Board, the hearing officer, and all other parties.. . . No party to a pending case, and no representative or witness of such a party, shall discuss the merits of such case with the hearing

---

[1] A "hearing officer" includes the Board as the entity that "issue[s] final orders." MVD Rule § 215.2(b)(15).

2

> officer outside of the presence of all other parties, or their representatives. Upon violation of this section, any party, witness, attorney, or other representative may be excluded from any hearing for such period and upon such conditions as are just; or may be subject to such other just, reasonable, and lawful disciplinary action as the hearing officer or department may prescribe.

Robertson was a witness in the proceedings before SOAH and identified himself as a Weitz's partner. Robertson's conduct is governed by this Rule and his actions are an undeniable violation of its terms that should not be tolerated by the Board. This Rule grants the Board broad discretion to impose disciplinary action in response to a violation. Given Robertson's deliberate attempt to impermissibly influence the outcome of the motion for rehearing, denial of the motion for rehearing would be appropriate.

Robertson also submitted an application to be an Audi dealer. (Respondents Ex. 163). He, therefore, is one of the Prospective Transferees whose qualifications were at issue. His attempt to improperly influence the outcome of this proceeding is overwhelming evidence that he (and potentially others who also did or attempted to make contact with the Board, as set forth in Duncan's letters) lacks the moral character necessary to satisfy the requirements of Section 2301.359(g)(2). Therefore, the Board should deny the motion for rehearing as a disciplinary action under Rule 215.43.

## II. NO CONTROVERSY EXISTS REGARDING THE BOARD'S JURISDICTION.

### A. The April 30th Letter Post-Dates Audi's Rejection and Does Not Reflect The Agreement of all of the Proposed Transferees.

Staff's Recommendation refers to "specific documentation" that may satisfy the jurisdictional requirements of Section 2301.359. This document is an April 30, 2013 letter from Ricardo Weitz to Audi that Protestant and Intervenors attached to a Reply brief to Audi's Opposition to the Motion for Rehearing. In the April 30th letter, Weitz belatedly agrees to be

3

bound by the Audi Dealer Agreement. This letter, however, is irrelevant to the issue of jurisdiction.

First, the April 30, 2013 came *after* Audi's rejection letter by two weeks. (Respondents Ex. 186 (Audi's rejection letter dated April 16, 2013)). The April 30 letter, therefore, cannot be evidence of compliance with Section 2301.359(c)(3) for purposes of this protest. "[T]he denial of an application by the manufacturer constitutes the end of that application process." *Gordon Rountree Motors, Ltd. v. Mazda Motor of Am., Inc., dba Mazda N. Am. Operations,* MVD Dkt. No. 07-0038 LIC (Proposal for Decision, dated July 14, 2009), at 8 (attached as Exhibit C). Therefore, the April 30th letter cannot have met the notice requirements to establish the Board's jurisdiction over this protest.

Second, the April 30th letter does not demonstrate an agreement by all of the proposed transferees to be bound by the terms of the Audi Dealer Agreement. As a result, even if it were timely, it alone cannot be evidence of compliance with the requirement of Section 2301.359(c)(3). The letter is signed only by Ricardo Weitz in his individual capacity. This transaction, however, involved multiple proposed transferees: Weitz 1998 Trust, NICPA Austin Motorcars LLC, Hi Tech Motorcars, LLC, Hi Tech Partners, LLC, Headwater HiTech Partners, LLC, LKCM Headwater Investments I, LP, LKCM Headwater Investments GP, LP, Charles Ross Bartley, Equity Trust Company FBO Charles Ross Bartley IRA, Turner Family Partnership, K. Rick Turner Revocable Trust. No evidence exists that any of these persons or entities agreed to be bound by the Audi Dealer Agreement at any time.

Protestant and Intervenors, in their Reply in Support of their Motion for Rehearing, describe the Prospective Transferees as only "potential investors" who should not be subject to the requirements of Section 2301.359(c)(3). But, the Prospective Transferees are not "potential

4

investors." The Proposal for Decision extensively discussed the significant amount of operational control over the dealerships that Headwater HiTech Partners, LLC ("Headwater HiTech") would have had. (Proposal for Decision at 19, 25-34 (rejecting argument that Headwater HiTech Partners, LLC was a "mere investor"), Finding of Fact ¶ 84 ("Headwater HiTech was more than a mere investor; rather it was a proposed owner with a controlling interest.")).

In addition, these parties beyond Weitz, would have been owners of the dealerships, had the proposed transaction been approved. (*See* Respondents Ex. 5 (proposed ownership chart); Respondents Ex. 127 at 3010 (identifying ownership of Hi Tech Motorcars, LLC); Respondents Exs. 52, 312 (Weitz Dealer Applications); Respondents Ex. 69 (LKCM Headwater Investments I, LP Dealer Application); Respondents Ex. 109 (Bartley Dealer Application); Respondents Ex. 124 (Turner Dealer Application); Respondents Exs. 163, 164 (Headwater HiTech Dealer Application and Robertson Dealer Application on behalf of Headwater HiTech); Respondents Ex. 70 at Weitz0003241 (identifying LKCM Headwater Investments GP, LP as the 100% owner of Headwater HiTech)).

Furthermore, the argument that Section 2301.359(c)(3) should only apply to Weitz, the party named on the asset purchase agreement, and not the remaining Prospective Transferees, the persons and/or entities to whom Weitz would assign his interests and who would hold an ownership interest in the dealerships (whether called "potential investors" or not), makes no sense. If the assignees will own the dealerships if the proposed ownership change is approved, it is the assignees' agreement to be bound by the terms of the dealer agreement that is critical. Any suggestion that a person or entity does not have to comply with Section 2301.359(c)(3) merely because they are not individually listed on the asset purchase agreement, but will have

5

ownership, is incorrect. Therefore, the April 30th letter cannot change the Board's prior Order that it lacks jurisdiction over this protest.

Protestant and Intervenors cite to the April 30th letter solely for purposes of creating confusion; their own actions belie any belief that this letter somehow satisfies the jurisdictional requirements. Protestant and Intervenors did not offer the letter as evidence during the evidentiary hearing before SOAH.[2] They did not refer to this letter when the issue of jurisdiction was argued to the Board. They did not include it in any of the briefing to the Board on the jurisdictional issue prior to the Board's Order. And, they did not include it until the very last section in a procedurally improper reply brief filed in support of their Motion for Rehearing.[3]

Neither of the statutes cited by Protestant and Intervenors in that Reply brief allows the Board to accept new evidence after the record has been closed, and certainly not in the context of an improperly filed reply brief associated with a motion for rehearing on a final order.[4] The April 30th letter should not be the basis for additional evidentiary proceedings before SOAH.

---

[2] Protestant and Intervenors have attempted to introduce new evidence in a reply brief before. During post-hearing briefing before SOAH, Protestant and Intervenors attached materials not submitted at hearing to their reply brief, seeking to include factual matters not presented at hearing and to prejudice Audi by presenting the evidence when Audi had no opportunity to respond. SOAH agreed that Protestant's and Intervenors' actions were improper and granted Audi's motion to strike the factual matters not in evidence and arguments referring to those facts, as the record was closed. (Order No. 34).

[3] Protestant's and Intervenors' reply filed on October 15, 2014 was improper because it does not comply with the procedures on rehearing. *See* Gov't Code § 2001.146. The Administrative Procedure Act only contemplates a motion for rehearing, Section 2001.146(a), and a response to that motion. Gov't Code § 2001.146(b).

[4] Texas Occupations Code § 2301.151 reads as follows:

(a)     The board has the exclusive original jurisdiction to regulate those aspects of the distribution, sale, or lease of motor vehicles that are governed by this chapter, including the original jurisdiction to determine its own jurisdiction.

(b)     The board may take any action that is specifically designated or implied under this chapter or that is necessary or convenient to the exercise of the power and jurisdiction granted under Subsection (a).

Texas Occupations Code § 2301.153(a)(3)—improperly cited as § 230.153(a)(3), which does not exist— reads as follows:

6

**B.     Weitz's Deposition Testimony Is Misleading And Does Not Show Compliance With Section 2301.359(c)(3).**

Protestant and Intervenors are also less than candid in their new argument in their Reply brief relating to the deposition testimony of Weitz with regard to whether Weitz provided a written agreement to be bound by the Audi Dealer Agreement.

The question asked at deposition was not limited as to timing; the question asked if the written agreement had been provided "at some point." (Weitz Desig. Vol. 1 at 10:9). The lack of a time frame in that question is significant. Weitz and the other prospective transferees attempted on at least three different occasions to have Audi to consider a proposed transfer. (*See* Intervenors Ex. 22 (December 20 submission); Respondents Exs. 202, 203 (May 1 submission); Respondents Exs. 226, 227 (May 10 submission)). Only one of those proposed transfers was at issue in the protest—the proposal initiated on December 20, 2012 and rejected by Audi on April 16, 2013.

Weitz's deposition testimony that he "at some point" agreed to be bound by the Audi Dealer Agreement does not mean that the written agreement was provided in conjunction with the transaction that was at issue in this protest. Rather, his testimony at the evidentiary hearing confirms the irrefutable fact that the Prospective Transferees did not provide a written agreement to be bound by the Audi Dealer Agreement with regard to the relevant application:

> Q.     . . . Do you recall that during the course of the application process *up until the turndown on April 16, 2013* that you never and no one on your behalf ever provided Audi with a statement that you or any of your entities would indeed comply with the Audi dealer agreement to the extent it was not in conflict with Texas law?
>
> A.     **No, we did not indicate that.**

---

Notwithstanding any other provision of law, the board has all powers necessary, incidental, or convenient to perform a power or duty expressly granted under this chapter, including the power to: . . . receive evidence and pleadings.

7

(Tr. at 1899:5-20 (Weitz) (emphasis added)). And by "we," he meant all of the Prospective Transferees.

## III.  CONCLUSION AND PRAYER.

The improper attempts of Corbin Robertson and others to influence the decision of the Board is a sufficient basis to deny the motion for rehearing. Furthermore, the April 30th letter, because it post-dates Audi's rejection of the proposed transfer and was not signed by all of the proposed transferees, is irrelevant to the Board's jurisdiction. The motion for rehearing should be denied.

Respectfully submitted,

BAKER & HOSTETLER LLP

By: _____

Billy M. Donley
State Bar No. 05977085
Mark E. Smith
State Bar No. 24070639
811 Main Street, Suite 1100
Houston, Texas 77002-6111
Telephone: (713) 751-1600
Facsimile: (713) 751-1717
bdonley@bakerlaw.com
mesmith@bakerlaw.com

Elizabeth A. McNellie
Admitted *Pro Hac Vice*
65 East State Street, Suite 2100
Columbus, Ohio 43215
Telephone: (614) 462-2651
Facsimile: (614) 462-2616
emcnellie@bakerlaw.com

ATTORNEYS FOR RESPONDENTS
VOLKSWAGEN GROUP OF AMERICA, INC.
AND AUDI OF AMERICA, INC.

8

## CERTIFICATE OF SERVICE

I certify that a true copy of this document was served on the following according to 43 T.A.C. § 215.30 and by email pursuant to the parties' Rule 11 agreement on December 1ˢᵗ, 2014.

*Filing Via Facsimile – (512) 465-3666*
*Original and three copies via*
*Next-Day Commercial Delivery Service*
Motor Vehicle Division, Docket Clerk
Texas Department of Motor Vehicles
4000 Jackson Avenue
Austin, Texas 78731

Texas Department of Motor Vehicles
Motor Vehicle Division
Mr. Daniel Avitia, Director
4000 Jackson Ave.
Austin, Texas 78731

William R. Crocker
1014 Vaughn Building
807 Brazos
Austin, Texas 78701
Email: crockerlaw@earthlink.net
Email: tcasteel@earthlink.net

*Attorney for Protestant Budget Leasing, LLC*
*d/b/a Audi North Austin and Audi South Austin*

*Via Email --*

David Duncan
Email: David.Duncan@txdmv.gov
Kenneth Herring
Email: Ken.Herring@txdmv.gov
Michelle Lingo
Email: Michelle.Lingo@txdmv.gov

*Attorneys for Motor Vehicle Division*

Lloyd E. "Buddy" Ferguson
Merritt N. Spencer
Strasburger & Price, LLP
720 Brazos St., Suite 700
Austin, Texas 78701
Email: Buddy.Ferguson@strasburger.com
Email: Kathi.Alexander@strasburger.com

*Attorneys for Porsche Cars North*
*America, Inc.*

J. Bruce Bennett
Cardwell, Hart & Bennett, LLP
807 Brazos, Suite 1001
Austin, Texas 78701
Email: jbb.chblaw@sbcglobal.net
Email: cardwellhartbennett@gmail.com

Joseph Letzer
Dent M. Morton
Burr & Forman LLP
420 20ᵗʰ Street N.
3400 Wells Fargo Tower
Birmingham, Alabama 35203
Email: jletzer@burr.com
Email: dmorton@burr.com

*Attorneys for Intervenors Ricardo M. Weitz, Hi*
*Tech Imports North, LLC, Hi Tech Imports*
*South, LLC and Hi Tech Imports, LLC*

9

Thomas R. Phillips
Matt C. Wood
Baker Botts L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, Texas 78701-4078
Email: tom.phillips@bakerbotts.com
Email: matt.wood@bakerbotts.com

*Attorneys for Amicus Curiae*
*Texas Automobile Dealers Association*

Billy M. Donley

10

**INTERVENORS' APPENDIX**

**TAB 3**

2013 WL 1087536 (TX.St.Off.Admin.Hgs.)

State of Texas

Office of Administrative Hearings

Kim Vickers

Docket No. XXX-XX-XXXX
February 27, 2013

*1 Kim Vickers
Executive Director
Texas Commission on Law Enforcement
Officer Standards and Education
6330 U.S. Hwy. 290 East, Suite 200
Austin, Texas 78723
RE: Texas Commission on Law Enforcement Officer Standards and Education v. James W. Bush

Dear Mr. Vickers:

On February 6, 2013, I issued a Proposal for Decision (PFD) in this case. On February 20, 21, and 23, 2013, I received the attached e-mail communications from James W. Bush (Respondent). Because I have issued a PFD, and returned the matter to the Texas Commission on Law Enforcement Officer Standards and Education (Commission), jurisdiction is now solely before the Commission. The Executive Director (ED) did not file exceptions.

Respondent's communications indicate that he may have new evidence that was not offered or admitted at the hearing. New evidence cannot be offered through an exception, and the consideration of new evidence is relief that I cannot grant. The Commission may remand the case for consideration of new evidence, but without such order, the record established at the hearing is the sole basis for the recommendations found in the PFD.

Therefore, the PFD is ready for your consideration.

Sincerely,

Penny A. Wilkov
Administrative Law Judge

2013 WL 1087536 (TX.St.Off.Admin.Hgs.)

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1911318 (TX.St.Off.Admin.Hgs.)

State of Texas

Office of Administrative Hearings

William H. Kuntz

Docket No. XXX-XX-XXXX.ACR
April 11, 2014

*1 William H. Kuntz
Executive Director
Texas Department of Licensing and Regulation
920 Colorado, 4th Floor
Austin, TX 78701
RE: Texas Department of Licensing and Regulation v. Dusan Drobot

Dear Mr. Kuntz:

I issued the Proposal for Decision (PFD) in this case on March 10, 2014. On April 4, 2014, the State Office of Administrative Hearings (SOAH) received exceptions to the PFD from the respondent, Dusan Drobot.

Mr. Drobot's exceptions were not timely filed. The PFD was issued on March 10 and sent to Mr. Drobot that day by regular mail. SOAH's rules provide that exceptions shall be filed within fifteen days after the date of service of the PFD.[1] SOAH's rules further provide that, if a document was sent by regular mail, the judge shall presume that it was received no later than three business days after mailing[2]—in this case, March 13. Mr. Drobot has offered no statement or evidence that he received the PFD later than March 13. Exceptions from Mr. Drobot were therefore due to be filed at SOAH no later than March 28, 2014. Even if Mr. Drobot received the PFD as late as March 19, the exceptions received at SOAH on April 4 were late.

I would note that Mr. Drobot's exceptions include an attachment consisting of a copy of a Texas apprentice electrician license bearing his name (and an expiration date of December 31, 2013). No evidence of such a license was admitted in the hearing. The PFD concludes, in part, that Mr. Drobot violated Texas Occupations Code § 1305.151 on May 22 and 25, 2011, by offering to perform electrical work without holding an appropriate license. If the license attached to Mr. Drobot's exceptions was in effect during the period of time relevant to this case, that fact might well have a bearing on the issues. However, SOAH's rules do not contemplate that a judge re-open the evidentiary record of a case after the PFD has issued, in the absence of an order by the governing body of the referring agency remanding the case to SOAH for further fact finding.

The remainder of the exceptions—including another document and additional assertions of fact outside the record in this case, as well as argument—would not warrant any change to the PFD even if they were considered, despite their lack of timeliness.

The PFD is therefore ready for consideration unless the Commission of Licensing and Regulation remands the matter to SOAH for the purpose of re-opening the hearing.

Sincerely,

Shannon Kilgore
Administrative Law Judge
Cathleen Parsley
Chief Administrative Law Judge

Footnotes

1       1 Tex. Admin. Code § 155.507(c)(1).

2       1 Tex. Admin. Code §§ 155.7(d), 155.103(c)(3).

2014 WL 1911318 (TX.St.Off.Admin.Hgs.)

**End of Document**                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3367155 (TX.St.Off.Admin.Hgs.)

State of Texas

Office of Administrative Hearings

William H. Kuntz

Docket No. XXX-XX-XXXX.ACR
June 5, 2013

*1 William H. Kuntz
Executive Director
Texas Department of Licensing and Regulation
920 Colorado, 4th Floor
Austin, TX 78701
RE: Texas Department of Licensing and Regulation v. Manuel Guerra

Dear Mr. Kuntz:

On April 25, 2013, I submitted to you my Amended Proposal for Decision in the above-referenced case and sent copies to the parties. Manuel Guerra (Respondent) filed exceptions. The Texas Department of Licensing and Regulation (Department) did not file a response.

The Amended Proposal for Decision is supported by the evidence developed in the evidentiary hearing and, as such, would stand unchanged. Having said that, Respondent made an impassioned plea in his exceptions. I have no doubt that had the matters raised in Respondent's exceptions been presented at hearing, they would have become a part of the evidentiary record and would likely have changed my decision regarding Respondent's fitness to hold a license. Respondent began his exceptions with a detailed personal history that demonstrates his willingness to work and, more importantly, the importance of his family. It also includes the absolute statement that he should not have engaged in the sale of counterfeit inspection stickers and would never do such a thing in the future. With respect to the falsehood on his application, Respondent states that he misunderstood the nature of a deferred adjudication; he thought that it did not count against him. This is an understandable mistake and, while Respondent did not fill out the application correctly, if that is the only wrong he committed, it should not be sufficient to revoke his license. Respondent discusses the path he has followed while on deferred adjudication and the fact that he is up to date on all fees, performs community service, and has no violations. He suggests calling his probation officer to verify, but, of course, that is not permissible. He again mentions his responsibility in his work history. Finally, he again states that he should not have gotten involved in the sale of counterfeit inspection stickers. He states that he has learned his lesson, and concludes with the following:

> Without the money from this work, I cannot be a man for my wife and a good provider for my children.
> They deserve better. This is why I will never take such risks again. I will never put myself in a situation
> in which crime is committed. If you have mercy and allow me to keep my license, I know that it will be
> an opportunity that will not come again. Please give me a chance.

As a consequence, as I stated at the outset, under the present evidentiary record my recommendation remains unchanged and the Amended Proposal for Decision is ready for your consideration. However, the Department has the discretion to remand this case for additional evidence consistent with Respondent's exceptions. Such an action would not only permit Respondent to fully present his case, but also allow the Staff to test his presentation through the crucible of cross-examination, thereby allowing both parties full and complete due process rights. I urge the Department to adopt this course.

*2 Sincerely,

Steven D. Arnold
Administrative Law Judge
Cathleen Parsley
Chief Administrative Law Judge

2013 WL 3367155 (TX.St.Off.Admin.Hgs.)

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 4172108 (TX.St.Off.Admin.Hgs.)

Office of Administrative Hearings

Appeal of Paris A. Mims, Jr. from Denial of Application Retirement Disability Benefits S.S. No. XXX-XX-XXXX-S

Docket No. XXX-XX-XXXX
September 2004

## AMENDED PROPOSAL FOR DECISION

*1 Paris A. Mims, Jr. (Appellant) appealed the decision of the Executive Director of the Employees Retirement System of Texas (ERS) denying Appellant's application for occupational disability benefits. The Executive Director found that Appellant's disability was caused by the aggravation of a preexisting condition in Appellant's spine. Consequently, Appellant's disability did not meet the definition of an occupational disability as defined in TEX. GOV'T CODE ANN., § 811.001(12). This amended proposal recommends Appellant's appeal be denied because Appellant's disability would not have occurred but for the degeneration of Appellant's spine caused by prior back surgeries.

### I. JURISDICTION, NOTICE, AND PROCEDURAL HISTORY

There are no contested issues of jurisdiction or notice in the proceeding. Therefore, those matters are set out in the proposed findings of fact and conclusions of law without further discussion here.

On December 8, 1995, Catherine C. Egan, Administrative Law Judge (ALJ) for the State Office of Administrative Hearings (SOAH) presided over the hearing in this matter. Appellant represented himself. The Staff of the ERS (the Staff) was represented by David R. Gavia, Assistant General Counsel to ERS. At the request of the Staff, the record remained open so the Staff could submit additional medical documentation to the ERS Medical Board for consideration. On January 3, 1996, the Staff filed a letter with SOAH, advising the ALJ that the ERS Medical Board had reviewed Appellant's additional documentation and had not changed its findings. The record was closed on January 3, 1996, and a proposal for decision was issued on February 29, 1996.

On October 16, 1996, the ALJ presented the proposal for decision to the ERS Board during a public meeting; the proposal recommended Appellant's appeal be granted. Appellant asked the ERS Board to review additional medical records before making a decision. The ERS Board wanted the additional medical records considered by the ALJ, and remanded the matter back the SOAH. The Staff asked the ERS Board to allow the ERS Medical Board to review the additional medical records before the ALJ. The ERS Board granted the Staff's request.

On April 4, 1997, the Staff filed a letter with SOAH requesting Appellant's additional medical records be marked and admitted as Exhibits 4 and 5, and the amended certification of the ERS Medical Board be marked and admitted as Exhibit 6. Appellant filed no objection to the Staff's request. Consequently, Exhibits 4, 5 and 6 were admitted into the record, and the record was closed on April 14, 1997.

### II. INTRODUCTION

#### A. An Overview of the Case.

*2 ERS stipulated that the ERS Medical Board (the Medical Board) certified Appellant as likely to be permanently disabled and that the injury was caused by an inherent risk or hazard of the job. The only issue to decide in this appeal is whether the Appellant's disability is due to an aggravation of a preexisting condition. The evidence consisted of Appellant's testimony and documentary evidence.

The Texas Department of Criminal Justice employed Appellant, a 49-year-old male, as a heavy-equipment supervisor I,

supervising and directing inmate work crews in the maintenance, repair, and operation of heavy equipment and machinery. On January 4, 1994, a boom truck Appellant was riding in hit a large rock, whipping Appellant around in his seat and injuring his neck. On January 11, 1994, Appellant was riding in a dump truck over rough terrain with an inmate hauling sand when Appellant experienced "some lower pain @ different times ...." Appellant had injured the lumbar area of his spine. This was Appellant's last day at work.

The Staff argued Appellant's two prior back surgeries compromised his spine, and that the January 4 and 11, 1994, injuries alone would not have caused Appellant's disability. Appellant argued that because he had no back problems between 1988, the date of his last spinal surgery and 1994 his disability directly resulted from the injuries he sustained in the 1994 incidents.

**B. Statutory Criteria.**

A member is ineligible for occupational disability retirement annuity unless the circumstances surrounding the member's disability meet the definition of occupational disability in Section 811.001(12), TEX. GOV'T CODE ANN., which provides in pertinent part:

> [O]ccupational disability mean ... disability from an injury or disease that directly results from a specific act or occurrence determinable by a definite time and place, and directly results from an inherent risk or hazard peculiar to a duty that arises from and in the course of State employment.

Additionally, the member must meet the following requirement as specified in TEX. GOV'T CODE ANN. § 814.202(c):

> A member otherwise eligible may not receive a disability retirement annuity unless the member is the subject of a certification issued as provided by Section 814.203.

A member must also establish that the member is mentally or physically incapacitated from the further performance of duty, the incapacity is likely to be permanent, and the member should be retired. TEX. GOV'T CODE ANN. § 814.203.

### III. EVIDENCE PRESENTED

**A. Appellant's Testimony.**

Appellant testified that although he had back surgery for a herniated disk in 1988, he had experienced no back problems from 1988 until January 1994 when he was injured on the job. Appellant had to ride in the trucks with the prisoners working the rock pits. Appellant stated that the truck seats were not suitable for the rough terrain. He complained to his supervisor that he was constantly bouncing around in his seat when the trucks hit bumps common in the area. When Appellant brought his concerns about the seats to the attention of his supervisor, the supervisor responded by asking, "Are you refusing to your job?" Appellant testified that the operation in 1988 involved disks C6 and 7, and that the injuries to his back in January 1994 occurred at disks L3-4 and L4-5, previously undamaged disks.

**B. Medical Opinions.**

**1. ERS Medical Board.**

*3 On August 8, 1995, the Medical Board certified that Appellant was physically incapacitated for the further performance of his duty and that the incapacity was likely to be permanent. The Board found Appellant's incapacity was "an aggravation of cervical and lumbar diskogenic[1] disease" caused by a "jolting injury to neck and lower back on the job."[2] The Board found Appellant's disability resulted from the aggravation of a preexisting condition: the two previous spinal operations-one in the cervical area in 1987 and the other in the lumbar region in 1988. The Medical Board concluded the January 4 and 11, 1994, incidents would not have caused permanent disability to a normal spine.

On March 5, 1997, the ERS Medical Board was provided with Appellant's additional medical records, marked as Exhibits 4 and 5. After reviewing Appellant's additional medical records, the ERS Medical Board found:

> Mr. Mims is known to have diskogenic disease requiring previous anterior cervical discectomy[3] of C6-7

and lumbar laminectomy[4] at L5-S1 on the left. The injury described would not result in a permanently disabling incapacity in a normal spine.[5]

**2. Statement of Attending Physician.**

A. L. Mendelow, M.D., a board certified orthopedic surgeon, treated Appellant for his back pain on January 12, 1994. Dr. Mendelow diagnosed Appellant's condition as "cervical disk syndrome, back strain." Dr. Mendelow stated Appellant hurt his neck in a whiplash type injury from the boom truck and injured his lower back while riding a dump truck over rough terrain. Dr. Mendelow found that Appellant's condition was likely to be permanent.

Dr. Mendelow noted Appellant had an anterior cervical discectomy and fusion in 1987 and a lumbar laminectomy and discectomy in 1988. In a letter dated December 6, 1995, Dr. Mendelow stated that the January 1994 injuries to Appellant's spine were not related to Appellant's previous back injuries. Dr. Mendelow did not provide further explanation for this conclusory statement.

**3. Other Documentary Evidence.**

On February 2, 1994, the Accident Review Board at the Texas Department of Criminal Justice met to review the January 4 and 11, 1994, incidents concerning Appellant. During the meeting, Appellant stated he was in a car accident in 1983. As a result of the accident, he was off from work from 1985-1988 and ultimately had the disks in his neck fused. The Accident Review Board's record of this meeting showed that Appellant was involved in seven accidents since his employment in 1992.

**4. Additional Documentary Evidence Submitted by Appellant at the ERS Board Meeting and Admitted as Exhibits 4 and 5.**

Appellant submitted additional medical records at the public hearing before the ERS Board on October 16, 1996. Most of the records were reports pertaining to Appellant's workers' compensation claim. The reports added a significant insight into Appellant's condition and provided additional medical information for consideration by the ALJ.

**a. Functional Capacity Evaluation.**

*4 On March 9, 1995, an occupational therapist, a physical therapist, and an exercise physiologist, all working at Work Ready (the Work Ready team), evaluated Appellant's condition and prepared a Functional Capacity Evaluation[6] (the report). The Work Ready team found Appellant exhibited five positive Waddell signs. Waddell's test measures whether there are nonorganic reasons for low-back pain. The presence of three or more positive Waddell signs suggests the patient has nonorganic reasons for the low-back pain. Waddell's test does not determine what the nonorganic reasons are.

According to the report, the Appellant could lift more than the 25 pounds indicated by Dr. Mendelow. The Work Ready team recommended Appellant return to work on light-duty status and avoid activities requiring pushing, pulling, crawling, climbing, and squatting. The Work Ready team wrote in the report:

CONSISTENCY & VALIDITY OF PERFORMANCE:

> Mr. Mims exhibited increased preoccupation with pain as exhibited with positive Waddell signs for nonorganic symptoms. It is felt that Mr. Mims can lift more than the specified 25-pound weight limitation assigned by physician. He showed minimal heart rate change and lacked weight shift during the lift test. Mr. Mims exhibited submaximal effort during the lift test, and therefore it is difficult to assess the maximal weight that he can lift.[7]

**b. Independent Physicians' Evaluations.**

The Texas Workers' Compensation Commission (TWCC) retained Eduardo R. Elizondo, M.D. to perform an independent

evaluation of Appellant's neck injury. Dr. Elizondo is board certified in physical medicine and rehabilitation. Dr. Elizondo found Appellant's past medical history remarkable because Appellant had a C6-7 fusion done in 1988 by Dr. Mendelow. The MRI of Appellant's cervical spine confirmed the C6-7 fusion, but provided no evidence of disk bulges or herniations. Dr. Elizondodiagnosed Appellant's condition as "Probable cervical disk degenerative disease and diskogenic pain without evidence of a bulge or herniated nucleus pulposus."[8]

TWCC hired Aaron L. Combs, M.D., a board certified orthopedic surgeon, to perform an independent evaluation of Appellant's lower back on May 19, 1995. Dr. Combs found Appellant suffered from lumbar spondylosis[9] of the L5-S1 caused by the previous L5-S1 discectomy, and gave Appellant a zero impairment rating.

According to Dr. Combs, the MRI of Appellant's lumbar spine taken on February 16, 1994, evidenced postoperative scarring and degenerative changes at the L5-S1 level of Appellant's spine, around the lumbar laminectomy. Dr. Combs found no evidence of an acute spine injury or other "significant" disk injury, and no evidence of neurologic impingement. Dr. Combs documented that while he performed the physical examination, Appellant guarded both the cervical and lumbar spine in his gait and posture. But, when Appellant was distracted, Dr. Combs noted Appellant attained a "more unrestricted posture" in the cervical and lumbar areas of his spine. Dr. Combs commented that there was "significant grimacing and sighing throughout the examination and interview process, however, again, this resolves when distracted."[10]

*5 Dr. Combs saw no evidence of a frank neurological deficit to Appellant's gait. During the range of motion test, Appellant responded differently on a seated straight leg test when compared to a supine straight leg test. There should have been no difference between the two tests. Dr. Combs found Appellant's condition was caused by nonorganic problems unrelated to his lumbar spine.

## IV. ANALYSIS AND RECOMMENDATION

Little evidence was presented at the hearing to explain the relationship between Appellant's previous back surgeries and the injuries Appellant suffered in January 1994. Both the Medical Board's statement of position and Dr. Mendelow's physician statement and letter provided little explanation for why each took diametrically opposed positions as to whether Appellant's condition was caused by an aggravation of a preexisting condition. However, the reports from the independent doctors hired by TWCC to evaluate Appellant's cervical and lumbar spine were extremely helpful.

To prevail in this appeal, Appellant had the burden of proving he had sustained an occupational disability. According to Dr. Combs, Appellant had scarring and degenerative changes in Appellant's lower back where the laminectomy was performed. Dr. Combs found nothing organic to explain Appellant's symptoms, and noted Appellant's complaints of pain diminished when he was distracted.

Similarly, Dr. Elizondo found nothing wrong with Appellant's cervical spine except normal degeneration around the area upon which Dr. Mendelow had previously operated. The Work Ready team also found Appellant's condition was aggravated by nonorganic causes. Appellant received five positive responses to the Waddell test, suggesting nonorganic causes for Appellant's symptoms.

Although Appellant experienced no medical problems with his back from 1988 until the incidents on January 4 and 11, 1994, Appellant's disability is due in part to the degeneration around the areas of Appellant's spine operated on in 1987 and 1988, and in part to nonorganic reasons. Dr. Mendelow's representation that there was no correlation between Appellant's previous back injuries and the injuries to his cervical and lumbar spine in January 1994 lacks credibility in light of the medical reports of Dr. Combs and Dr. Elizondo. The ALJ finds Appellant's disability is due primarily to the aggravation of Appellant's preexisting conditions, and recommends Appellant's appeal be denied.

## PROPOSED FINDINGS OF FACT

1. Paris A. Mims, Jr. (Appellant) filed a claim for occupational disability retirement benefits with the Employees Retirement System of Texas (ERS), which was denied by Charles D. Travis, Executive Director, in a letter dated September 22, 1995. Appellant timely appealed the decision.

2. Notice of a hearing on Appellant's appeal was issued to all parties on November 9, 1995.

3. The hearing on the merits was held on December 8, 1995. Appellant and ERS appeared and participated in the hearing. Counsel for ERS requested the record remain open so the additional medical records presented at the hearing by Appellant could be reviewed by the Medical Board. The record closed on January 3, 1996, following notification from ERS counsel that the Medical Board had not changed its position after reviewing the additional medical information.

*6 4. On February 29, 1996, the Adm inistrative Law Judge issued a proposal for decision, which was presented to the ERS Board on October 16, 1996, in a public meeting. During the presentation, Appellant offered additional medical records and asked that they be considered.

5. The ERS Board remanded the matter to SOAH and directed that the additional medical records be reviewed and considered by the ERS Medical Board and by the Administrative Law Judge.

6. On April 4, 1997, the Staff filed a letter with SOAH requesting Appellant's additional medical records be marked and admitted as Exhibits 4 and 5, and the amended certification of the ERS Medical Board be marked and admitted as Exhibit 6. Appellant filed no objection to the Staff's request. On April 14, 1997, Exhibits 4, 5and 6 were admitted into the record, and the record was closed.

7. On January 4 and 11, 1 994, Appellant was employed by the Texas Department of Criminal Justice as a heavy-equipment supervisor I, supervising and directing inmate work crews in the maintenance, repair, and operation of heavy equipment and machinery. Appellant's position required that he ride with inmates in large trucks over some rough terrain.

8. While at work on January 4, 1994, Appellant rode in the passenger seat of a boom truck driven by an inmate. When the truck hit a large rock, Appellant's seat gave way and he was thrown back and forth, causing a whiplash type injury to his neck.

9. While at work on January 11, 1 994, Appellant was riding in a dump truck when the truck drove over some rough terrain, jarring Appellant's lower back and causing it to hurt.

10. On January 12, 1994, Appellant went to his physician, A. L. Mendelow, M.D., and was diagnosed as having cervical disk syndrome and back strain.

11. Appellant was in a car accident in 1983. As a result of the injuries he sustained in the car accident, he was out of work from 1985-1988. Appellant underwent an anterior cervical discectomy to C6-7 and a lumbar laminectomy and discectomy to L5-S1 in 1987 and 1988.

12. After the 1988 operation on his back, Appellant recovered and returned to work full-time. Appellant did not experience any back pain until the incidents in January

13. On August 8, 1995, the ERS Medical Board certified Appellant as likely to be permanently disabled.

14. The parties stipulated that Appellant's disability directly resulted from an inherent risk or hazard peculiar to a duty that arose from Appellant's course of State employment.

15. Appellant's disability directly resulted from degeneration of Appellant's spine around the areas operated on in 1987 and 1988 and from other nonorganic problems.

16. The injury that occurred on January 4, 1994, hurting Appellant's neck, and the injury that occurred on January 11, 1994, hurting Appellant's lower back, would not have caused Appellant's disability but for his preexisting condition.

## PROPOSED CONCLUSIONS OF LAW

1. The Board of Trustees of the Employees Retirement System has jurisdiction over this appeal pursuant to TEX. GOV'T

CODE ANN. §§ 810.001 - 815.507.

*7 2. The State Office of Administrative Hearings has authority to hear this matter and issue a proposal for decision with proposed findings of fact and conclusions of law, under TEX. GOV'T CODE ANN. ch. 2003.001.

3. Proper and timely notice of hearing, as noted in Findings of Fact 1 -3, was effected upon the parties according to the provisions of TEX. GOV'T CODE ANN. §§ 2001.051 and 2001.052.

4. As reflected in Finding of Fact No. 1, Appellant timely appealed a claim for occupational disability retirement benefits which was denied by the ERS Executive Director, as contemplated in 34 TEX. ADMIN. CODE § 67.5.

5. Based on Findings of Fact No. 7-16, Appellant failed to prove that his disability directly resulted from a specific act or occurrence determinable by a definite time and place, as required by TEX. GOV'T CODE ANN. § 811.001 (12).

6. As reflected in Findings of Fact No. 7-16 and Conclusion of Law No. 5, the appeal of Paris A. Mims, Bedias, Texas, should be denied.

Catherine C. Egan
Administrative Law Judge

Footnotes

1    Discogenic: caused by derangement of an intervertebral disk. *Dorland's Illustrated Medical Dictionary*, (28th ed. W.B. Saunders Company 1994).

2    Exhibit 1, page 16-17.

3    Discectomy: excision of an intervertebral disk; called also discectomy. *Dorland's Illustrated Medical Dictionary*, (28th ed. W. B. Saunders Company 1994).

4    Laminectomy is defined as the excision of the posture arch of a vertebra. *Dorland's Illustrated Medical Dictionary*, (28th ed. W. B. Saunders Company 1994).

5    Exhibit 6.

6    Exhibit 4.

7    Exhibit 4.

8    Exhibit 4.

9    Spondylosis is defined as ankylosis (immobility and consolidation of a joint due to disease, injury or surgical procedure) of a vertebral joint, or a general term of degenerative changes due to osteoarthritis. (28th ed. W. B. Saunders Company 1994).

10   Exhibit 5.

**2004 WL 4172108 (TX.St.Off.Admin.Hgs.)**

**End of Document**                                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4694594 (Tex.Cptr.Pub.Acct.)

Comptroller of Public Accounts

State of Texas
Soah Docket No. 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.26
CPA Hearing No. 108,005
June 16, 2014

**\*1  Type: Sales and Use Tax/RDT**
TAXPAYER NO.: \*\*\*

AUDIT OFFICE: \*\*\*

AUDIT PERIOD: July 1, 2007 THROUGH March 31, 2011

Texas Comptroller of Public Accounts: SUSAN COMBS

Representing Tax Division: KATHY PICKUP

Representing Petitioner: \*\*\*

COMPTROLLER'S DECISION

\*\*\*. (Petitioner) was audited for sales and use tax compliance by the Tax Division of the Texas Comptroller of Public Accounts (Staff). Petitioner contests the resulting assessment on the grounds that Staff has incorrectly disallowed resale certificates and that the sale of certain items was exempt because they were shipped out of state. Staff agreed to accept certain resale certificates and the documentation establishing certain items were shipped out of state, but continued to reject the remaining contentions. In the Amended Proposal for Decision, the Administrative Law Judge (ALJ) finds that no further adjustments to the audit assessment are warranted and recommends that the assessment should be affirmed subject to the agreed adjustments

I. PROCEDURAL HISTORY, NOTICE & JURISDICTION

On April 4, 2013, Staff referred this matter to the State Office of Administrative Hearings for a hearing based on the parties' written submissions. Petitioner was represented by \*\*\* of COMPANY A, while Staff was represented by Assistant General Counsel Jenny Burleson. The record closed on September 30, 2013. The ALJ issued a Proposal for Decision (PFD) on October 17, 2013. Petitioner filed its exceptions on December 16, 2013, while Staff filed its Reply to Petitioner's Exceptions on January 13, 2014. This Amended PFD constitutes the ALJ's consideration and ruling on the exceptions and reply filed in this case.

There are no contested issues of notice or jurisdiction in this proceeding. Therefore, these matters are set out in the Findings of Fact and Conclusions of Law without further discussion here.

II. REASONS FOR DECISION

A. Evidence Presented

Staff offered the following exhibits that were admitted into evidence: (1) 60-Day Letter; (2) Texas Notification of Audit Results; (3) Penalty and Interest Waiver Worksheet; (4) Audit Report; (5) Audit Plan; and (6) Amended Audit Procedure 124 (AP 124) spreadsheet of allowed and disallowed transactions.[1] Petitioner provided copies of the disputed certificates and related invoices as well as shipping documentation. Staff also submitted the pleadings and attached exhibits that were filed while this matter was pending before the Comptroller. All of these submitted documents are admitted without objection. Petitioner, during the exceptions period, submitted two letters, described by Petitioner as affidavits, from individuals who worked for companies involved in the disputed purchases in which the author attested to shipment out-of-state of the disputed purchases. However, under 1 Texas Administrative Code SECTION 155.153(a)(4), the ALJ is precluded from reopening the record once a PFD has been issued. Therefore, the ALJ is proscribed from giving any consideration to the letters.[2]

B. Agreed Adjustments

**\*2** Staff has agreed to adjust the audit. SEE the second Amended AP 124 spreadsheet.

C. Background and Issues Presented

Petitioner is a manufacturer and wholesaler of automotive parts for drilling equipment and large machinery. Petitioner was audited by Staff for the audit period July 1, 2007, through March 31, 2011. Staff issued a Texas Notification of Audit Results dated November 10, 2011, assessing a deficiency in the amount of $\*\*\*, consisting of tax in the amount of $\*\*\*, penalties in the amount of $\*\*\*, and accrued interest of $\*\*\*. Petitioner timely requested redetermination.

The only remaining contentions involve two resale certificates and two blanket exemption certificates that Petitioner contends were improperly disallowed by the auditor, and a sale in which the goods were shipped out of state. Staff contends that the certificates in dispute were produced after the 60-day reconciliation period and therefore cannot be accepted. In the case of the remaining contested sales, Staff contends that Petitioner has failed to show that the items were shipped out of state.

D. ALJ's Analysis and Recommendation

All gross receipts of a seller are presumed taxable unless a properly completed resale or exemption certificate is accepted by the seller.[3] All certificates obtained on or after the date the Comptroller's auditor actually begins work on the audit at the seller's place of business or on the seller's records after the entrance conference or during the 60-day reconciliation period are subject to verification, even if the certificate is complete on its face.[4] Certificates delivered after the sixty-day period will not be accepted and the deduction will not be granted.[5]

There are two resale certificates that are in dispute. The two resale certificates have been rejected by Staff because they were produced after the 60-day reconciliation period expired. Petitioner produced the resale certificates executed by \*\*\* (COMPANY B) and \*\*\* (COMPANY C) on July 17, 2013, when they were filed by facsimile transmission in this contested case hearing. The COMPANY B resale certificate is dated April 25, 2010, while the COMPANY C resale certificate is dated July 4, 2006. The 60-day letter was issued on January 3, 2012. The 60-day letter expressly stated that: "Any certificates presented after the expiration of the sixty days will not be accepted and the sales will be treated as taxable as required by Tex. Tax Code Ann. SECTION 151.054 and 151.103."

Petitioner claims that the COMPANY B resale certificate applies to 15 invoices, which were scheduled in the audit as Rec. ID nos. 1919-219 to 1919-277. The transactions were scheduled as additional taxable sales because no resale certificate was provided to the auditor. In the case of the COMPANY C resale certificate, Petitioner claims that the COMPANY C resale certificate applies to one invoice, which was scheduled in the audit as Rec. ID. No. 1919-16. The transaction was scheduled as an additional taxable sale because no resale certificate was provided to the auditor. Petitioner has not provided any evidence

that contradicts the readily apparent conclusion that both resale certificates were produced after the 60-day reconciliation period had expired. Thus, the ALJ concludes that the disallowance of the two resale certificates should be affirmed.

**\*3** The remaining certificates in dispute are described in Petitioner's submission dated July 11, 2013, as blanket certificates of exemption. They involve sales to \*\*\* (COMPANY D) and \*\*\* (COMPANY E). However, in the case of COMPANY D, its certificate actually states that the items were purchased for resale or further processing. Petitioner claims that the certificates relates to three sales that were scheduled as taxable by the auditor as Rec. ID Nos. 1919-198, 1919-252, and 1919-254 because no certificates were provided. The certificate was included in Petitioner's submission dated July 11, 2013, which occurred after the 60-day reconciliation period ended. Petitioner has not provided any evidence contradicting the conclusion that the certificate was produced after the sixty-day period. Therefore, the ALJ concludes that the COMPANY D certificate was properly disallowed by Staff.

Although Petitioner in its July 11, 2013, submission refers both to a blanket exemption certificate and shipping documentation for the COMPANY E sale, no certificate was found in the exhibits. The ALJ only found documentation supporting a claim that the items purchased by COMPANY E were shipped out of state. Therefore, the ALJ will only consider Petitioner's claim that the sale involved an out-of-state shipment.

Sales tax normally applies to the sale of taxable items in Texas.[6] However, taxable items purchased in Texas for shipment outside of Texas are exempt from sales tax.[7] Nevertheless, vendors, such as Petitioner, who are claiming that the sales are exempt because the tangible personal property was shipped out of state, must maintain documentation supporting the out-of-state delivery or shipment.[8] Petitioner must show that shipment was made by means of the vendor's facilities, by means of delivery to a carrier for shipment to a consignee at a point outside of Texas, or by means of delivery to a forwarding agent for shipment to a location in another state, territory, or possession of the United States.[9]

The sale to COMPANY E was scheduled in the audit as Rec. ID. No.1919-0264, the item is referred to in the audit as CLT-9880 for a taxable amount of $\*\*\*. The related invoice (No. 1106220) describes the part as CLT-9884 Transmission Core, with a ship-to address of COMPANY E, \*\*\*. The shipping documentation provided by Petitioner does not match the invoice. The item being shipped is described as "CLT 9880 Allison Trans," and the address is \*\*\*. Petitioner in its submission dated September 29, 2013, explains that the invoice was prepared before it received payment in advance of shipment and received instructions to ship the item to the customer's rebuild facility of choice, which was described in the shipping documents. In addition, Petitioner explains that CLT-9880 refers to a family of transmission models that includes CLT-9884. Petitioner, however, did not provide any evidence supporting these explanations. Consequently, the ALJ finds that Petitioner has not provided evidence that would allow the ALJ to determine that the item was shipped out of state.

**\*4** In the absence of evidence supporting Petitioner's contentions, the ALJ finds there is no basis for recommending any additional deletions to the audit.

III. FINDINGS OF FACT

1. \*\*\* (Petitioner) was audited for sales and use tax compliance by the Tax Division of the Texas Comptroller of Public Accounts (Staff) for the audit period July 1, 2007, through March 31, 2011.

2. Staff issued a Texas Notification of Audit Results dated November 10, 2011, assessing a deficiency in the amount of $\*\*\*, consisting of tax in the amount of $\*\*\*, penalties in the amount of $\*\*\*, and accrued interest of $\*\*\*.

3. Petitioner timely requested redetermination.

4. On April 4, 2013, Staff referred this matter to the State Office of Administrative Hearings for a hearing based on the parties' written submissions and issued a Notice of Hearing by Written Submissions that contained a statement of the nature of the hearings; a statement of the legal authority and jurisdiction under which the hearings were to be held; a reference to the particular sections of the statutes and rules involved; and a short, plain statement of the matters asserted.

5. The record closed on September 30, 2013.

6. Staff has agreed to adjust the tax assessed.

7. The 60-day letter was issued on January 3, 2012. The 60-day letter expressly stated that: "Any certificates presented after the expiration of the sixty days will not be accepted and the sales will be treated as taxable as required by Tex. Tax Code Ann. SECTION 151.054 and 151.103."

8. Petitioner produced the resale certificates executed by *** (COMPANY B) and *** (COMPANY C) on July 17, 2013, when they were filed by facsimile transmission in this contested case hearing.

9. The COMPANY B resale certificate is dated April 25, 2010, while the COMPANY C resale certificate is dated July 4, 2006.

10. The COMPANY B and COMPANY C certificates were produced after the 60-day reconciliation period expired.

11. The blanket resale certificate executed by COMPANY D, was produced by Petitioner as part of its submission dated July 11, 2013, which occurred after the 60-day reconciliation period ended.

12. The sale to *** (COMPANY E) was scheduled in the audit as Rec. ID. No. 1919-0264. The item is described in the audit as CLT-9880 for a taxable amount of $***.

13. The related invoice (No. 1106220) describes the part as CLT-9884 Transmission Core, with a ship-to-address of COMPANY E, ***.

14. The shipping documentation provided by Petitioner does not match the invoice. The item being shipped is described as "CLT 9880 Allison Trans," and the address is ***.

IV. CONCLUSIONS OF LAW

1. The Comptroller has jurisdiction over this matter pursuant to Texas Tax Code ch. 111.

2. The State Office of Administrative Hearings has jurisdiction over matters related to the hearing in this matter, including the authority to issue a proposal for decision with findings of fact and conclusions of law pursuant to Texas Government Code ch. 2003.

**\*5** 3. Staff provided proper and timely notice of the hearing pursuant to Texas Government Code ch. 2001.

4. The burden of proof of establishing error by a preponderance of evidence rests on Petitioner. SEE 34 Tex. Admin. Code SECTION 1.40(2)(B). If the claimed error involves an exemption, the burden rests on Petitioner to show entitlement to the exemption by clear and convincing evidence. SEE 34 Tex. Admin. Code SECTION 1.40(2)(A).

6. All gross receipts of a seller are presumed taxable unless a properly completed resale or exemption certificate is accepted by the seller. SEE Tex. Tax Code Ann. SECTION 151.054(a).

7. All certificates obtained on or after the date the Comptroller's auditor actually begins work on the audit at the seller's place of business or on the seller's records after the entrance conference or during the 60-day reconciliation period are subject to verification, even if the certificate is complete on its face. SEE 34 Tex. Admin. Code SECTION 3.282 and 3.285, and Comptroller's Decision No. 48,770 (2011).

8. Certificates delivered after the 60-day period will not be accepted, and the deduction will not be granted. SEE 34 Tex. Admin. Code SECTION 3.285(b)(4), Tex. Tax Code Ann. SECTION 151.054(e), and Comptroller's Decision No. 104,169 (2011).

9. The disputed certificates were properly disallowed.

10. Sales tax normally applies to the sale of taxable items in Texas. SEE Tex. Tax Code Ann. SECTION 151.051(a).

11. However, taxable items purchased in Texas for shipment outside of Texas are exempt from sales tax. SEE Tex. Tax Code Ann. SECTION 151.330(a).

12. Nevertheless, vendors, such as Petitioner, who are claiming that the sales are exempt because the tangible personal property was shipped out of state, must maintain documentation supporting the out-of-state delivery or shipment. SEE Letter Rulings, State Tax Automated Research System Accession Nos. 9210L1198G09 (September 2, 1992) and 8908L0951F10 (August 21, 1989).

13. Petitioner must show that shipment was made by means of the vendor's facilities, by means of delivery to a carrier for shipment to a consignee at a point outside of Texas, or by means of delivery to a forwarding agent for shipment to a location in another state, territory, or possession of the United States. SEE, Tex. Tax Code Ann. SECTION 151.330(a), (d).

14. Petitioner failed to show that the part sold to COMPANY E was shipped out of state.

15. No additional adjustments to the audit assessment are warranted, other than those agreed to by Staff. Therefore, the audit should be affirmed, subject to the adjustments agreed by Staff.


## ORDER OF THE COMPTROLLER

*6 On October 17, 2013, the State Office of Administrative Hearings' Administrative Law Judge (ALJ), Peter Brooks, issued a Proposal for Decision in the above-referenced matter to which Petitioner filed Exceptions on December 16, 2013. The Tax Division filed a Response on January 13, 2014. An Amended Proposal for Decision was issued on January 30, 2014, and no exceptions were filed. The Comptroller has considered the Exceptions, the Response and the ALJ's recommendation letter and determined that the ALJ's Amended Proposal for Decision, except for minor changes to correct typographical or clerical errors, should be adopted without change and this Decision represents the ruling thereon.

The above Decision resulting in Petitioner's liability as set out in Attachment A, which is incorporated by reference, is approved and adopted in all respects. The Decision becomes final twenty days after the date Petitioner receives notice of this decision, and the total sum of the tax, penalty, and interest amounts is due and payable within twenty days thereafter. If such sum is not paid within such time, an additional penalty of ten percent of the taxes due will accrue, and interest will continue to accrue. If either party desires a rehearing, that party must file a motion for rehearing, which must state the grounds for rehearing, no later than twenty days after the date Petitioner receives notice of this Decision. Notice of this Decision is presumed to occur on the third day after the date of this Decision.

Signed on This 16th Day of June 2014.

Susan Combs

Texas Comptroller of Public Accounts

Footnotes

1.  Staff in its Response to Petitioners Additional Argument and Evidence (dated September 16, 2013) agreed, after reviewing additional shipping documentation provided by Petitioner that COMPANY C Nos. 555 and 556, representing sales shipped out of state to COMPANY G, should be deleted. A second Amended AP 124 spreadsheet was submitted with this Response superseding the original Amended AP 124 spreadsheet that was attached to the Response to Petitioners Reply to the Position Letter, which was dated February 13, 2013. The original Amended AP 124 adjustments reduced the tax assessed to $***.

2.  Nonetheless, even if the letters were admissible, they cannot substitute for the evidence of shipping required by Texas Tax Code SECTION 151.330(a). Documents such as bills of lading, Federal Express receipts, or postal receipts, in conjunction with an invoice with an out-of-state shipping address, have been found sufficient to document an out-of-state sale. SEE Comptrollers Decision No. 102,724 (2010) and See Comptrollers Decision No. 45,102 (2007). ALSO SEE Comptrollers Decision No. 41,893 (2003) holding that affidavits are not sufficient to establish proof of out-of-state shipment.

3.  SEE Tex. Tax Code Ann. SECTION 151.054(a).

4.  SEE 34 Tex. Admin. Code SECTION 3.282 and 3.285, and Comptrollers Decision No. 48,770 (2011).

5.  SEE 34 Tex. Admin. Code SECTION 3.285(b)(4), Tex. Tax Code Ann. SECTION 151.054(e), and Comptrollers Decision No. 104,169 (2011).

6.  SEE Tex. Tax Code Ann. SECTION 151.051(a).

7.  SEE Tex. Tax Code Ann. SECTION 151.330(a).

8.  SEE Letter Rulings, State Tax Automated Research System Accession Nos. 9210L1198G09 (September 2, 1992) and 8908L0951F10 (August 21, 1989).

9.  SEE, Tex. Tax Code Ann. SECTION 151.330(a), (d).

**2014 WL 4694594 (Tex.Cptr.Pub.Acct.)**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.